UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEAMFITTERS LOCAL 449 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| vs. | ) ) | |
| ADVANTA CORP., DENNIS ALTER, WILLIAM A. ROSOFF, PHILIP M. BROWNE and DAVID B. WEINSTOCK, | ) ) ) ) | |
| Defendants. | ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

## INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the Class A and/or Class B common stock of Advanta Corp. ("Advanta" or the "Company") between October 31, 2006 and November 27, 2007, inclusive (the "Class Period"), against Advanta and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      Advanta was formerly one of the nation's largest issuers of MasterCard and some Visa credit cards to small businesses and professionals in the United States, through Advanta Bank Corp. ("Advanta Bank"), a subsidiary of Advanta. The Company's business credit card accounts provided approved customers with unsecured revolving business credit lines. Advanta is headquartered in Spring House, Pennsylvania.

3.      During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results. Defendants engaged in improper behavior that harmed Advanta's investors by failing to disclose the impact of the economic environment and the deteriorating credit trends on its business. The Company also failed to adequately and timely record losses for its impaired loans and customer delinquencies, causing its financial results to be materially false. The continued deterioration of credit trends during 2007 was a major threat to Advanta's business. This would lead to severe problems in the long-term for the Company itself, yet defendants concealed the impact of these trends on the Company so as to unjustly enrich themselves while in possession of material adverse non-public information concerning Advanta's operations and unsound mortgage practices. Defendants also concealed the adverse effects the Company's manipulations of its cash rewards program was having on its business.

4.      As a result of defendants' false statements, Advanta's stock traded at artificially inflated prices during the Class Period, reaching a high of $34.07 per share on June 19, 2007.[1]

5.      Then, on November 27, 2007, Advanta held a conference call with analysts and investors to discuss the Company's business performance.  Advanta announced that due to the volatility of the economy, guidance for 2008 would not be released.  Additionally, since the release of the third quarter 2007 results on October 25, 2007, a higher percentage of customers had become delinquent on their credit card payments and a lower percentage of customers made payments, indicating a trend of charge-offs.

6.      After these disclosures, Advanta stock dropped, closing on November 27, 2007 at $11.06 per share, and falling to as low as $9.35 per share on November 28, 2007, a decline of 72% from Advanta's Class Period high of $34.07 per share in June 2007.  Subsequently, the news for investors in Advanta only got worse as the Company cancelled millions of cards held by small businesses in May 2009 and was hit with a Cease and Desist Order from the Federal Deposit Insurance Corporation ("FDIC") for improper practices going back to 2004.

7.      The Class A and Class B shares currently trade at $0.45 and $0.51 per share, respectively.

8.      The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

         (a)      Advanta's assets contained tens of millions of dollars worth of impaired credit card receivables for which the Company had not accrued losses;

         (b)      Prior to and during the Class Period, Advanta had been extremely aggressive in granting credit to customers without verifying the customers' ability to pay, to such a degree that

_____

[1]      All share pricing has been adjusted for Advanta's three-for-two stock split in June 2007.

by the summer of 2009, Advanta customers' default rate would be almost six times worse than industry average;

    (c)    Advanta's manipulation of its cash rewards program angered customers and caused the Company to lose good, creditworthy customers;

    (d)    Advanta's credit receivables were unduly risky due to the Company's practice of issuing credit cards to small business owners without, in many instances, verifying income;

    (e)    To compensate for its loose credit approval process, Advanta would dramatically increase interest rates to the degree where even customers who paid on time would suddenly see their interest rates double or triple, infuriating customers and causing creditworthy customers to leave the Company;

    (f)    Defendants failed to properly account for Advanta's continuing delinquent customers and the credit trends in the Company's portfolio, resulting ultimately in large charges to reflect impairments; and

    (g)    The Company was not on track to be profitable in 2008.

    9.    As a result of defendants' false statements, Advanta stock traded at inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 72% from their Class Period high before these disclosures.

## JURISDICTION AND VENUE

    10.    Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5. The amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of this Court.

    11.    Venue is proper here pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District. Advanta has a substantial presence

in Pennsylvania. Many of the acts and transactions giving rise to the violations of law complained of occurred here.

13. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

13. Plaintiff Steamfitters Local 449 Pension Fund purchased Advanta common stock as described in the attached Certification and was damaged thereby.

14. Defendant Advanta was formerly one of the nation's largest issuers of MasterCard and some Visa credit cards to small businesses and professionals in the United States. The Company's business credit card accounts provided approved customers with unsecured revolving business credit lines. Advanta is headquartered in Spring House, Pennsylvania.

15. Defendant Dennis Alter ("Alter") is, and at all relevant times was, Chairman of the Board and Chief Executive Officer ("CEO") of Advanta. Alter participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings. Alter's compensation from Advanta, which was inflated in part due to defendants' false statements, was $4.88 million and $2.83 million for 2007 and 2006, respectively.

16. Defendant William A. Rosoff ("Rosoff") is, and at all relevant times was, Vice Chairman of the Board and President of Advanta. Rosoff participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings. Rosoff's compensation from Advanta, which was inflated in part due to defendants' false statements, was $2.75 million and $2.17 million for 2007 and 2006, respectively.

17. Defendant Philip M. Browne ("Browne") is, and at all relevant times was, Senior Vice President and Chief Financial Officer ("CFO") of Advanta. Browne participated in the

issuance of improper statements, including the preparation of the improper press releases and SEC filings. Browne's compensation from Advanta, which was inflated in part due to defendants' false statements, was $1.03 million and $1.13 million for 2007 and 2006, respectively.

18.    Defendant David B. Weinstock ("Weinstock") was, at all relevant times, Vice President and Chief Accounting Officer until his termination from the Company on September 1, 2009. Weinstock participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings. Weinstock's compensation from Advanta, which was inflated in part due to defendants' false statements, was $516,000 for 2007.

19.    Defendants Alter, Rosoff, Browne and Weinstock (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Advanta's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

20.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Advanta. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Advanta Class A and Class B common stock was a success, as it: (i) deceived the investing public regarding Advanta's prospects and business; (ii)

artificially inflated the prices of Advanta Class A and Class B common stock; and (iii) caused

plaintiff and other members of the Class to purchase Advanta Class A and Class B common stock at

inflated prices.

21.    Due to the apparent success of Advanta's business, the defendants were well-

compensated:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Dennis Alter | 2008 | 1,000,000 | 0 | 199,401 | 1,016,456 | 0 | 3,056,841 | 306,085 | 5,578,783 |
| Chairman of the Board of | 2007 | 992,212 | 0 | 356,971 | 843,850 | 1,026,875 | 1,493,017 | 167,572 | 4,880,497 |
| Directors and Chief Executive Officer | 2006 | 595,000 | 334,723 | 446,214 | 499,338 | 0 | 833,409 | 119,762 | 2,828,446 |
| William A. Rosoff | 2008 | 750,000 | 0 | 199,401 | 992,382 | 0 | 399,248 | 157,407 | 2,498,438 |
| President and Vice | 2007 | 750,000 | 0 | 356,971 | 843,850 | 339,375 | 298,840 | 159,285 | 2,748,321 |
| Chairman of the Board | 2006 | 595,000 | 489,723 | 446,214 | 499,338 | 0 | 0 | 137,098 | 2,167,373 |
| Philip M. Browne | 2008 | 597,141 | 0 | 310,142 | 158,331 | 0 | 0 | 114,226 | 1,179,840 |
| Senior Vice President and | 2007 | 577,024 | 6,622 | 220,048 | 168,550 | 0 | 0 | 56,544 | 1,028,788 |
| Chief Financial Officer | 2006 | 558,842 | 123,784 | 275,072 | 125,181 | 0 | 0 | 43,259 | 1,126,138 |
| David B. Weinstock | 2008 | 312,718 | 0 | 132,326 | 71,705 | 0 | 0 | 55,100 | 571,849 |
| Vice President and Chief Accounting Officer | 2007 | 302,222 | 2,771 | 93,386 | 82,040 | 0 | 0 | 35,478 | 515,897 |

## CLASS ACTION ALLEGATIONS

22.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

of Civil Procedure on behalf of all persons who purchased or otherwise acquired Advanta Class A

and/or Class B common stock during the Class Period (the "Class"). Excluded from the Class are

defendants.

23.    The members of the Class are so numerous that joinder of all members is

impracticable. The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court. Advanta has over 14 million shares of Class A common stock outstanding

and nearly 30 million shares of Class B common stock outstanding, owned by hundreds if not

thousands of persons.

24.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the prices of Advanta Class A and Class B common stock were artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

25.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

26.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

27.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## BACKGROUND

28.     Advanta, incorporated in 1974, issues business purpose credit cards to small businesses and business professionals in the United States. The Company's business credit card accounts provide customers with unsecured revolving business credit lines. Advanta primarily funds

and operates its business credit card business through Advanta Bank, which offers a range of deposit products that are insured by the FDIC in accordance with applicable FDIC regulations and limits. The Company offers credit protection and related products to its customers.    Advanta is headquartered in Spring House, Pennsylvania.

29.    Advanta's credit card business fluctuated based on management's emphasis on two contrary forces.  Advanta could show growth by loosening credit standards.  However, loosened standards would in many instances lead to increased losses later on.  Through the years Advanta had loosened and alternatively tightened standards.  Investors were aware of this history, but unaware during the Class Period of the extent to which Advanta had loosened standards, and were unaware of Advanta's improper practices with respect to its cash back rewards program which later led to defections of more creditworthy customers.

30.    In 2009, the FDIC issued two Cease and Desist Orders against Advanta Bank.  One for its improper practices going back to 2004:

> The FDIC considered the matter and determined that it has reason to believe that *the Bank committed violations of law and/or regulations and engaged in unsafe or unsound banking practices*, including, but not limited to, violations of section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (1) ("Section 5") in connection with the marketing of the Cash Back Reward feature of the Bank's credit card products and acts or practices related to the repricing of credit card accounts; the adverse action notification requirements of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 et seq. ("ECOA"), set forth at 15 U. S. C. § 1691 (d), and Regulation B of the Board of Governors of the Federal Reserve System, 12 C. F . R. Part 202 et seq. ("Regulation B"), set forth at 12 C.F.R. § 202.9 (collectively "Adverse Action Notification Requirements"); and operating the Bank without effective oversight and supervision of the Bank's credit card products; that the Bank was unjustly enriched in connection with such violations or practices; and that the Bank should be required to make restitution to remedy the injuries resulting from such violations or practices.

And the other for alleged unsafe and unsound banking practices which resulted in Advanta Bank ceasing and desisting from:

> 1.    . . . [O]perating in a manner that causes the Bank's significant financial deterioration;

2.   Operating with inadequate capital for the Bank's risk profile; and

3.   Operating in a manner that does not sustain satisfactory earnings performance to maintain sufficient capital in relation to the Bank's risk profile.

The Stipulation and Consent to the issuance of the Orders to Cease and Desist were signed by defendants Alter and Browne as directors of Advanta Bank.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

31.   On October 31, 2006, Advanta reported its third quarter 2006 financial results in a release that stated in part:

Advanta Corp. today reported third quarter 2006 net income of $21.1 million or $0.73 per diluted share for Class A and Class B shares combined. Advanta Business Cards earned net income of $20.7 million compared to $16.2 million for third quarter 2005.

"I am happy to report strong profits again this quarter and to share with you that our portfolio is performing well and growing. Not only are we continuing to attract a large number of new high credit quality, profitable customers through our focused marketing efforts, but we are able to leverage our infrastructure costs through this growth," said Dennis Alter, Chairman and CEO. "During the quarter, new bankruptcy filings remained lower than we anticipated, and we are increasing our guidance for 2006 full year earnings from continuing operations to a range of $2.78 to $2.83 per combined diluted share primarily due to the lower net credit losses we now expect for the full year."

The earnings per share guidance assumes no venture capital investment gains or losses in the fourth quarter as such amounts are based on future market conditions which cannot be reliably forecasted.

During the third quarter of 2006, Advanta Business Cards customers exceeded the 1 million mark while ending managed receivables of $4.6 billion grew 29% over the same quarter last year. Owned Business Cards receivables were $1.2 billion at quarter end, reflecting growth of 46% over those reported at the same quarter end last year. Transaction volume for the quarter was $3.1 billion, exceeding third quarter 2005 volume by 23%.

32.   After releasing its third quarter 2006 earnings on October 31, 2006, Advanta hosted a conference call for analysts, investors and media representatives, during which defendants represented the following:

[ALTER:]    I'm happy to report today that we had another strong quarter.

*        *        *

*The reason our earnings are as high as they are this quarter, despite this increased marketing spend, is mainly because of the lower credit losses for the quarter.* Bankruptcy filings were lower than we anticipated, and recoveries were higher. As a result of this, we're also increasing our 2006 earnings guidance from continuing operations to a range of $2.78 to $2.83. We now expect managed net credit losses for 2006 to be between 3.4% and 3.45% as contrasted with the range of 3.5% to 3.7% we shared during our second quarter call.

*        *        *

By educating our customers on the benefits of using a business credit card, along with MasterCard and Visa working with suppliers such as utilities, landlords, and other vendors to increase acceptance of credit cards, we believe our customers will process more transactions through their cards. In fact, the industry predicts the small business bank card purchase volumes will grow by 25% to 30% annually. As you can see, it's an exceedingly good market to be in, and again because of our focus, we believe we're in a particularly well positioned place to take advantage of it.

*        *        *

[BROWNE:]   Managed receivables 30 days or more delinquent of $125.3 million were 2.7% of any managed receivables, improved by $2.7 million and 85 basis points, respectively. Managed receivables 90 days or more delinquent were $57.1 million, or 1.23% of any managed receivables, improved by $773,000 and 38 basis points, respectively. The improvement in delinquency dollars primarily results from having a portfolio of higher credit quality customers than we did a year ago.

*        *        *

[ROSOFF:]    As is evidenced in the results that Dennis and Phil just shared, *we had another terrific quarter to add to an already terrific year*. We continue to go to our solid foundation for originating **high credit quality customers**, positioning the business to maximize earnings for the long haul. To this end, we expect to add about 365,000 to 375,000 new customers this year, as contrasted with 237,000 new customers last year, and 131,000 new customers the year before.

33.    On November 8, 2006, the Company filed its Form 10-Q for the third quarter of 2006, which included the Company's previously reported financial results. The Form 10-Q was signed by defendants Browne and Weinstock and included certifications signed by defendants Alter and Browne, which stated:

I, [Dennis Alter/Philip M. Browne], certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Advanta Corp.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

34.     On January 25, 2007, Advanta reported its fourth quarter 2006 and fiscal year 2006 financial results in a release that stated in part:

Advanta Corp. today reported full year 2006 net income from continuing operations of $84.2 million or $2.86 per diluted share for Class A and Class B shares combined. This includes a $0.03 per share asset valuation gain associated with the Company's venture capital portfolio. These results are $0.03 per combined diluted share above the high end of the Company's most recent guidance range, including $0.01 per share of venture capital gain that was not anticipated in the guidance.

"Our 2006 full year Business Cards earnings increased by over 50%, and our managed receivables grew by almost 39%; we added 56% more new customers, and our managed net credit loss rate dropped by 230 basis points to 3.41%. We had a great year! Most importantly we continued to strengthen and build on the foundation for the burgeoning results we expect to see going forward," said Dennis Alter, Chairman and CEO.

Ending managed receivables grew to $5.2 billion at December 31, 2006, with full year new customers totaling approximately 371,000. Ending owned receivables grew 29% during the year to $1.1 billion, and the full year net credit loss rate on owned receivables decreased 218 basis points to 3.19%. 2006 customer transaction volume totaled $12.3 billion, a 26% increase over 2005.

For the fourth quarter, Advanta reported net income of $18.2 million or $0.62 per combined diluted share, including a $0.01 per share asset valuation gain associated with the Company's venture capital portfolio.

35.     After releasing its fourth quarter 2006 and fiscal year 2006 earnings on January 25, 2007, Advanta hosted a conference call for analysts, investors and media representatives, during which defendants represented the following:

[ALTER:]    I am happy to report that '06 was the banner year for Advanta we've been predicting. For the year, we are net income from continuing operations of $84.2 million, or $2.80 per combined diluted share, with over a 50% increase in business card earnings for 2005.

*       *       *

I read recently that Americans use 700 million bank cards, about six or seven for each creditworthy adult. We at Advanta don't need that many of them as customers in order to do very well. That's one of the reasons *we're so confident and bullish on our business for '07, '08, and beyond*. By attracting only 300,000 to 400,000 new customers a year, as we plan to continue doing, we'll fuel outstanding earnings well into the future.

We don't have to struggle for double-digit growth because we're small compared to our competition. We need only a fraction of the absolute number of new customers they need each year.

*              *              *

[BROWNE:] On the credit front, our managed net credit loss rate for the quarter was 3.4%, and for 2006 was 3.41%, which is consistent with the most recent guidance range provided. We're often asked about our low portfolio credit loss rate and how our recent vintages are performing versus our older vintages. The answer is that the losses in the more recent vintages are lower and the timing of the losses is very similar.

*              *              *

[ROSOFF:] As we said on the guidance call in November, our 2007 earnings from continuing operations are expected to be in the range of $3.15 to $3.25 per diluted share for Class A and Class B shares combined. We expect to achieve these results even after taking into account the temporary impact of lower yields from introductory rate balances and the expensing of acquisition costs in the first year related to the record number of new customers added in 2006.

*Then, the profits from these new customers are expected to make our 2008 income shoot up by more than 40%*, based on our current projections. The increase is virtually all cash-based. We are looking forward to realizing these profits with all of this together.

36.    On February 28, 2007, Advanta filed a Form 10-K with the SEC for the fourth quarter and full year 2006, setting forth the financial results described in the above paragraph. The Form 10-K was signed by defendants Alter, Browne, Weinstock and Rosoff and was accompanied by certifications signed by defendants Alter and Browne substantially identical to the certification quoted above.

37.    On April 24, 2007, Advanta announced its first quarter 2007 financial results in a release that stated in part:

Advanta Corp. today reported first quarter 2007 net income of $21.4 million or $0.72 per diluted share for Class A and Class B shares combined. This includes a $0.01 per share asset valuation gain associated with the Company's venture capital portfolio.

"We had a very good start to 2007," said Dennis Alter, Chairman and CEO. "Strong earnings, low credit losses and delinquencies, and the addition of new high credit quality customers continued to mark our performance."

Ending managed receivables grew to $5.6 billion at March 31, 2007 with ending owned receivables totaling $1.1 billion. During the quarter, approximately 97,000 new customers were added and transaction volume of $3.4 billion reflected growth of 24% over the comparable quarter of 2006. The managed net credit loss rate decreased 32 basis points to 3.3% and the owned net credit loss rate decreased by 43 basis points to 3.1%.

38.    After releasing its first quarter 2007 earnings on April 24, 2007, Advanta hosted a conference call for analysts, investors and media representatives, during which defendants represented the following:

[ALTER:]  I'm happy to report that our year is off to a very good start. Advanta Business Cards, our net income this quarter of $21.2 million, and we grew our managed receivables to $5.6 billion. Transaction volume was $3.4 billion strong. We attracted 97,000 new small business customers during the first quarter with an average FICO score of 726. Our credit metrics for the quarter continue to be strong and, in fact, outshined many of our competitor's metrics as a direct result of the high credit quality strategy we embraced more than six years ago.

*        *        *

Because of our success and our belief that we'll continue to produce excellent results going forward, our Board approved several actions in early April, as communicated in our press release. These actions include a three-for-two stock split for both the class A and class B common stock. This will apply to shareholders of record as of May 25th, '07, with the stock dividend payable after the close of business on June 15th, '07.

*        *        *

[BROWNE:]  As Dennis said, we had an excellent quarter. After four consecutive quarters of Advanta Business Cards management interest income hovering around $90 million plus or minus $1 million, our management interest income this quarter increased to $95.4 million. In 2007 we expect to see a continued positive trend in these dollars as promotional rates on balance transfers taken by our customers in 2006 expire and convert to higher contractual go-to rates.

- 14 -

39.     On May 9, 2007, Advanta filed a Form 10-Q with the SEC for the first quarter of 2007, setting forth the financial results described in the above paragraph. The Form 10-Q was signed by defendants Browne and Weinstock and was accompanied by certifications signed by defendants Alter and Browne substantially identical to the certification quoted above.

40.     On July 31, 2007, Advanta reported its second quarter 2007 financial results in a release that stated in part:

> Advanta Corp. today reported second quarter 2007 net income from continuing operations of $0.51 per diluted share for Class A and Class B shares combined. This is $0.03 per share higher than the first quarter. It includes a $0.01 per share asset valuation gain associated with the Company's venture capital portfolio.
>
> "The powerful dynamics we have described in the business are once again demonstrated by the performance in the quarter," said Dennis Alter, Chairman and CEO.
>
> Ending managed receivables grew to $6.0 billion at quarter end with ending owned receivables totaling $1.1 billion. During the quarter, 103,000 new customers were added and transaction volume increased to $3.7 billion. The managed net credit loss rate was 3.48% and the owned net credit loss rate was 3.06%.

41.     On July 31, 2007, Advanta hosted a conference call for analysts, investors and media representatives, during which defendants represented the following:

> [ALTER:]     We're now halfway through the year and are pleased to report our progress for the second quarter of '07. During the quarter, Advanta Business Cards earned net income of $22.2 million. Our managed receivables grew to $6 billion and our customers used their Advanta credit cards for $3.7 billion in transactions. Through direct mail and the Internet, we acquired 103,000 new customers during the quarter with an average origination FICO score of 727. We've added 200,000 new customers in the first half of the year.
>
> *          *          *
>
> [BROWNE:]     When compared to the same quarter of last year, as expected, both risk adjusted revenue and operating expense dollars were higher, with the net result of these increases yielding slightly lower after-tax income.
>
> *          *          *
>
> On the securitization markets, we've been having really good receptivity to our offerings. Our last transaction was bought in a reverse inquiry where people came looking for our paper, which is always a positive sign. And you probably saw that

over the last several months we've had actually decreases in our credit enhancement levels, which is obviously positive that the rating agencies have signed off on lower credit enhancement levels or subordinated traunch [sic] levels.

\*      \*      \*

[ROSOFF:]    We basically have our own scoring system, so FICO is in a sense a simplistic proxy. And there is everything from – it includes all kinds of different things including D&B information and a lot of other information that we utilize in our experience with our own customers. I think the most telling thing is that – in that regard, is that we've talked about the expected annual loss rates from the newer vintages that we've done, which, correct me if I'm wrong, Phil, but are in the 3 to 3.5% range on a 5-year look-forward based on our experience. And those are – that range, it still holds for the business we're putting on.

\*      \*      \*

[ANALYST:]    Just a quick question on the regulatory front. There has been some more noise out of congress on the credit card front. I'm just curious if you get a chance to review some of the – I guess what they're talking about and if that in any way impacts current business practices?

[ROSOFF:]    This is Bill. As you would imagine, we're reviewing all the time and we're very on top of it. ***We're completely complying. We believe in everything we're doing now***. We don't anticipate any changes as a result of present rules. If things change as a result of congressional proposals passing or otherwise, we've evaluated them, we have plans with respect to them, but that's all speculation at this point. As long as we're on a level playing field with everybody else, our view is we'll do fine.

42.    On August 8, 2007, Advanta filed a Form 10-Q with the SEC for the second of quarter 2007, setting forth the financial results described in the above paragraph. The Form 10-Q was signed by defendants Browne and Weinstock and was accompanied by certifications signed by defendants Alter and Browne substantially identical to the certification quoted above.

43.    On October 25, 2007, Advanta issued a press release, entitled "Advanta's Solid Fundamentals Underlie Another Good Quarter," which stated in part:

Advanta Corp. today reported third quarter 2007 net income of $22.1 million or $0.50 per diluted share for Class A and Class B shares combined. This is consistent with the Company's full year expectations.

Ending managed receivables grew to $6.2 billion at quarter end with ending owned receivables totaling $1.2 billion. During the quarter, over 74,000 new

customers were added and transaction volume totaled $3.6 billion. The managed net credit loss rate was 3.87% and the owned net credit loss rate was 3.52%.

"Over the past years, we've been planning for a potentially more difficult environment by focusing on high credit quality customers," said Dennis Alter Chairman and CEO. "This strategy continues to look good to us now."

44.    On October 25, 2007, Advanta hosted a conference call for analysts, investors and media representatives, during which defendants represented the following:

[ALTER:]    I'm happy to report that for the third quarter we earned $0.50 per combined diluted share. This reflects net income from Advanta Business Cards of $22.1 million. So three quarters into the year, our earnings from continuing operations were $1.49 per combined diluted share toward our guidance range of $2.10 to $2.17. We currently believe we're positioned to achieve this, but we continue to monitor retail sales, the housing market, job formation, and the general economy. All of these and other economic trends have an impact on everyone, including our customers and our Company.

Credit performance is certainly central to any lending business, so let me address our credit results next. At the end of the quarter, our 30 days or more and 90 days or more managed delinquency rates were 3.15% and 1.41%, respectively. Consistent with what the industry is experiencing, these rates are up from a year ago. However, our rates are still at the lower end of those reported by other card issuers. In addition to the high credit quality of our customers, we've enhanced our collection efforts and strategies using what we believe to be very sophisticated analytic techniques. We believe these will further mitigate some of the possible negative effects of a weakening economy.

*        *        *

[BROWNE:]    On a year-to-date basis, we're slightly above the high end at about 3.6%, and we now expect the full-year rate to be in a range of 3.6% to 3.7%, consistent with Dennis' comments about the economy and what we are seeing with competitors. This modest increase is being driven by higher losses generally in our industry segments. This is a change from what we saw in the second quarter and what we spoke about at our Investor Day. What we saw then was increased rates in a portion of three industry segments. This is all, of course, within the context we mentioned earlier below absolute rates, which are below end of industry rates. The allowance for credit losses was increased by $4 million this quarter. At the end of September, our reserve as a percentage of ending owned receivables was 4.6%.

Operating expenses in the third quarter totaled $68 million, which was $2.2 million higher than the same quarter of 2006. This increase includes additional variable costs to support growth in the portfolio. Also, keep in mind that in the third quarter of 2006, we incurred $4.2 million of incremental customer acquisition costs associated with new prospect lists and alternate marketing creatives. We did not have life costs this quarter.

- 17 -

With all of this said, our operating expense ratio has improved significantly. For the third quarter, our ratio was 4.46%, compared to 5.84% a year ago. It also continued to trend downward from the 4.71% we reported last quarter. We're happy with the leverage we've seen this year and believe we can leverage our fixed infrastructure further over time.

\*       \*       \*

[ROSOFF:]   Here's what I would like to leave you with. What we have seen in the third quarter and looking forward is what we said in Investor Day last month. I will repeat now what I said then. We have built an engine to prevail in good times and bad. A business built around high credit quality customers that anyone would want regardless of the environment. That does not mean that we are unaffected by the economy, we are. But we are positioned by design for strength in a weaker economy and to strive over the long haul.

45.     On November 8, 2007, Advanta filed a Form 10-Q with the SEC for the third quarter of 2007, setting forth the financial results described in the above paragraph. The Form 10-Q was signed by defendants Browne and Weinstock and was accompanied by certifications signed by defendants Alter and Browne substantially identical to the certification quoted above.

46.     On November 26, 2007, Advanta's Class A and Class B stock closed at $11.10 and $12.23 per share, respectively.

47.     Then, on November 27, 2007, Advanta held a conference call with analysts and investors to discuss earnings and financial expectations for the Company and subsequently filed a Form 8-K with the SEC, which stated in part:

The conference call was publicly announced in a press release issued by the Company on November 20, 2007. The call was broadcast for the public simultaneously over the Internet through www.advanta.com or investorcalendar.com, and replays of the call are available for the next 90 days on both of these websites.

With respect to fiscal year 2007, management addressed the impact of the current economic environment on business performance. Specifically, management addressed, among other things, the following items during the conference call:

- Since the Company announced third quarter 2007 earnings results, delinquency buckets have been negatively impacted as a higher percentage of customers than anticipated have rolled into delinquency and a lower percentage of delinquent customers have made payments. Management indicated that, consistent with what other credit card issuers are anticipating, the Company now believes that these higher

delinquency rates, and therefore charge-off trends, will continue for some time before they improve.

- The Company indicated that if current entry rates and collections rates for delinquent customers continue for the rest of this year, or get modestly worse, it expects 2007 earnings per share from continuing operations to be between $1.90 and $2.00 per combined diluted share. This is lower than the Company's previous guidance range of $2.10 and $2.17 per combined diluted share. Management further noted that if there were more than modest worsening in delinquency entry rates and/or collections rates, then earnings per share would be less.

- The Company indicated that, based on current collection rates and recovery expectations, the managed net charge-off rate is expected to be about 3.75% for the 2007 fiscal year, as compared to its most recent estimate of 3.6% to 3.7% for the year. Based on the same assumptions, the owned net charge-off rate is expected to be about 3.4% for the 2007 fiscal year, as compared to the Company's most recent estimate of 3.25% to 3.35% for the year.

- The Company confirmed that it is on track with its previously announced guidance for receivable and transaction volume growth for 2007.

- The Company expects to acquire approximately 330,000 new customers in fiscal year 2007. The Company indicated that its marketing campaigns continue to do well and that management is pleased with the results of its marketing investments.

- The Company noted that it has not factored anything into its 2007 earnings guidance range related to the Visa/American Express litigation settlement since it is still being evaluated. The Company discussed this litigation settlement and its potential impact on the Company's financial results in a Current Report on Form 8-K filed with the SEC on November 16, 2007.

With respect to expectations for 2008, the Company stated that it would not be providing guidance for earnings or other 2008 financial measures at this time. Management commented that it believes it is prudent not to give guidance for 2008 at this time given the degree of volatility and uncertainty in the current economic environment. Management stated that the Company expects to be profitable and to continue to pay its quarterly dividend at its present level.

Following the Company's prepared remarks, there was a question and answer session with institutional investors and analysts. Management responded to questions about various items, including the following:

- With respect to credit trends in the current portfolio, management indicated that the deteriorating credit trends were not limited to any

specific segments of the portfolio and that the trends are being experienced throughout the portfolio.

- There were questions about various aspects of the Company's business, plans and expectations, including, among others, questions about plans for managing growth, marketing campaigns, expectations for credit quality and the possibility of authorizing a stock buyback. The Company reiterated that it would not give guidance for 2008 and, consistent with that, management declined to speculate or offer predictions in any of these areas. However, management indicated that it plans to continue to monitor all aspects of the business, including these areas, and to evaluate opportunities and make prudent decisions that are focused on the long-term health of the business.

48.   After these disclosures, Advanta stock dropped, closing on November 27, 2007 at $11.06 per share, and falling to as low as $9.35 per share on November 28, 2007, a decline of 72% from Advanta's Class Period high of $34.07 per share in June 2007.

49.   The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)   Advanta's assets contained tens of millions of dollars worth of impaired credit card receivables for which the Company had not accrued losses;

(b)   Prior to and during the Class Period, Advanta had been extremely aggressive in granting credit to customers without verifying the customers' ability to pay, to such a degree that by the summer of 2009, Advanta customers' default rate would be almost six times worse than industry average;

(c)   Advanta's manipulation of its cash rewards program angered customers and caused the Company to lose good, creditworthy customers;

(d)   Advanta's credit receivables were unduly risky due to the Company's practice of issuing credit cards to small business owners without verifying income;

(e)   To compensate for its loose credit approval process, Advanta would dramatically increase interest rates to the degree where customers who paid on time would suddenly

see their interest rates double or triple, infuriating customers and causing creditworthy customers to leave the Company;

      (f)     Defendants failed to properly account for Advanta's continuing delinquent customers and the credit trends in the Company's portfolio, resulting ultimately in large charges to reflect impairments; and

      (g)     The Company was not on track to be profitable in 2008.

    50.    As a result of defendants' false statements, Advanta stock traded at inflated levels during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down 72% from their Class Period high before these disclosures.

    51.    Subsequently, on May 11, 2009, Advanta issued a press release entitled "Advanta Announces Plan to Maximize Capital and Dramatically Reduce Risk," which stated in part:

> Advanta Corp. today announced its Board of Directors has approved a plan designed to dramatically limit the Company's credit loss exposure and maximize its capital and its liquidity measures.
>
> As a result of the deteriorating economic environment, the Company would expect the negative performance trends, if not abated with this plan, to result in losses that would erode its capital. Therefore, the Company envisions the following.
>
> - The Company's securitization trust will go into early amortization based on May's performance. Early amortization will officially be determined on June 10.
>
> - Since the securitizations will not be permitted to fund new receivables after June 10, the Company will shut down all credit card accounts to future use at that time. Neither Advanta Bank Corp. nor any other Advanta-related entity will fund activity on its balance sheet from the accounts. Therefore, the Company will not take any off-balance sheet receivables onto its balance sheet. Shutting down the accounts will not accelerate payments required from cardholders on existing balances.
>
> - In early amortization almost all of the receipts from cardholders are required to be paid to the securitization trust's noteholders and to the Company's seller's interest (its on-balance sheet share of the receivables). The securitization trust's notes are obligations of the

trust and not of any Advanta entity. The Company is only at risk with respect to the off-balance sheet obligations to the extent of its residual interests.

- Advanta Bank Corp. will use up to $1.4 billion to make a cash tender offer for Advanta Business Card Master Trust Class A senior notes at a price between 65% and 75% of their face value in a modified Dutch Auction.

- Advanta Corp. will make a cash tender offer for any or all of the $100 million of 8.99% Capital Securities issued by Advanta Capital Trust I at 20% of their face value.

- The Company will continue to service and collect the securitization trust's credit card receivables and its own receivables. This, along with taking appropriate actions to adjust expenses to be consistent with these activities, will be the Company's first priority. The Company will be free to do new business in the future to the extent it chooses, but it does not expect to do so in a significant way until implementation of the plan is well under way.

- Advanta Corp.'s senior retail investment notes are unlimited obligations of Advanta Corp. and will remain outstanding and continue to be issued in the ordinary course. The benefits of the plan to the Company are designed to benefit the senior retail note program holders as well as the Company's shareholders.

The Company previously disclosed that it expected to use tools at its disposal to avoid early amortization of the securitization trust unless it concluded there was a better plan to maximize its capital and liquidity. The Company has now concluded that the plan outlined here is that better plan.

52.     On May 12, 2009, *Bloomberg.com* issued an article entitled "Advanta's Card-Lending Shutdown May Imperil Customers," which stated in part:

Advanta Corp., the credit-card issuer for small businesses, may leave 1 million customers scrounging to find new lenders and debt holders facing losses of 35 percent after the company shut down accounts to preserve capital.

Advanta will cease lending June 10 after uncollectible debt reached 20 percent as of March 31, according to a statement and filings yesterday by the Spring House, Pennsylvania-based firm. The lender earmarked $1.4 billion to buy back securitized card loans with offers of 65 cents to 75 cents on the dollar.

Credit-card company profits suffered as the recession pushed U.S. unemployment to 8.9 percent in April. Defaults on cards historically track the jobless rate, and analysts have been concerned that the industry's average for bad loans

would breach 10 percent and set a record. Advanta decided to cut off customers after "charge-offs" rose to twice that threshold, from 9.6 percent at year-end.

"The question is how many business owners depend solely on their Advanta credit card," said William Dunkelberg, chief economist at the National Federation of Independent Business. While most probably have other sources of credit, self-employed entrepreneurs may have trouble getting a new card, he said. "Credit is harder to find than it's ever been in this expansion," said Dunkelberg, whose biography lists him as a former Advanta director.

Stock Declines

The company's A-shares dropped 28 cents, or 25 percent, to 85 cents at 4 p.m. in Nasdaq Stock Market trading. Advanta, which had $2.4 billion in deposits as of March 31, reported three consecutive quarterly losses and its shares have plunged from about $30 in June 2007. The recession affected Advanta's customers across the country, Chief Financial Officer Philip Browne has said.

"We'll be shutting down accounts for future transaction activities, but many of the customers will maintain balances and pay us off over time," Browne said yesterday in a telephone interview. "We'll have to service and collect on that, and that will be the first order of business for the company."

More than 90 percent of Advanta's small business customers will have "adequate" access to alternative credit after the company halts lending, Browne said.

Citing the recession, Advanta said it's planning to "maximize capital and dramatically reduce risk." While the company has "no indication" if debt investors will accept the buyback offer, the price is "relatively consistent with recent trading levels of the bonds," Browne said.

No Public Actions

Advanta's credit-card unit is chartered and regulated in Utah and has "no corrective actions that are public," said G. Edward Leary, the state commissioner of financial institutions. He declined to say whether any non-public actions were taken against the company.

This would be the first so-called early amortization of a trust since 2003, according to JPMorgan Chase & Co. analyst Christopher Flanagan.

"Early amortization has been viewed as a catastrophic event for issuers," Scott Valentin, an analyst at Friedman Billings Ramsey & Co., said today in a research note. Advanta's filing said that the charge-off rate for uncollectible loans may increase after accounts are closed. Valentin said that's likely because "the cards have substantially less utility to cardholders," cutting the incentive to keep up with payments.

"They're hoping they can stay alive barely until the environment changes," said David Robertson, president of the Nilson Report, the Carpinteria, California-

based industry newsletter. This is "a big sign that the credit-card industry has problems that are going to be around for several years."

Workforce Slashed

Advanta was the 11th-biggest U.S. credit-card issuer at the end of 2008 with about $5 billion in outstanding balances, and the only major lender focused on small business borrowers, Robertson said. In the first quarter the company slashed the workforce by about 300 employees, or 36 percent, from 841 as of Dec. 31, 2008. Calls inquiring about the future of current employees weren't returned.

The company's woes aren't likely to spread to other asset-backed issuers, said JPMorgan's Flanagan. Advanta's "precarious liquidity and capital position" make the lender more vulnerable to deteriorating credit than its stronger counterparts, Flanagan said in a May 8 report.

Credit-card companies can take steps to protect investors and avoid having to wind down trusts, including removing overdue accounts from the pool and increasing the cash cushion that comes with the securities to shield bondholders from losses. Bank of America Corp., Citigroup Inc., General Electric Co. and JPMorgan have already taken steps to protect their securitized assets as delinquencies surge, according to JPMorgan data.

Needs Capital

Advanta relied on the asset-backed securities market for funding, and has been unable to raise cash through securitization since June 2008, according to Bloomberg data. It is shut out of the Federal Reserve's Term Asset-Backed Securities Loan Facility, or TALF, because of ratings cuts on its bonds.

Credit card-backed debt eligible for purchase with TALF loans must be rated AAA. Moody's Investors Service has assigned "junk" ratings to Advanta's senior unsecured and subordinated debt. The trust preferred securities rating of Advanta Capital Trust I was cut to C from Caa3 in April by Moody's, citing a "high degree of uncertainty" that investors will get repaid because of Advanta's "weak financial condition."

Today, Standard & Poor's cut its rating on Advanta to CC from CCC and assigned a negative outlook to the company.

53.    On this news, Advanta's stock fell from $1.55 per share on May 11, 2009 to close at

$1.09 per share on May 12, 2009.

54.    Then, on June 8, 2009, Advanta issued a press release entitled "Advanta Announces

Termination of Its Cash Tender for Class A Senior Notes, " which stated in part:

As a result of the termination of the ABS Notes Tender Offer, the Company will not be able to complete all of the components of the plan it previously

- 24 -

announced which together were intended to limit the Company's credit loss exposure and maximize its capital and its liquidity measures. Although the Company does not expect to fully realize its objectives of maximizing its capital and its liquidity measures, it still expects to realize the limitation of its credit loss exposure. ***This is expected to be achieved as a result of early amortization of the Company's securitization trust, which is anticipated to begin this month, and the closing of all customer accounts to future use that was effective May 30, 2009***.

In addition, the Company expects the Bank to enter into an agreement with its regulators in the near term about its operations.

55. On this news, Advanta's stock fell to $0.72 per share.

56. Thus, investors were finally informed that Advanta's funding was drying up due in large part to the significant amount of overdue and uncollectible credit card accounts on its books.

## LOSS CAUSATION/ECONOMIC LOSS

57. By misrepresenting Advanta's financial position, the defendants presented a misleading picture of the Company's business and prospects. Thus, instead of truthfully disclosing during the Class Period that Advanta's business was not as healthy as represented, Advanta falsely concealed the extent of its exposure to credit delinquencies – and the threat to its entire business from this financing, as well as its failure to properly account for goodwill impairment and loan loss reserves.

58. Defendants' claims of profitability and confidence in the market caused and maintained the artificial inflation in Advanta's stock price throughout the Class Period and until the truth about its past and future earnings was gradually revealed to the market.

59. Defendants' false and misleading statements had the intended effect and caused Advanta stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $34.07 per share in June 2007.

60. As a result of defendants' false statements, Advanta stock traded at inflated levels during the Class Period. However, after the above revelations seeped into the market, the

Company's shares were hammered by massive sales, sending them down 72% from their Class Period high before these disclosures.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

61.     Plaintiff incorporates ¶¶1-60 by reference.

62.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Advanta common stock during the Class Period.

64.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Advanta common stock.  Plaintiff and the Class would not have purchased Advanta Class A and Class B common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

65.    Plaintiff incorporates ¶¶1-64 by reference.

66.    The Individual Defendants acted as controlling persons of Advanta within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Advanta stock, the Individual Defendants had the power and authority to cause Advanta to engage in the wrongful conduct complained of herein. Advanta controlled the Individual Defendants and all of its officers and other employees. By reason of such conduct, the defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiff and the members of the Class damages, including interest;

C.    Awarding plaintiff's reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  October 14, 2009

LAW OFFICES BERNARD M. GROSS, P.C.

DEBORAH R. GROSS

Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA  19107
Telephone:  215/561-3600
215/561-3000 (fax)

COUGHLIN STOIA GELLER
  & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

STEAMFITTERS LOCAL 449 PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    (a)    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:


(b)    Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*Steamfitters Local 449 Pension Fund v. Sturm, Ruger & Company, Inc., et al.*, No. 3:09-cv-01293-CFD (D. Conn.)

(c)    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Kapur v. USANA Health Sciences, Inc., et al.* No. 2:07CV177DAK (D. Utah)
*In re NexCen Brands Inc. Sec. Litig.*, No. 1:08-cv-04906-AKH (S.D.N.Y.)
*In re Medicis Pharmaceutical Corp. Sec. Litig.*, No. 2:08-cv-01821-PHX-GMS (D. Ariz.)

ADVANTA

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _13th_ day of _October_, 2009.

STEAMFITTERS LOCAL 449 PENSION FUND

By: _Joseph M. Little_

Its: _Joseph Little, Trustee_

- 2 -

ADVANTA

SCHEDULE A

SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 08/01/2007 | 900 | $26.86 |
| 11/15/2007 | 400 | $13.33 |
| 11/16/2007 | 1,200 | $13.32 |
| 11/26/2007 | 100 | $12.58 |
| 11/26/2007 | 200 | $12.61 |