UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEAMFITTERS LOCAL 449 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 2:09-cv-04730-CMR |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DENNIS ALTER, WILLIAM A. ROSOFF, PHILIP M. BROWNE, CHRISTOPHER J. CARROLL, DAVID B. WEINSTOCK, JOHN F. MOORE, ROBERT S. BLANK, MAX BOTEL, THOMAS P. COSTELLO, DANA BECKER DUNN, RONALD LUBNER, OLAF OLAFSSON and MICHAEL A. STOLPER, | ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | <u>DEMAND FOR JURY TRIAL</u> |
| | ) | |

AMENDED COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

**INTRODUCTION**

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the Class A and/or Class B common stock of Advanta Corp. ("Advanta" or the "Company") between October 16, 2006 and January 30, 2008, inclusive (the "Class Period"), against certain of Advanta's officers and/or directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").   The defendants are the following top insiders at Advanta:  Dennis Alter (Chief Executive Officer ("CEO") and Chairman of the Board), William A. Rosoff (Vice Chairman and President), Philip M. Browne (Chief Financial Officer ("CFO")), Christopher J. Carroll (Chief Credit Officer), David B. Weinstock (Chief Accounting Officer), John F. Moore (President of Advanta Bank Corp.), Robert S. Blank (Audit Committee Chair), Max Botel (Compensation Committee Chair and Audit Committee Member), Thomas P. Costello (Audit Committee Chair), Dana Becker Dunn (Director), Ronald Lubner (Director), Olaf Olafsson (Director) and Michael A. Stolper (Audit Committee Member) (collectively, "defendants").

2.      This case is a stunning portrayal of deception that saw virtually ***all of Advanta's senior-most executives*** and almost ***every director*** dump the ***vast majority of their holdings*** in Advanta stock when they knew that the Company's repeated protestations about the "high credit quality" of its customer base and its improving credit loss and delinquency rates were false.  Indeed, defendants repeatedly told investors that the Company was adding hundreds of thousands of new "high credit quality" credit card customers each quarter and that the Company's credit metrics were "outshin[ing]" many of Advanta's competitors at the same time that they had ***opened an internal investigation*** into the actions of the Company's collectors who were manipulating a stunning lack of internal controls ***to mask the true delinquency rate at the Company***.  This practice rendered Advanta's reported financial results materially false and misleading and defendants knew it.  One defendant, the Company's Chief Credit Officer, even unloaded over $1 million of Advanta stock

(*75% of his Advanta holdings*) only days before opening an internal audit into the collection practices.  All told, five executives and five of the seven non-executive directors sold over *$27.5 million* in stock with knowledge of the internal audit and that the Company's public statements were false.[1]

3.      Throughout the Class Period, and while they were engaged in a massive insider trading spree, defendants told investors that Advanta was experiencing strong earnings growth and improving credit metrics.  According to defendants, "[s]trong earnings, low credit losses and delinquencies, and the addition of new high credit quality customers" continued to mark Advanta's strong performance and justified each executive's compensation, including bonus award.  Indeed, defendants increased earnings guidance at the beginning of the Class Period because of supposed lower-than-expected net credit losses (which they claimed was "the reason [Advanta's] earnings are high"), they projected declining charge-off rates because of "an increase in percentage of high credit quality customers in the portfolio," and they claimed that "[t]he powerful dynamics we have described in the business are once again demonstrated by the performance in the quarter."  In fact, defendants emphasized, quarter after quarter, that they were increasing Advanta's credit card portfolio with hundred of thousands of "high credit quality customers" and that doing so would bestow untold benefits on the Company, including "supercharged" earnings and an offset in a bad economy.

4.      Defendants' extraordinarily optimistic statements were false and they knew it.  Not only were defendants unloading their stock with actual knowledge that the actions of the Company's collections department into which they had conducted *successive internal audits* were masking delinquency rates, but witnesses have come forward to report that defendants were doing whatever it

---

[1]      Unless stated otherwise, all insider sales refer to defendants' sales of Advanta Class B shares.

took to meet or exceed Wall Street expectations.  From dramatically escalating interest rates (*i.e.*, re-pricing accounts) each quarter **for the purpose of making financial expectations** (despite the long-term damage that doing so had on the Company's customer base and exposure to regulatory violations) to extending credit cards to customers with **FICO scores as low as 575** (660 was the industry standard for the sub-prime cut-off), defendants' business practices were directly at odds with the claims that defendants were making publicly about the Company.  Indeed, witnesses have explained that there was a direct correlation between the risky accounts that defendants were embracing throughout the Class Period and the financial turmoil that Advanta disclosed to investors at the end.[2]

5.     At the end of the Class Period, defendants bled the truth into the market.   On October 25, 2007, defendants stunned investors by disclosing increased credit loss and delinquency rates, and net charge-offs that had skyrocketed by **$20 million year-over-year**.  On November 27, 2007, they reduced earnings guidance while disclosing that "our delinquency buckets have been negatively impacted as a higher percentage of customers than anticipated have rolled into delinquency, and a lower percentage of our customers have made payments."  And on January 30, 2008, defendants disclosed that Advanta would have to take a **$0.39 per share** charge to earnings because "substantial reserves" were added in the quarter because of what they claimed were "recent credit trends."  As alleged herein, however, witnesses reported that Advanta was experiencing these trends throughout the Class Period.

6.     Combined, Advanta stock collapsed **almost 75% from their respective Class Period highs**.

---

[2]     Plaintiff's confidential sources of information alleged are described herein and *infra* at ¶¶176-184.

## STATEMENT OF THE CASE

**Background**

7.     Defendant Alter's father founded the Company in 1951 under the name of Teachers Service Organization, Inc., which offered need-based loans to schoolteachers.  Alter took over as CEO in 1971, and incorporated Advanta in 1974.  Over the years, the Company provided a variety of loan services.  But small business credit cards became the Company's sole focus when it exited its mortgage and leasing services businesses in 2001.  In its 2007 annual filing with the Securities and Exchange Commission ("SEC"), Advanta characterized its Advanta Business Cards segment as its "only reportable business segment."  In 2006, it represented 94% of the Company's revenues; in 2007, it represented 92%.

8.     According to the Company's SEC filings, Advanta's business credit card accounts provided customers with unsecured revolving business credit lines.  Witnesses place the credit limits between $10,000 and $100,000, with the majority of the limits falling closer to the $10,000 range.  On Advanta's fourth quarter 2007 conference call, an analyst from Keefe, Bruyette & Woods also commented that Advanta had a "fairly significant number of accounts which have relatively large dollar limits," citing the credit limit range of "$25,000 to $50,000."  Advanta primarily funded and operated its credit card business through Advanta Bank Corp., chartered under the laws of the state of Utah.  Advanta was headquartered in Spring House, Pennsylvania.

9.     Historically, Advanta kept a reign on its credit growth.  According to a senior information solutions manager, who had been in senior management for more than six years before the Class Period (who participated in weekly management meetings attended by all senior executives, and who reported directly to defendants Alter and Rosoff), Advanta's goals in the past had always been to grow at a reasonable rate, but not "too fast" in case it should "backfire" and problems arise like delinquencies and other credit-related problems.  But in 2005, defendants'

- 4 -

conservative nature changed.  According to the same senior manager, in the pursuit of "strategic options" for Advanta in 2005 and early 2006, defendants did "everything to dress up the company" to effectuate those options.  Shedding more light on these options, *Bloomberg* reported that by the end of 2005, at least two banks were looking to acquire Advanta.  And defendants stood to reap handsome rewards for pursuing such options.  Pursuant to their employment agreements, as reported in Advanta's 2006 Proxy Statement, in the event of a termination or a change in control at Advanta, defendants Alter, Rosoff, Browne, Carroll and Moore collectively would have received payments of more than $34.7 million – over $21.1 million, $9.6 million, $2.3 million, $847,000 and $803,000, respectively.

10.     Defendants' attempts failed, however, by March 2006.  It was at this point that their strategy for the Company changed.  Instead of pursuing moderate growth as they did before 2006 and managing Advanta's "book of business," as the former senior information solutions manager described it, defendants focused on "trimming expenses" by "out-sourcing and off-shoring" many functions, while concurrently aggressively growing the number of new accounts; a pace that the senior information solutions manager described as "irrational."  Their new focus was designed to drive Advanta's stock price, which had been hovering in the mid and high teens in 2005.[3]

11.     Defendants Alter and Rosoff were particularly motivated to grow the number of new accounts as transaction volume, the number of new customers, and earnings per share ("EPS") were the measures that determined whether defendants Alter and Rosoff would receive additional bonuses of over $4.1 million and $1.3 million, respectively, from Advanta's Cash Bonus Plan in 2007.

---

[3]     All stock prices are presented on a split-adjusted basis.

**Defendants Grow Advanta's Business by Relaxing Credit Standards**

12.     Defendants sought strong growth in 2006 and, according to the senior information solutions manager who sat in on weekly meetings with defendants, did so by "relaxing credit standards."  They added 371,000 new accounts in 2006 compared to just 237,005 a year earlier, and 130,563 in 2004.  At the same time, defendants boasted about the Company's performance as its stock price ran to $23 and $25 per share for Class A and Class B stock, respectively.  Defendant Alter used the opportunity to unload $38.5 million worth of his holdings in an unprecedented private transaction with the Company, selling 995,000 shares for $25.78 per share on a split-adjusted basis, just two months after defendants' "strategic options" failed.[4]  According to the public records maintained by Thompson Research dating back to 1998, defendant Alter had never before sold Advanta stock on the open market, nor had he engaged in any comparable private transactions of Advanta stock.

13.     By the start of the Class Period, defendants began a massive sell-off of their Advanta holdings.  On October 16-17, 2006, and just weeks before the internal audit was formally authorized, defendants Carroll and Weinstock sold $673,000 worth of Advanta stock.  Days later, defendants began bragging to investors about Advanta's financial performance.  They told investors on October 31, 2006 that Advanta was increasing its guidance for 2006 because of "lower than expected net credit losses," and added that those lower-than-expected losses were the "reason our earnings are high."  They also emphasized the benefits of their supposed focus on "higher credit quality customers," claiming that the Company had "added 85,000 new customers" with average FICO scores of 728, and that the Company had improved its "delinquency dollars" because of those "higher credit quality customers."

---

[4]     At the time, the reported unadjusted share price was $38.67.

14.     As the Class Period progressed, defendants continued to emphasize the "high credit quality" of Advanta's customer base and their improving (and low) delinquency rates because of "improved asset quality."  In a press release dated January 25, 2007, defendants reported $84.2 million in earnings for the fiscal year ($18.2 million for the quarter) and explained that they not only exceeded earnings expectations but also saw their "net credit loss" results fall within guidance for both the quarter and the fiscal year.  They added that delinquency rates had improved and even said that losses in recent customer "vintages" were lower than older vintages.  They also claimed that the Company added 371,000 new customers for the year with an average FICO score of 730.

15.     Advanta's Form 10-K, filed on February 28, 2007, also emphasized the Company's focus on supposed "high credit quality customers."  In it, defendants said that the Company's product offerings were designed to attract and retain "high credit quality customers," which they claimed benefited the Company through lower delinquency and credit loss rates:

> We design our product offerings to selectively *attract and retain high credit quality customers* and to respond to the competitive environment.  We experience the benefits of high credit quality customers *through lower delinquency and credit loss rates* and increases in transaction volume.

16.     The Form 10-K also explained in detail how the Company's receivables were presented "net of allowance for receivable losses," and explained that net receivable losses decreased year-over-year because of the supposed "improved credit quality of the portfolio."  Defendants even added that "[o]ur charge-off policy for contractually delinquent business credit card accounts is to charge-off an unpaid receivable no later than the end of the month in which it becomes and remains past due 180 cumulative days from the contractual due date."

17.     Advanta's financial results (specifically, EPS, net income, pre-tax income, net receivables, credit losses, and receivable losses) and defendants' statements about Advanta meeting or exceeding expectations were false.  *See also* ¶¶121-153.  According to witnesses, defendants only obtained these results during the Class Period by engaging in a campaign to re-price customers'

- 7 -

credit cards *for the purpose of meeting financial expectations*.  According to the senior information solutions manager, defendants engaged in the re-pricing campaigns to raise more capital and to "make the numbers" for a given reporting period, which was a sentiment shared by a senior internal auditor at the Company.  In fact, the senior internal auditor described the re-pricing campaigns as "short-term plays" with brief benefits and negative long-term consequences because of the intense customer dissatisfaction that followed the campaigns, *which were implemented even if customers were current in their payments to Advanta*.  Two separate unrelated witnesses (an executive assistant whose executives both attended weekly meetings with defendants Alter and Rosoff and were involved in evaluating the re-pricing campaigns, and a VP of Innovation and Business Development who implemented collections processes at Advanta), confirmed that defendants Alter and Rosoff were the individuals responsible for making the re-pricing decisions.

18.     Numerous witnesses have described the fall-out that accompanied these re-pricing campaigns.  A senior financial/planning analyst reported that these unexpected interest rate hikes were typically followed by an increase in the volume of customer service calls, which he/she witnessed as part of performing his/her duties.  And the senior information solutions manager confirmed that Advanta was "left with the worst accounts" because customers in the best financial standing closed their accounts whereas those who lacked the financial ability to leave had to stay and pay the increased fees, *which did not always occur*.  In fact, the senior internal auditor added that the re-pricing campaigns resulted in "pockets of delinquencies," even among Advanta's higher quality customers.  And according to a director of strategic operations for client services, who considered himself/herself a customer advocate within Advanta with the view that the re-pricing practices were too aggressive, Advanta's best customers were facing re-priced accounts and cancelled their accounts because Advanta's IT system "treated all customers alike."  The witness added that Advanta disregarded the differences among customers and basically said "to heck with you" and

- 8 -

increased rates and fees regardless of the effect this had on the customers.   The senior financial/planning analyst also explained that defendants gave the customer service organization not much explanation to share with angry customers nor the discretion to cancel the re-price to keep Advanta's good customers, which differed from how Advanta handled its consumer credit card customers in the past where it would "meet the customer in between."   According to the witness, he/she helped prepare scripts for use by the customer service representatives but responding to the customer calls was not an easy thing to do – "even at my level, it was difficult to know why there had been a change."   A former VP of Innovation and Business Development and the executive assistant corroborated these accounts by confirming that the re-pricing campaigns were self-injurious because Advanta angered and lost its best customers.   Further corroborating these witness accounts are two 2009 Federal Deposit Insurance Corporation ("FDIC") decisions that found "unsafe and unsound" banking practices at Advanta (during periods of time overlapping with the Class Period), including Advanta's deceptive execution of its cash rewards program and abusive cardholder repricing initiatives, which further undermined Advanta's credit portfolio.

19.    There is no question that each defendant had actual knowledge of the re-pricing campaigns and how the Company was using them.   According to witnesses, the re-pricing campaigns were widely known throughout the Company and were a frequent topic of discussion at weekly management meetings during the Class Period where, according to the senior information solutions manager who attended the meetings, Dave Griffith (the Chief Analytics Officer and SVP) presented analyses of how re-pricing campaigns would "degrade the book" compared to the benefit of making short-term numbers.   In fact, two separate unrelated witnesses (the senior internal auditor and the executive assistant) noted that the re-pricing campaigns were aggressive in 2006 and 2007 – *a time period that coincided directly with Advanta's supposedly strong earnings growth*.   These campaigns became so commonplace that, according to a former financial business modeling analyst,

Advanta used a dedicated re-pricing group to select accounts for re-pricing *on a monthly basis*.  A former VP of Innovation and Business Development corroborated this account and added that Dave Griffith and a VP of Marketing and Credit Analytics, Alev Seur (a frequent visitor to the top floor offices where Alter and Rosoff were located), tracked customer retention following the re-pricing campaigns.  And the executive assistant noted that it was definitely known and understood amongst the executives when evaluating a re-pricing campaign that even if Advanta had the legal right to re-price customer accounts, doing so could nonetheless have "an impact on profit" if the campaign resulted in customer losses.  As the executive assistant put it, there "were always concerns" about the impact of a re-pricing campaign.  Nonetheless, the financial business modeling analyst noted that after he/she left Advanta for US Bank following the Class Period, US Bank considered purchasing some, or all, of the Advanta credit card portfolio (after Advanta had filed for bankruptcy).  What stood out to the witness was that Advanta was charging upwards of *30% interest on most of the cards*.

20.    Defendants' statements about the "high credit quality" nature of Advanta's customer base and its improving credit loss and delinquency rates were also false and misleading.  As an initial matter, the growth was not secured entirely by "high credit quality customers" but instead by a practice of opening accounts with individuals well below the standard for what is considered "high quality" in the credit industry.  In fact, defendants' reference to FICO scores above 700 was materially misleading since it concealed the fact that Advanta was issuing cards to customers with credit scores much closer (and even below) the cut-off in the industry considered to be sub-prime.  A former collector with Advanta who explained that collectors assigned borrowers to categories A-D according to their creditworthiness – the highest caliber borrowers were in the A category – reported that FICO scores dropped during the Class Period into the 600-650 range and in some cases were as low as 575.

- 10 -

21.     The collector and the senior information solutions manager, who attended weekly management meetings with defendants, both explained that Advanta had no choice but to lower its credit standards to obtain the type of growth that Advanta was reporting.  In fact, the senior information solutions manager explained that defendants were building new customer advertising campaigns specifically designed to "make the numbers" and trying to add hundred of thousands of new customers, even as many of the new accounts were going bad.  And the collector added that the Company's focus in 2003 and 2004 was on signing up high-caliber customers with typically very high FICO scores, including lawyers, physicians and "blue-chip" professionals.  But, as noted by the senior internal auditor, a particularly high percentage of Advanta's customers in 2006 and 2007 were construction subcontractors and small business start-ups – a clear shift in customer concentration and risk.  As the senior information solutions manager put it, Advanta was "stepping on the gas" as delinquencies were going up.  Even for those customers that had FICO scores that defendants were emphasizing publicly, the senior internal auditor noted that FICO scores were proving not to be good predictors of collectibility.

22.     To make matters worse, defendants concealed the fact that the Company's collections department was manipulating the collections system to secure increased bonuses and masked true delinquency rates in the process.  As a result, defendants had no idea what the Company's true default rates or delinquency rates were through much of the Class Period.  All they knew was that it was much worse than they were telling investors.  According to the senior internal auditor who represented Advanta in Utah where the collections activities were taking place, Advanta's compensation policies were causing collectors to manipulate delinquency rates since they were paid on the reduction in the number of delinquency occurrences, which was reported ***before*** the actual cash was collected.  Collectors would routinely post "promise to pay" notations in the accounts to make the account appear to be more current or submit an electronic request for payment (without

- 11 -

approval or verification of funds) to move the accounts to an earlier delinquency "bucket" (*e.g.*, 0-30 days, 31-60 days, 61-90 days delinquent, etc.).   By doing so, the collectors not only dramatically improved their compensation (collectors could receive between 25% and 37% of their annual salary in bonus), but they also artificially improved Advanta's receivables, loss reserves and charge-offs, which are calculated directly from the Company's delinquency rates.   These collection activities directly undermined defendants' claims about EPS, net income, pre-tax income, net receivables, credit losses, and receivable losses.   *See also* ¶¶121-153.

23.     Like their re-pricing scheme, there is no question that defendants knew about these practices.   According to the internal auditor, the practices had surfaced as early as 2005 when Advanta's Chief Credit Officer, defendant Carroll, first caused the Company to investigate the practices.   The internal auditor confirmed that the practices were occurring, and the internal audit team recommended remedial efforts that senior management refused to accept.   In the internal audit department's report to defendants Alter, Browne, Carroll, Rosoff and Weinstock, and non-defendants Elizabeth Mai (Chief Administrative Officer, Senior Vice President, Secretary and General Counsel), Michael Coco (Advanta Treasurer), Anne Howley (SVP of Operations/Client Services), Dave Griffith (SVP Credit and Marketing Analysis), Bob Cardwell (Chief Compliance Officer), a KPMG auditor, Kreg Monson (VP Operations) and Tony Morelli (SVP Collections) in mid-October 2005, the internal auditor reported that the collection department's compensation was too tied to the performance of the portfolio delinquency buckets and wrongly incentivized the collectors to engage in practices that would show a given receivable was current or less past-due than it actually had been.   According to the auditor, the 2005 report emphasized in a section he remembered was titled "monitoring processes," that not enough oversight was in place to ensure that the numbers being reported by the collectors were actually resulting in payments being received.   In fact, collectors did not have to pay back (or have "clawed back") commissions they received when

the payments were not actually made.  Therefore, the collectors were motivated to falsely claim that an account had been successfully collected since they would be compensated regardless if the payment was actually made and there would be no consequence if the payment was not made.

24.    Following these findings, internal audit recommended tying the collectors' compensation to the cash actually collected, not what the collectors reported was being collected. The two senior executives with oversight of the collections process, Larry Blackmon and Sue Nocero, resisted any changes to the compensation setup but promised to implement additional management supervision and review of collections practices, including listening to more collections calls to ensure that collectors were adhering to Advanta's policies.  But according to the witness, the Collections Quality group lacked independence since Sue Nocero, who oversaw the group, reported to Larry Blackmon, who was the VP of Collections responsible for setting the collectors' monthly incentives.  And to make matters worse, Sue Nocero's compensation was tied to how well the collections group overall performed, which, according to the witness, was a clear conflict of interest. As a result, the problematic practices persisted in spite of the internal audit findings and recommendations.

25.    Defendant Carroll raised the issue again in November 2006, ***but only after selling 75% of his stock***.  Defendant Carroll sold $644,000 on two days starting on October 16, 2006, the start of the Class Period, when he knew that Advanta's collectors were engaging in practices that masked the Company true delinquency rates.  And by the end of the year, another four defendants began divesting themselves from Advanta's future by selling off almost $2.5 million of their personal holdings.  The protocol at Advanta was for the Audit Committee of the Board (Blank (until June 4, 2007), Botel, Costello and Stolper), Weinstock, and/or the "Office of the Chair" (which was comprised of Alter, Rosoff and Browne) to open internal investigations and they did so in response to Carroll's concerns.  The senior internal auditor reported that he/she, together with other members

of the internal audit department, subsequently conducted a "full-blown" audit into the Company's collections practices, which took place between November 2006 and July 2007. According to the witness, the audit that opened in November 2006 was even more substantive and in-depth than the 2005 audit. The second audit confirmed what defendant Carroll had reported – the practices of the collections personnel who were improperly indicating that past due accounts had been paid were effectively masking the true proportions of Advanta's delinquent receivables. And while every one of the delinquency "buckets" was affected and made to appear to be performing better than was actually the case, the most affected and most distorted were the older, most past-due buckets, *which had the most severe effect on the Company's reported financial statements*. The consensus amongst members of the internal audit group, both within Utah and Pennsylvania, who, according to the witness, were a close group, was that the Collections management had engaged in "gross mismanagement" in allowing the problematic practices to have continued for so long. Since defendants were required to increase reserves with increasingly delinquent accounts and charge-off accounts that reached 180 days delinquent, the practices reported by Carroll in 2005, and again in 2006, meant that Advanta's EPS, pre-tax income, net income, reported receivables, reserves, credit losses, interest and fee income, and net receivable losses were misstated. *See also* ¶¶121-153. They also meant that Advanta would have insufficient reserves in place when it became necessary to charge off the loan because the reserve would not have been adequately established for the loan. Indeed, the senior internal auditor reported that accounts *more than 250 days delinquent* were not charged off during the Class Period.

26.     By the end of the first quarter of 2007, defendants' rhetoric was at full pitch. In response to reporting net income for the quarter of $21.2 million from Advanta Business Cards, defendants claimed on April 24, 2007, that "[s]trong earnings, low credit losses and delinquencies, and the addition of new high credit quality customers continued to mark our performance." They

573821_1

emphasized that the Company's managed net credit loss rate decreased 32 basis points to 3.3% and the owned net credit loss rate decreased by 43 basis points to 3.1%, and claimed to have "attracted 97,000 new small business customers during the first quarter" with an average FICO score of 726. They even boasted that Advanta's "credit metrics for the quarter continue to be strong and, in fact, outshined many of our competitor's metrics as a direct result of the high credit quality strategy we embraced more than six years ago."  In April 2007, the Board approved salary increases and an additional bonus plan for defendants Alter and Rosoff – the Cash Bonus Plan, which authorized a discretionary "performance-based" bonus of over $4.1 million for defendant Alter and over $1.3 million for defendant Rosoff.

27.     Defendants knew that their statements were false.  In addition to their undisclosed repricing strategy for making financial results and successive internal investigations into collection practices that clearly inflated those results, defendants continued to dump their shares of Advanta stock.  Defendant Rosoff sold $11.9 million of his personal holdings (***the first time he had ever sold in the open market based on publicly available data from Thompson Research going back to 1998***) at the very same time that defendant Carroll approached the FDIC and told it to "look into" Advanta's collections practices because, like in response to the 2005 internal investigation, the Company's management was not taking any action to correct the problem.  In response, the FDIC created a "fire storm" at Advanta interviewing employees, according to the internal auditor.  Two days after the first quarter 2007 financial results announcement on April 24, 2007, defendant Blank (who served as the Chair of the Board's Audit Committee since 2001 and therefore would have been aware of both audits, the FDIC investigation, and the Company's true financial condition), ***dumped 100% of his holdings for gross proceeds of over $2.1 million***.  By June 5, ***defendant Botel***, also on the Audit Committee, ***sold 90.48% of his holdings*** (excluding vested options) ***for gross proceeds of over $1 million***.  During May through July, ***defendants Browne and Weinstock continued with***

*heavy sales of their holdings for over $1.6 million in gross proceeds*.  Suspiciously, two of the four very Audit Committee members that authorized and/or were contemporaneously aware of the internal audit dumped the largest percentage of Advanta stock.

28.     According to the internal auditor, internal audit reported its results to the Board in a memorandum dated July 16, 2007, which was specifically addressed to defendants Alter, Browne, Carroll, Rosoff and Weinstock, and non-defendants Elizabeth Mai (Chief Administrative Officer, Senior Vice President, Secretary and General Counsel), Michael Coco (Advanta Treasurer), Anne Howley (SVP of Operations/Client Services), Dave Griffith (SVP Credit and Marketing Analysis), Bob Cardwell (Chief Compliance Officer), a KPMG auditor, Kreg Monson (VP Operations) and Tony Morelli (SVP Collections).   Notably, defendant Carroll's approach to the FDIC about Advanta's collection practices, which he knew violated Regulatory Accounting Principles, was a remarkable act of self-preservation having unloaded 75% of his shares months earlier.

29.     Despite the fact that the internal audit had confirmed that the collections department had been masking the Company's true delinquency and credit loss rates, and reported their results to the Board and certain defendants in July 2007, defendants continued to boast about the Company's performance and credit loss rates on the very last day of the same month – July 31, 2007.   They reported net income for Advanta Business Cards of $22.2 million ($0.03 per share higher than the first quarter) and *improved* credit loss rates of 3.48% for managed net credit losses and 3.06% for owned net credit losses while acquiring 103,000 new customers during the quarter with a supposed average FICO score of 727.  These statements were false for the same reasons discussed in ¶¶22-25, 27-28, 121-153.

**The Truth Begins to Emerge**

30.     With the internal audit completed and the FDIC investigating, defendants could no longer conceal the truth about Advanta's true financial condition.  Accordingly, defendants reported

- 16 -

dramatically deteriorated results for third quarter 2007 on October 25, 2007.  The managed net credit

loss rate jumped to 3.87%, the owned net credit loss rate jumped to 3.52%, and credit loss reserves

increased by $4 million.  Delinquency rates had also jumped to 3.15% and 1.41% for 30 and 90 days

plus, respectively.  And managed net charge-offs had almost doubled year-over-year from $38.4

million to $59.1 million.  In directly referencing the internal audit, defendants also claimed that

"we've enhanced our collection efforts and strategies using what we believe to be very sophisticated

analytic techniques," which they said they believed would further mitigate some of the possible

negative effects of a weakening economy.

    31.    Advanta stock collapsed more than 20% on this news.

    32.    Despite their proclamation when reporting deteriorated third quarter 2007 results that

"[w]e have built an engine to prevail in good times and bad [and] [a] business built around high

credit quality customers that anyone would want regardless of the environment," defendants revealed

more of the truth only a month later.  On November 27, 2007, defendants disclosed that Advanta's

"delinquency buckets ha[d] been negatively impacted as a higher percentage of customers than

anticipated ha[d] rolled into delinquency, and a lower percentage of our customers have made

payments."  They reduced 2007 guidance from $2.10-$2.17 to $1.90-$2.00, refused to provide

guidance for 2008, and revealed that these shocking disclosures came from increased reserves

because of increased delinquency rates:

> *One very significant factor is the amount of reserves we established in the*
> *fourth quarter which are directly impacted by the amount of delinquency*.  If we
> assume current collection rates and recovery expectations, our managed net charge
> off rate would be about 3.75% for the year.  On our last call, we had estimated the
> high end of managed net credit loss range to be 3.7%.

    33.    Advanta stock dropped more than 9% as investors digested the news.

    34.    Despite these horrific results, defendants continued to insist that they had been

improving credit quality at Advanta – "not only didn't we dramatically change credit over the last

period of time when we were growing at the rates we have been for the last couple of years, we have been improving credit quality, and we have not cut corners at all so that everything we said about the quality of the customers that we've been putting on and the core of them is exactly right."  This statement has been directly refuted by the reports of credible witnesses as alleged herein.

35.     Defendants finally disclosed the extreme nature of the problem when reporting fourth quarter and fiscal year 2007 results.  They announced on January 30, 2008 results that missed analyst expectations by an amazing $0.24 per share because "substantial reserves" supposedly had to be added in the fourth quarter.  They revealed that fourth quarter earnings incorporated $0.39 per share of after-tax balance sheet charges and "reserve build" resulting primarily from purported recent credit trends.  They disclosed that Advanta ended the year with a managed 30-day plus delinquency rate of 4.29% and a 90-day plus delinquency rate of 1.97%.  And they added that they increased Advanta's allowance for credit losses by $10 million.  While defendants claimed that these dramatic reserves resulted from "recent credit trends," witnesses have revealed that those reserves were necessary much earlier – at least as early as the beginning of the Class Period.

36.     Advanta stock dropped over 6% on this news.

## JURISDICTION AND VENUE

37.     Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b), 20(a) and 20A of the 1934 Act and SEC Rule 10b-5.  The amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of this Court.

38.     Venue is proper here pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.  Advanta was headquartered in Spring House, Pennsylvania and many of the acts and transactions giving rise to the violations of law complained of occurred there.

39.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

40.     Lead Plaintiff Western Pennsylvania Electrical Employees Pension Fund ("plaintiff") purchased Advanta common stock as described in the Certification previously filed with the Court on December 14, 2009, and was damaged thereby.

41.     Advanta was formerly one of the nation's largest issuers of MasterCard and some Visa credit cards to small businesses and professionals in the United States.  The Company's business credit card accounts provided approved customers with unsecured revolving business credit lines.  Advanta primarily funded and operated its business credit card business through Advanta Bank Corp., chartered under the laws of the Utah.  Advanta Bank Corp. offered a range of deposit products that were insured by the FDIC in accordance with applicable FDIC regulations and limits. Advanta is not a named defendant in this action as it petitioned the Court for bankruptcy on November 8, 2009 and is in the process of liquidating.

42.     Defendant Dennis Alter ("Alter") was, at all relevant times, Chairman of the Board and CEO of Advanta, a position he held since 1971.  He had inherited the Company from his father and maintained a tight grip over all of its operations, leading insiders to describe him as the Company's "alter-ego."  He had dual roles as Chairman of the Board and the President and CEO of Advanta Banking Corp.  Since 2001, he also served as Chairman of Advanta's Corporate Governance Board, which according to public SEC filings, formally convened for the last time in 2004.  In addition to his annual compensation of $4.88 million and $2.83 million for 2007 and 2006, respectively, he had significant holdings in Advanta stock. ***The Company divided its common stock into two classes (Class A and Class B) in 1992 in response to defendant Alter's "concerns about***

- 19 -

*voting powers*" *for the Alter family and management*.  Class A common stock had one vote per

share on all matters, and the Class B common stock had no voting rights.  During the Class Period,

Alter owned 31.71% of the Class A voting stock.  By the end of the Class Period, Alter was able to

increase his Class A voting stock to 41.3%, subject to the Company's requirement that he also own

Class B stock, of which he owned approximately 11% during the Class Period.  Alter participated in

the issuance of false and misleading statements, including the preparation of the press releases and

SEC filings alleged herein.

43.     Defendant William A. Rosoff ("Rosoff") was, at all relevant times, Vice Chairman of

the Board and President of Advanta.  He had a dual role as Vice Chairman of the Board of Advanta

Banking Corp.  During the Class Period, he served on the Corporate Governance Committee of the

Company.  Rosoff's compensation from Advanta was $2.75 million and $2.17 million for 2007 and

2006, respectively.  Rosoff participated in the issuance of false and misleading statements, including

the preparation of the press releases and SEC filings alleged herein.  Profiting from the artificially

inflated share price caused by these statements, and realizing the true condition of the Company,

defendant Rosoff *in one day* during the Class Period sold 375,000 shares in Advanta for proceeds of

*$11.5 million*, which was *more than four times his total compensation*.  According to Thompson

Research dating back to 1998, he had never sold any Advanta shares before that day on the open

market.

44.     Defendant Philip M. Browne ("Browne") was, at all relevant times, Senior Vice

President and CFO of Advanta.  He had a dual role as CFO of Advanta Banking Corp.  Browne's

compensation from Advanta was $1.03 million and $1.13 million for 2007 and 2006, respectively.

Browne participated in the issuance of false and misleading statements, including the preparation of

the press releases and SEC filings alleged herein.  Profiting from the artificially inflated share price

caused by these statements, and realizing the true condition of the Company, defendant Browne sold

38.2% of his shares in Advanta (excluding vested options) during the Class Period for proceeds of $2.8 million.

45.     Defendant Christopher J. Carroll ("Carroll") was, at all relevant times, Chief Credit Officer of Advanta until his employment terminated on November 29, 2007.  He thereafter signed a Separation Agreement on December 20, 2007.  He had a dual role as Chief Credit Officer of Advanta Bank Corp. until his termination from the Company.  Carroll's compensation from Advanta was $633, 000 and $522,000 for 2007 and 2006, respectively.  Profiting from the artificially inflated share price caused by defendants' statements, and realizing the true condition of the Company, defendant Carroll sold *75%* of his shares in Advanta in the space of five weeks at the beginning of the Class Period for proceeds of $1 million.

46.     Defendant David B. Weinstock ("Weinstock") was, at all relevant times, Vice President and Chief Accounting Officer until his termination from the Company on September 1, 2009.  Weinstock's compensation from Advanta was $516,000 for 2007.  Weinstock participated in the issuance of false and misleading statements, including the preparation of the press releases and SEC filings alleged herein.  Profiting from the artificially inflated share price caused by these statements, and realizing the true condition of the Company, Weinstock sold 61.7% of his shares in Advanta (excluding vested options) during the Class Period for proceeds of $2.2 million.

47.     Defendant John F. Moore ("Moore") was, at all relevant times, President of Advanta Bank Corp., a position he held since January 2004.  Moore's compensation from Advanta was $674,000 and $584,000 for 2007 and 2006, respectively.  Moore participated in the issuance of false and misleading statements, including the preparation of the press releases and SEC filings alleged herein.  Profiting from the artificially inflated share price caused by these statements, and realizing the true condition of the Company, Moore sold 42.7% of his shares in Advanta (excluding vested options) during the Class Period for proceeds of $1 million.

48.     Defendant Robert S. Blank ("Blank") was, at all relevant times, a Director of the Company, a position he held since August 2001.  He did not stand for re-election as a Director at the 2007 Annual Meeting of Shareholders, and left the Company on June 4, 2007.  During his tenure, he served on the Audit Committee, and was its Chairman from 2002 until he stepped down in 2007. Blank participated in the issuance of false and misleading statements by signing an SEC filing alleged herein.  Profiting from the artificially inflated share price caused by defendants' statements, and realizing the true condition of the Company, Blank sold *100%* of his shares in Advanta in just over one month during the Class Period for proceeds of $2.2 million.

49.     Defendant Max Botel ("Botel") was, at all relevant times, a Director of the Company, a position he held since 1974 when the Company was incorporated.  During the Class Period, he served as Chairman of the Compensation Committee, as well as serving on the Audit Committee. Botel participated in the issuance of false and misleading statements by signing an SEC filing alleged herein.  Profiting from the artificially inflated share price caused by defendants' statements, and realizing the true condition of the Company, Botel sold *90.5%* of his shares in Advanta (excluding vested options) during the Class Period for proceeds of $1 million.

50.     Defendant Thomas P. Costello ("Costello") became a Director of the Company in December 2006.  In 2007, he served as Chairman of the Audit Committee.  Costello participated in the issuance of false and misleading statements by signing an SEC filing alleged herein.

51.     Defendant Dana Becker Dunn ("Dunn") was, at all relevant times, a Director of the Company, a position she held since March 1996.  During the Class Period, she served on the Compensation Committee. Dunn participated in the issuance of false and misleading statements by signing an SEC filing alleged herein.  Profiting from the artificially inflated share price caused by defendants' statements, and realizing the true condition of the Company, Dunn sold *100%* of her

- 22 -

shares in Advanta (excluding vested options) during the Class Period for proceeds of almost $600,000.

52.     Defendant Ronald Lubner ("Lubner") was, at all relevant times, a Director of the Company, a position he held since December 1996.  During the Class Period, he served on the Compensation and Nominating Committees.  Lubner participated in the issuance of false and misleading statements by signing an SEC filing alleged herein.  Profiting from the artificially inflated share price caused by defendants' statements, and realizing the true condition of the Company, Lubner sold almost 30% of his shares in Advanta (excluding vested options) during the Class Period for proceeds of $937,000.

53.     Defendant Olaf Olafsson ("Olafsson") was, at all relevant times, a Director of the Company, a position he held since December 1997.  During the Class Period, he served as Chairman of the Nominating Committee, as well as serving on the Corporate Governance Committee.  Olafsson participated in the issuance of false and misleading statements  by signing an SEC filing alleged herein.  Profiting from the artificially inflated share price caused by defendants' statements, and realizing the true condition of the Company, Olafsson sold *100%* of his shares in Advanta (excluding vested options) *in one day* of trading during the Class Period for proceeds of *$4.2 million*.

54.     Defendant Michael A. Stolper ("Stolper") was, at all relevant times, a Director of the Company, a position he held since June 1998.  During the Class Period, he served on the Audit Committee.  Stolper participated in the issuance of false and misleading statements  by signing an SEC filing alleged herein.

55.     Defendants Alter, Rosoff, Browne, Carroll, Weinstock, Moore, Blank, Botel, Costello, Dunn, Lubner, Olafsson and Stolper, because of their positions with the Company, possessed the power and authority to control the contents of Advanta's quarterly reports, press

- 23 -

releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  Defendants are liable for the false statements and omissions pleaded herein.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS DURING THE CLASS PERIOD

56.     Defendants Carroll and Weinstock sold $673,000 of their Advanta stock on October 16-17, 2006, the start of the Class Period.  Because they possessed material adverse non-public information and used that information in connection with their stock sales, defendants Carroll and Weinstock had a duty to disclose the information or abstain from trading, which they breached by omitting the fact that Advanta's collections department was engaging in practices that masked Advanta's delinquency rates and artificially inflated Advanta's financial results and stock price as a result.  Defendants Carroll and Weinstock violated the federal securities laws by trading on inside information.

**Third Quarter 2006 Financial Results and 2006 and 2007 Earnings Guidance**

57.     On October 31, 2006, Advanta reported its third quarter 2006 financial results in a release signed by Elizabeth Mai (Chief Administrative Officer, Senior Vice President, Secretary and General Counsel) that stated in part:

> ***Advanta Corp. today reported third quarter 2006 net income of $21.1 million or $0.73 per diluted share for Class A and Class B shares combined.  Advanta***

***Business Cards earned net income of $20.7 million compared to $16.2 million for third quarter 2005***.

"I am happy to report strong profits again this quarter and to share with you that our portfolio is performing well and growing. ***Not only are we continuing to attract a large number of new high credit quality, profitable customers through our focused marketing efforts***, but we are able to leverage our infrastructure costs through this growth," said Dennis Alter, Chairman and CEO. "During the quarter, new bankruptcy filings remained lower than we anticipated, and ***we are increasing our guidance for 2006 full year earnings from continuing operations to a range of $2.78 to $2.83 per combined diluted share primarily due to the lower net credit losses we now expect for the full year***."

58.     Advanta hosted a conference call for analysts, investors and media representatives the

same day, during which defendants represented the following:

[ALTER:]  I'm happy to report today that we had another strong quarter. . . . ***We're continuing to attract a large number of high credit quality customers*** who are using the Advanta Business Card to help finance their businesses. By focusing only on the specific needs of the small business market, we understand what these business owners really want. ***From July through September, we added 85,000 new customers to our portfolio, with an average FICO score of 728***.

*        *        *

***The reason our earnings are as high as they are this quarter, despite this increased marketing spend, is mainly because of the lower credit losses for the quarter***. Bankruptcy filings were lower than we anticipated, ***and recoveries were higher. As a result of this, we're also increasing our 2006 earnings guidance from continuing operations to a range of $2.78 to $2.83. We now expect managed net credit losses for 2006 to be between 3.4% and 3.45%*** as contrasted with the range of 3.5% to 3.7% we shared during our second quarter call.

*        *        *

[BROWNE:]  ***Managed receivables 30 days or more delinquent of $125.3 million were 2.7% of any managed receivables, improved by $2.7 million and 85 basis points, respectively. Managed receivables 90 days or more delinquent were $57.1 million, or 1.23% of any managed receivables, improved by $773,000 and 38 basis points, respectively. The improvement in delinquency dollars primarily results from having a portfolio of higher credit quality customers than we did a year ago***.

*        *        *

[ROSOFF:]  As is evidenced in the results that Dennis and Phil just shared, we had another terrific quarter to add to an already terrific year. ***We continue to go to our solid foundation for originating high credit quality customers, positioning the business to maximize earnings for the long haul***. To this end, we expect to add

- 25 -

about 365,000 to 375,000 new customers this year, as contrasted with 237,000 new customers last year, and 131,000 new customers the year before.

Most importantly, *these new, high credit quality customers are highly profitable*.  The new customers from the recent marketing campaigns are expected to have a five-year average return on assets contribution of between 2.7% and 3.2% a year, as compared to our 2006 expected ROA of about 1.9%.

59.     As a result of the materially false and/or misleading statements alleged in ¶¶57-58, Advanta stock traded at artificially inflated prices between $23.93 and $27.79 for Class A shares and between $26.16 and $30.41 for Class B over the next four weeks.   Defendants' statements referencing Advanta's lower-than-expected credit losses and the strength of its credit portfolio were false and misleading as explained in ¶¶12-25, 27-28, and because, unbeknownst to investors, defendants had veered away from their previously conservative course of business in favor of risky practices with the potential for highly profitable short-term benefits and disastrous long-term consequences – some of which the FDIC would later deem "unsafe and unsound" banking practices. Those practices included the falsification of receivables and collections records, monthly re-pricing campaigns (even among high quality customers), and aggressively growing customer accounts using significantly reduced credit standards.   The timing of these risky practices was no coincidence as they followed on the heels of defendants' failed efforts to execute "strategic options" (and, thus, defendants' chance to cash out of Advanta) as of March 2006.   Two months later, in May 2006, defendant Alter had Advanta buy $38.5 million worth of his personally held Class B common stock. Indeed, by the beginning of the Class Period, defendants Carroll and Weinstock had starting dumping their stock, while Botel, Browne and Lubner started shortly thereafter.  *See* ¶158.

60.     In attributing "strong profits" to Advanta's new acquisition of purportedly "high credit quality customers," defendants failed to disclose the true purpose and known risks of Advanta's aggressive campaign to *increase its yearly intake of customers by almost double the average of the previous five years*.  By the start of the Class Period, defendants had initiated this

aggressive new customer campaign in order to artificially inflate Advanta's stock prices by making Advanta's credit quality appear better than it actually was in the near term, as new accounts are unlikely to have credit problems in the near term.  Defendants knew they were putting Advanta at severe risk because in order to achieve this aggressive growth rate, defendants had significantly reduced Advanta's credit standards – issuing credit cards to risky customers with credit scores at or below the cut-off point for subprime (660).  Defendants knew that the opposing forces of aggressive growth and significantly adverse selection in poor quality customers was causing a material escalation of delinquencies and credit losses.  *See* ¶¶12-21, 27-28, 155-175.

61.     Defendants also materially misled investors about Advanta's EPS, net income, pre-tax income, net receivables, credit losses and receivable losses by lauding an "improvement in delinquency dollars."  As alleged in detail in ¶¶121-153, defendants knew, but failed to disclose, that Advanta was making quarterly earnings expectations by routinely re-pricing customers' rates and aggressively adding poor credit quality customers to Advanta's portfolio.  The FDIC validated the concerns of the confidential witnesses by finding that Advanta's re-pricing practices were "unsafe and unsound" banking practices.  Similar to defendants' aggressive new customer campaign, defendants knew that while their re-pricing practices achieved short-term numbers, these practices would degrade Advanta's book of business.  High credit quality customers were leaving, whereas Advanta's growing number of poor credit quality customers who lacked the ability to pay the higher fees were forced to stay – causing an escalation of delinquencies and credit losses.

62.     Additional omissions rendered defendants' statements emphasizing their "lower net credit losses" and "improvement in delinquency dollars" materially false and misleading as alleged in detail in ¶¶12-29.  For example, in 2005, defendant Carroll had suspicions about the Violations of Regulatory Accounting Principles, lack of adequate internal controls over the Collections department and the reliability of delinquency figures reported by Collections.  As a result, Carroll requested an

internal audit to look into the practices. This 2005 audit resulted in formal internal control recommendations, which were directly designed to prevent Collections from masking delinquency rates. At the time defendants announced their third quarter 2006 financial results, however, they knew they had failed to implement the 2005 audit's recommended controls. Consequently, defendants knew Advanta's reported delinquency and credit loss rates were unreliable. This rendered Advanta's financial results false (specifically, EPS, net income, pre-tax income, net receivables, credit losses and receivable losses). *See also* ¶¶121-153.

63.     Just days after defendants' October 31, 2006 statements increasing guidance for 2006, and again based on suspicions raised by defendant Carroll, the internal audit department formally initiated a second internal audit into whether Advanta had implemented the controls previously recommended by internal audit in 2005 and whether current Collections practices masked Advanta's true delinquency rate. By October 31, and just weeks before the internal audit was formally authorized, defendants Carroll and Weinstock sold $673,000 worth of Advanta stock. By November 27, 2006, defendant Carroll, concerned over how news of Advanta's true delinquency rates and the financial consequences therefrom would impact the value of his substantial Advanta stock holdings, had ***dumped 75% of his Advanta stock for proceeds of over $1 million***.

64.     Meanwhile, Advanta's positive announcements for the third quarter 2006 convinced analysts that Advanta's supposed focus on high credit quality customers was driving Advanta's strong results. For example, Cohen & Company reported on November 1, 2006: "The stronger than expected results were due to higher managed receivables growth and lower managed losses compared to our estimates." This analyst also repeated Advanta's misleading statements about its credit quality, noting that the Company was "continuing the trend of originating credit to higher quality borrowers" and finding that the "better credit quality has had a large impact on EPS as quarterly provision expense has been low this year."

- 28 -

65.     On November 8, 2006, the Company filed its Form 10-Q for the third quarter of 2006, which included the Company's previously reported financial results.  The Form 10-Q was signed by defendants Browne and Weinstock and included certifications pursuant to §302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley Act") signed by defendants Alter and Browne, which stated:

[Dennis Alter/Philip M. Browne], certify that:

1.      I have reviewed this quarterly report on Form 10-Q of Advanta Corp.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most

recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

66.   On November 27, 2006, Advanta hosted a conference call to provide its 2007 earnings guidance for analysts, investors and media representatives, during which defendants represented the following:

[ALTER:]   It's been a great year.   There are few reasons for these results.   *We continue to attract and retain [high] credit quality customers through very effective direct marketing activities*.

*       *       *

[BROWNE:]   *We expect our charge-off rate to be in a range of 3.2% to 3.5% compared to our current guidance range for 2006 of 3.4% to 3.45%.*

Our projected rates continue to be low and we expect to continue to outperform industry trends.   *Our projected charge-off for 2007 reflect an increase in percentage of high credit quality customers in the portfolio*.

*       *       *

[ROSOFF:]   We are obviously having great success.   It is particularly gratifying to have such increasing success in the market and our results during a period of intense competition over the last year.   *We are projecting roughly a 50% earnings increase in 2006 from a very good 2005, while adding over 50% more new customers*.

We expect a very good 2007 adding to what we have done in 2006, and *we expect a profit dynamic from the highly profitable new customers we are adding to*

- 30 -

***supercharge our earnings in 2008*** when they begin to reach full profitability. It's a nice position to be [in].

67.     As a result of the false and/or misleading statements alleged in ¶¶65-66, Advanta stock traded at artificially inflated prices. In response to the November 27 announcements, for example, Advanta's Class A shares ***increased 9.9%*** from their previous trading day's close of $25.62 to $28.15, while the Class B shares ***increased 10.2%*** from $27.93 to $30.79.

68.     For the same reasons discussed in ¶¶59-63, Advanta's falsification of receivable and collections records, aggressive new customer campaigns, lower credit quality standards, re-pricing practices, and the consequences therefrom, rendered defendants' positive statements, including statements about "internal control over financial reporting," "retain[ing]" high credit quality customers, the "profit dynamic from the highly profitable new customers we are adding" and that "highly profitable new customers"/"high credit quality customers" would "supercharge" future earnings, false and misleading when made.

69.     Defendants' statements about increased earnings, internal controls over financial reporting and charge-off rates were false when made because defendants knew, but failed to disclose, that in the same month as these optimistic statements, defendant Carroll had caused the Company to open a second internal audit of Collections based on evidence that the Collections management had failed to correct the internal control deficiencies over delinquency reporting identified in the 2005 audit report. Though defendants had been informed by internal audit as early as 2005, and certainly by October 2006, that the practices in Collections made it impossible for the Company to know its true delinquency rate, this did not stop defendants from reporting false and misleading current and forecasted charge-off rates during the November 27, 2006 conference call, including a charge-off rate of between 3.4% and 3.45% for 2006.

70.     Defendant Carroll personally benefited from defendants' materially misleading statements and omissions on November 27, 2006 by selling 4,500 shares at the highest price he had

ever sold – $29.33 per share.  Advanta's senior executives and directors, including individuals who had formally authorized the November 2006 audit, knew that the internal audit placed the value of their substantial holdings of Advanta stock at severe risk as Advanta's true delinquency rate would ultimately be revealed (impacting EPS, net income, pre-tax income, net receivables, credit losses, and receivables losses) and, consequently, the artificial inflation in Advanta stock would be lost.  *See also* ¶¶121-153.  Defendant Botel, who sat on the Audit Committee of the Board, thus began to unload his Advanta shares, profiting to the tune of over $429,000 in November 2006 alone.  Advanta's Chief Accounting Officer, defendant Weinstock, also sold off significant portions of his shares in November and December 2006.  Advanta's CFO, defendant Browne, though proclaiming in the November 27, 2006 announcement that the percentage of net credit loss to receivables would be even "lower" in the years to come, began his selling spree in November 2006.  And, defendant Lubner sold off 30% of his shares (excluding vested options) for proceeds of almost $1 million.  *See also* ¶158.

71.     Advanta's November 27, 2006 positive statements impressed analysts.  For example, an analyst at Cohen & Company raised earnings expectations for the Company, and opined on November 28, 2006: "We think the stock will continue to trend upward over the next few quarters and recommend investors buy the stock, especially on any weakness."  The analyst continued:

> The 2007 anticipated performance figures in managed losses, receivables growth and transaction volume are slightly better than what we (and investors) probably anticipated, but not out of line with what most thought was likely.  The most important part of the guidance in our view is the 2008 earnings expectation.  ***40% growth clearly lends credence to the company's statements that newly added customers, with their higher credit scores and lower initial interest rates and fees, will eventually become very profitable 1-2 years after signing on***.  This guidance is very positive in our view, and should sustain the increased valuation and then some.

72.     The Company's positive statements in November 2006 caused Davenport Equity Research to initiate coverage of Advanta on January 9, 2007, reporting that "[s]ince Advanta began to focus on attracting higher credit quality customers, the Company has indeed seen a very

- 32 -

impressive decline in net charge-offs, allowing the decline in net interest margin to be offset by lower provisions for credit losses. And while it is yet to be seen, Advanta's portfolio should perform comparatively well when credit conditions do deteriorate."

**Fourth Quarter and Fiscal Year 2006**

73.     On January 25, 2007, Advanta reported its fourth quarter 2006 and fiscal year 2006 financial results in a release that stated in part:

> ***Advanta Corp. today reported full year 2006 net income from continuing operations of $84.2 million or $2.86 per diluted share for Class A and Class B shares combined***. This includes a $0.03 per share asset valuation gain associated with the Company's venture capital portfolio. These results are $0.03 per combined diluted share above the high end of the Company's most recent guidance range, including $0.01 per share of venture capital gain that was not anticipated in the guidance.
>
> "***Our 2006 full year Business Cards earnings increased by over 50%, and our managed receivables grew by almost 39%; we added 56% more new customers, and our managed net credit loss rate dropped by 230 basis points to 3.41%. We had a great year!*** Most importantly we continued to strengthen and build on the foundation for the burgeoning results we expect to see going forward," said Dennis Alter, Chairman and CEO.
>
> Ending managed receivables grew to $5.2 billion at December 31, 2006, with full year new customers totaling approximately 371,000. Ending owned receivables grew 29% during the year to $1.1 billion, and ***the full year net credit loss rate on owned receivables decreased 218 basis points to 3.19%***. 2006 customer transaction volume totaled $12.3 billion, a 26% increase over 2005.

74.     After releasing its fourth quarter 2006 and fiscal year 2006 earnings on January 25, 2007, Advanta hosted a conference call for analysts, investors and media representatives the same day, during which defendants represented the following:

> [ALTER:] I am happy to report that '06 was the banner year for Advanta we've been predicting. ***For the year, we are net income from continuing operations of $84.2 million, or $2.80 per combined diluted share, with over a 50% increase in business card earnings for 2005***.
>
> . . . ***We added about 371,000 new customers in 2006, a 56% increase from the prior year, and ended the year with 1.1 million customers and $5.2 billion in managed receivables. The average origination FICO score of these new customers was 730***. We're proud of our success in growing the number of our ***high credit***

*quality small business customers* and expanding our support for the small business market.

\* \* \*

[BROWNE:] *On the credit front, our managed net credit loss rate for the quarter was 3.4%, and for 2006 was 3.41%, which is consistent with the most recent guidance range provided. We're often asked about our low portfolio credit loss rate and how our recent vintages are performing versus our older vintages. The answer is that the losses in the more recent vintages are lower and the timing of the losses is very similar.*

\* \* \*

At year-end, our managed *30-day-plus delinquency rate of 2.58% is at a low point* when compared to the past eight quarters. *Our managed 90-day-plus delinquency rate of 1.25% showed improvement* from the 1.36% reported at the end of last year, and was relatively flat to the 1.23% reported last quarter.

\* \* \*

[ROSOFF:] *As we said on the guidance call in November, our 2007 earnings from continuing operations are expected to be in the range of $3.15 to $3.25 per diluted share for Class A and Class B shares combined*. We expect to achieve these results even after taking into account the temporary impact of lower yields from introductory rate balances and the expensing of acquisition costs in the first year related to the record number of new customers added in 2006.

*Then, the profits from these new customers are expected to make our 2008 income shoot up by more than 40%,* based on our current projections. The increase is virtually all cash-based. We are looking forward to realizing these profits with all of this together.

75.   As a result of the materially false and/or misleading statements alleged in ¶¶73-74, Advanta stock traded at artificially inflated prices.

76.   Once again, defendants materially misled investors about the strength of Advanta's credit portfolio. Defendants boasted an increase of 371,000 new customers for 2006, with an average FICO score of 730. However, these statements were false and misleading when made for the same reasons discussed in ¶¶12-21 and 59-60. Contrary to defendants' promise that the Company's "300,000 to 400,000 new customers a year" would "fuel outstanding earnings well into the future," Advanta's aggressive customer campaigns were weakening the overall portfolio. And

- 34 -

defendants failed to disclose that Advanta was simultaneously *losing* the higher credit quality customers in its existing portfolio due to re-pricing initiatives designed to meet Wall Street's short-term expectations.

77.     Defendants also materially misled investors when they announced that Advanta's 2006 "managed net credit loss rate dropped by 230 basis points to 3.41 %," "full year net credit loss rate on owned receivables decreased 218 basis points to 3.19%," 30-day plus delinquency rate was at a "low point," and that its 90-day plus delinquency rate "showed improvement." These statements were false and misleading when made for the same reasons discussed in ¶¶12-25, 27-28, 61-63 and 69. In addition, these statements were false and misleading because the Collections department was still conducting its full-blown internal audit into the collections practices that rendered credit loss and delinquency rates unreliable. Based on the previous findings of the 2005 internal audit, defendants knew that these rates were in fact unreliable because, even after the 2005 audit, they had failed to implement sufficient internal controls over the Collections department. Thus, defendants chose to speak about Advanta's credit loss and delinquency rates despite the known severe undisclosed risk that these rates had been artificially lowered. They therefore had no reasonable basis for their stated earnings expectations. *See also* ¶¶121-153.

78.     On the Company's January 25, 2007 announcement, analysts at Cohen & Company raised their expectations for EPS in a report released the same day. For its part, Davenport Equity Research characterized Advanta as a "positive story" based on its review of Advanta's delinquent and charged-off loans:

> Credit quality remained positive and largely unchanged in the fourth quarter. As a percentage of receivables, delinquent loans and net charge-offs either declined or remained largely unchanged. The rapid growth in receivables has the potential to disguise some deterioration in credit quality, but looking at delinquent and charged-off loans as a percentage of receivables lagged 12 months yields basically the same positive story.

- 35 -

79.     With investors and analysts sold on Advanta's current success and bright future, defendants continued to take advantage of the artificial inflation built into Advanta's share price by engaging in massive insider sales while in possession of material adverse information about the Company.  During January and February 2007 alone, defendants Botel, Browne, Dunn, Moore and Weinstock dumped 64,502 shares for proceeds of nearly $2 million.  *See also* ¶158.

80.     On February 28, 2007, Advanta filed a Form 10-K with the SEC for the fourth quarter and full year 2006, setting forth the financial results described in the above paragraph.  The Form 10-K also made the following claims about the high credit quality of Advanta's new customers and "lower delinquency and credit loss rates":

> ***We design our product offerings to selectively attract and retain high credit quality customers*** and to respond to the competitive environment.
>
> *   *   *
>
> ***Our strategy in Advanta Business Cards is to maximize long-term profits by attracting and retaining high credit quality customers*** and deepening our customer relationships. Our marketing campaigns are designed to achieve our strategy by utilizing competitively-priced product offerings that typically include promotional pricing and rewards. . . .  The general economic environment in the United States may also affect our results.  We believe that a strong U.S. economy could favorably impact the credit quality of our receivables and increase customer activity, while deterioration in the U.S. economy could negatively impact the credit quality of our receivables and decrease customer activity.  Increased competition or additional improvement in the U.S. economy could result in lower net interest margin that we believe could be partially offset by increases in customer activity and further improvements in the credit quality of our receivables.  ***In response to these challenges, we continue to develop and refine our product offerings, services and strategies to assist us with originating and retaining profitable relationships with high credit quality customers***.
>
> *   *   *
>
> ***We design our product offerings to selectively attract and retain high credit quality customers*** and to respond to the competitive environment.  ***We experience the benefits of high credit quality customers through lower delinquency and credit loss rates*** and increases in transaction volume. . . .  ***Advanta Business Cards pretax income increased for the years ended December 31, 2006*** and 2005, each as compared to the prior year, ***due primarily to*** growth in average owned and securitized receivables, higher transaction volume, ***improved asset quality resulting***

*in decreases in credit loss rates on owned and securitized receivables*, and decreases in operating expenses as a percentage of owned and securitized receivables.

81.     The Form 10-K also described how Advanta's receivables were presented in the Company's financial filings and boasted about a significant decrease in the provision for credit losses:

> ***Receivables on the consolidated balance sheets are presented net of the allowance for receivable losses***.  We establish the allowance for receivable losses as losses are estimated to have occurred through provisions charged to earnings. . . .  The allowance for receivable losses is evaluated on a regular basis by management and is based upon management's review of the collectibility of receivables in light of historical experience by receivable type, the nature and volume of the receivable portfolio, adverse situations that may affect the borrowers' ability to repay and prevailing economic conditions. . . .  A 10% change in the allowance for business credit card receivable losses at December 31, 2006 would impact the allowance for receivable losses and pretax income of the Advanta Business Cards segment by $5.0 million.

> \*      \*      \*

> ***The decrease in provision for credit losses for the year ended December 31, 2006 as compared to 2005 was due primarily to*** lower bankruptcy petition filings and ***improved credit quality of the portfolio***, partially offset by increases in average owned business credit card receivables.

> \*      \*      \*

> ***For the year ended December 31, 2006, provision for credit losses on a consolidated basis decreased $1.7 million to $38.6 million as compared to 2005***, and the provision for interest and fee losses on business credit card receivables, which is recorded as a direct reduction to interest and fee income, decreased $440 thousand to $8.8 million as compared to 2005.  ***The decreases in provisions were due primarily to*** lower bankruptcy petition filings and ***improved credit quality of the portfolio***, partially offset by an increase in average owned business credit card receivables of $224 million for the year ended December 31, 2006 as compared to 2005.  ***The improved credit quality is evident in lower delinquency and charge-off rates***.

> \*      \*      \*

> ***The allowance for receivable losses on business credit card receivables was $49.7 million as of December 31, 2006, or 4.39% of owned receivables, which was lower as a percentage of owned receivables than the allowance of $44.3 million, or 5.04% of owned receivables, as of December 31, 2005***.  Owned business credit card receivables increased to $1.1 billion at December 31, 2006 from $879 million at December 31, 2005.  ***The decrease in allowance as a percentage of owned***

- 37 -

*receivables reflects a reduction in the estimate of losses inherent in the portfolio based on improvements in delinquency and net principal charge-off rates reflecting the composition of the portfolio that included more high credit quality customers*.  The decrease also reflects a reduction in our estimate of potential loss exposure related to customers affected by the 2005 hurricanes, based on subsequent experience. . . .  *Our charge-off policy for contractually delinquent business credit card accounts is to charge-off an unpaid receivable no later than the end of the month in which it becomes and remains past due 180 cumulative days from the contractual due date*.

82.     Finally, the Form 10-K addressed the Company's internal controls.  It claimed that

Advanta's internal control over financial reporting was effective as of December 31, 2006:

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Securities Exchange Act of 1934, as amended.  Under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.  Based on our evaluation under the framework in Internal Control – Integrated Framework, *management concluded that our internal control over financial reporting was effective as of December 31, 2006*.  Management's assessment of the effectiveness of our internal control over financial reporting as of December 31, 2006 has been audited by KPMG LLP, an independent registered public accounting firm, as stated in their report which is included herein.

*            *            *

An evaluation was performed by management with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures.  Based on this evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, *as of December 31, 2006, our disclosure controls and procedures are effective to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms*.  There have been no changes in our internal control over financial reporting that occurred during the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

83.     The Form 10-K was signed by defendants Alter, Rosoff, Browne, Weinstock, Blank, Botel, Costello, Dunn, Lubner, Olafsson and Stolper, and was accompanied by certifications

pursuant to the Sarbanes-Oxley Act signed by defendants Alter and Browne substantially identical to the certification quoted above.  *See* ¶65.

84.     Defendants continued to emphasize Advanta's "high credit quality customers" who would "maximize long-term profits."  Defendants stated that they were "retaining" these high quality customer.  And they boasted about Advanta's "improved asset quality resulting in decreases in credit loss rates on owned and securitized receivables."  Defendants' statements about the strength of Advanta's credit portfolio were false and misleading for the same reasons discussed in ¶¶12-31, 59-60 and 76.  In addition, the Company misled investors by reporting reduced credit loss rates, which were false and misleading for the reasons set forth in ¶¶12-25, 27-28, 61-63, 69 and 77.  Further, defendants chose to make positive unqualified statements about Advanta's "effective" internal control over financial reporting, despite the known breakdown of internal controls in 2005 that led to Advanta's **second** and ongoing internal audit of its Collections department in 2006, which made their claims about the Company's receivables allowance and how those receivables were calculated (¶83), and their assertion of the Company's charge-off policy, false and misleading.  As a result of the materially false and/or misleading statements alleged in ¶¶80-83, Advanta stock continued to trade at artificially inflated prices.

85.     In the period following the Advanta Form 10-K filing, more of its directors separated themselves from the Company.  Defendant Dunn sold off the 80% of her shares on March 21.  She had already sold 20% in early February.  On proceeds from selling 100% of her holdings (excluding vested options), she received proceeds of almost $600,000.  Similarly, defendant Moore continued dumping his stock, ultimately unloading 42.7% of his holdings (excluding vested options) between January 3, 2007 and April 2, 2007 for proceeds of over $1 million.  *See also* ¶158.

**First Quarter 2007 Financial Results**

86.     On April 24, 2007, Advanta announced its first quarter 2007 financial results in a

release that stated in part:

> *Advanta Corp. today reported first quarter 2007 net income of $21.4 million or*
> *$0.72 per diluted share for Class A and Class B shares combined*.  This includes a
> $0.01 per share asset valuation gain associated with the Company's venture capital
> portfolio.
>
> "We had a very good start to 2007," said Dennis Alter, Chairman and CEO.
> "*Strong earnings, low credit losses and delinquencies, and the addition of new*
> *high credit quality customers continued to mark our performance*."
>
> Ending managed receivables grew to $5.6 billion at March 31, 2007 with
> ending owned receivables totaling $1.1 billion.  During the quarter, approximately
> 97,000 new customers were added and transaction volume of $3.4 billion reflected
> growth of 24% over the comparable quarter of 2006.  *The managed net credit loss*
> *rate decreased 32 basis points to 3.3% and the owned net credit loss rate decreased*
> *by 43 basis points to 3.1%*.

87.     After releasing its first quarter 2007 earnings on April 24, 2007, Advanta hosted a

conference call for analysts, investors and media representatives the same day, during which

defendants represented the following:

> [ALTER:]  I'm happy to report that our year is off to a very good start.
> *Advanta Business Cards, our net income this quarter of $21.2 million*, and we grew
> our managed receivables to $5.6 billion. Transaction volume was $3.4 billion strong.
> *We attracted 97,000 new small business customers during the first quarter with an*
> *average FICO score of 726.  Our credit metrics for the quarter continue to be*
> *strong and, in fact, outshined many of our competitor's metrics as a direct result of*
> *the high credit quality strategy we embraced more than six years ago*.
>
>                         *            *            *
>
> [BROWNE:]  As Dennis said, we had an excellent quarter.  *After four*
> *consecutive quarters of Advanta Business Cards management interest income*
> *hovering around $90 million plus or minus $1 million, our management interest*
> *income this quarter increased to $95.4 million*.  In 2007 we expect to see a
> continued positive trend in these dollars as promotional rates on balance transfers
> taken by our customers in 2006 expire and convert to higher contractual go-to rates.

88.     On May 9, 2007, Advanta filed a Form 10-Q with the SEC for the first quarter of

2007, setting forth the financial results described in the above paragraph.  The Form 10-Q was

- 40 -

signed by defendants Browne and Weinstock and was accompanied by certifications pursuant to the Sarbanes-Oxley Act signed by defendants Alter and Browne substantially identical to the certification quoted above. *See* ¶65.

89.     As a result of the materially false and/or misleading statements alleged in ¶¶86-88, Advanta stock reached a Class Period high of $31.15 per Class A share and $34.07 per Class B share by June 4, 2007.

90.     Defendants' statements about their supposed effective internal controls and that "[s]trong earnings, low credit losses and delinquencies, and the addition of new high credit quality customers continued to mark our performance" were false and misleading for the same reasons stated in ¶¶12-21, 59-60, 76 and 84.  Also, by the end of first quarter 2007, defendants continued to attribute impressive results and declining delinquencies and credit loss rates to higher credit quality customers.  Despite the on-going internal audit of Collections, defendants emphasized in their first quarter 2007 announcement that "managed net credit loss rate decreased 32 basis points to 3.3% and the owned net credit loss rate decreased by 43 basis points to 3.1%."  Defendants also claimed to have "attracted 97,000 new small business customers during the first quarter with an average FICO score of 726."  These statements and defendants' claim that Advanta "outshined many of [its] competitors' metrics" were false and misleading for the same reasons set forth in ¶¶12-25, 27, 59-63, 69 and 76-77; *see also* ¶¶121-153.

91.     Finally, as alleged in detail in ¶¶22-25 and 27-28, defendants materially omitted from their statements that Advanta's second internal audit into Collections was also being concealed from the FDIC, as the senior internal auditor reported that defendant Carroll only reported the second internal audit to the FDIC after its annual examination of Advanta Bank Corp.  At the time of defendants' April 2007 statements, the FDIC was conducting its annual on-premise safety and soundness examination of Advanta.  Soon after the FDIC had completed its annual examination (and

only after unloading his stock), defendant Carroll, in a remarkable act of self-preservation, blew the whistle on Advanta.  Carroll informed the regulators of the serious internal control and delinquency reporting machinations being investigated by Advanta's internal audit department.  According to the senior internal auditor, defendant Carroll had not informed the Company that he would be taking this action.  When the FDIC learned that Advanta masked its delinquency rate through improper collections practices, it immediately started its own investigation.

92.     On June 15, 2007, citing its deceptively optimistic financial results as justification, the Company announced that it would apply a three-for-two-stock split for both the Class A and Class B common stock.  Meanwhile, defendants knew that internal audit's and/or the FDIC's investigation would soon put a stop to Advanta's improper collections practices that had artificially deflated Advanta's credit loss and delinquency rates and inflated Advanta's stock price and earnings throughout the Class Period.  So, defendants continued their massive insider selling spree – seizing on Advanta's favorable stock price, which had been maintained at an artificially high level by defendants' positive first quarter 2007 statements and results.

93.     Two days after the first quarter announcement, defendant Blank, who served as the Chair of the Audit Committee since 2001 and therefore would have been aware of both audits and the Company's true financial condition, dumped *100%* of his holdings for gross proceeds of over $2.1 million.  By June 5, defendant Botel, also on the Audit Committee, sold *90.48%* of his holdings (excluding vested options) for gross proceeds of over $1 million.  During May through July, defendants Browne and Weinstock continued with heavy sales of their holdings for over $1.6 million in gross proceeds.  Most stunningly, two days after the first quarter 2007 announcement, defendant Rosoff – *having never sold on the open market for at least over a decade*, made *$11,557,500* by selling almost half of his holdings (excluding vested options) *in one sale*.  *See also* ¶158.

- 42 -

94.     Analysts and investors, meanwhile, were still kept in the dark.  On June 18, 2007, the analyst at Davenport Equity Research reported on Advanta's "[s]trong first quarter with results above expectations."  It reiterated the Company's statements, saying that Advanta's growth metrics stayed strong during the quarter and its credit quality remained good.

**Second Quarter 2007 Financial Results**

95.     On July 31, 2007, Advanta reported its second quarter 2007 financial results in a release that stated in part:

> ***Advanta Corp. today reported second quarter 2007 net income from continuing operations of $0.51 per diluted share for Class A and Class B shares combined***.  This is $0.03 per share higher than the first quarter.  It includes a $0.01 per share asset valuation gain associated with the Company's venture capital portfolio.
>
> "***The powerful dynamics we have described in the business are once again demonstrated by the performance in the quarter***," said Dennis Alter, Chairman and CEO.
>
> Ending managed receivables grew to $6.0 billion at quarter end with ending owned receivables totaling $1.1 billion.  During the quarter, 103,000 new customers were added and transaction volume increased to $3.7 billion.  ***The managed net credit loss rate was 3.48% and the owned net credit loss rate was 3.06%***.

96.     On July 31, 2007, Advanta hosted a conference call for analysts, investors and media representatives, during which defendants represented the following:

> [ALTER:]  We're now halfway through the year and are pleased to report our progress for the second quarter of '07.  ***During the quarter, Advanta Business Cards earned net income of $22.2 million***.  Our managed receivables grew to $6 billion and our customers used their Advanta credit cards for $3.7 billion in transactions.  Through direct mail and the Internet, ***we acquired 103,000 new customers during the quarter with an average origination FICO score of 727***.  We've added 200,000 new customers in the first half of the year.
>
> *          *          *
>
> [BROWNE:]  ***When compared to the same quarter of last year, as expected, both risk adjusted revenue and operating expense dollars were higher***, with the net result of these increases yielding slightly lower after-tax income.
>
> *          *          *

- 43 -

573821_1

[ALTER:]  In terms of our customers being self-employed, while many of them are, more than 50% of our customers have been in business five years or longer and probably 20, 25% ten years or longer.  So it's a very stable customer base.  ***And while we do make – offer cards to people who are forming a new business, that's not the core of the business.  We find that it's an attractive segment to go after and at 730 we're making the loan on the basis of the person's individual credit characteristics, not so much the business***.

\*     \*     \*

[ROSOFF:]  We basically have our own scoring system, so FICO is in a sense a simplistic proxy.  And there is everything from – it includes all kinds of different things including D&B information and a lot of other information that we utilize in our experience with our own customers.  I think the most telling thing is that – in that regard, is that we've talked about the ***expected annual loss rates from the newer vintages that we've done***, which, correct me if I'm wrong, Phil, but ***are in the 3 to 3.5% range*** on a 5-year look-forward based on our experience.  And those are – that range, it still holds for the business we're putting on.

97.     On August 8, 2007, Advanta filed a Form 10-Q with the SEC for the second quarter of 2007, setting forth the financial results described in the above paragraph.  The Form 10-Q was signed by defendants Browne and Weinstock and was accompanied by certifications pursuant to the Sarbanes-Oxley Act signed by defendants Alter and Browne substantially identical to the certification quoted above.  *See* ¶65.

98.     Defendants' statements regarding their supposed effective internal controls, financial performance and the strength of their credit portfolio, including the number of "high credit quality" customers and their average FICO scores, were false and misleading when made for the reasons discussed in ¶¶12-21, 59-60, 76, 84 and 90.  Advanta claimed in its second quarter 2007 results that its managed net credit loss rate was 3.48% and its owned net credit loss rate was 3.06%.  These statements were false and misleading for the reasons discussed in ¶¶12-25, 27-28, 61-63, 69, 77, 84 and 91-92.  Further, the collections practices that defendant Carroll had reported to certain other defendants and even the FDIC directly undermined the accuracy of these credit loss numbers.  In fact, by mid-July, the FDIC's investigation had created a "firestorm" at the Company, and the internal audit's investigation of the Collections department was complete and its formal and final

- 44 -

report had been delivered to senior executives, including several of the defendants.  If Carroll's report in November 2006 had not, the internal audit department's investigation confirmed (and the report made clear) that the recommendations from the 2005 audit had not been implemented and Advanta was masking its delinquencies.  Thus, there was no way defendants could claim to know with any basis Advanta's credit loss rate or delinquency rates.  In fact, defendants also knew that credit losses, reserves and net income were misstated but stated without qualification that "Advanta Business Cards earned net income of $22.2 million."  *See* ¶121-153, 155-175.  This was false and misleading.  As a result of the materially false and/or misleading statements alleged in ¶¶95-97, Advanta stock continued to trade at artificially inflated prices.  Defendants' claim that offering cards to people who were forming a new business was not the "core of the business" was also misleading as the senior internal auditor confirmed that start-ups were indeed a large part of the business in 2006 and 2007.

99.    Realizing Advanta's true financial condition could soon be revealed, defendants Browne and Weinstock continued to trade on inside information while failing to disclose material adverse facts about the Company.  For example, by September 17, 2007, Weinstock had dumped 61.3% of his shares (excluding vested options) for gross proceeds of $2.2 million.  *See also* ¶158.

## ADVANTA ISSUES PARTIAL DISCLOSURES CONCERNING THE CREDIT QUALITY OF ITS PORTFOLIO

100.    By October 25, 2007, defendants could no longer conceal the truth about Advanta's financial condition.  Though Advanta tried to hide behind an optimistic title in its earnings press release, claiming "Solid Fundamentals" and "Another Good Quarter," defendants reported dramatically deteriorated results for third quarter 2007.  With the issuance of the internal audit report in mid-July 2007, and the FDIC paying closer attention to procedures in the Collections department, Advanta was forced to report that its managed net credit loss rate jumped to 3.87%, while its owned net credit loss rate reached 3.52%:

- 45 -

*Advanta Corp. today reported third quarter 2007 net income of $22.1 million or $0.50 per diluted share for Class A and Class B shares combined.* This is consistent with the Company's full year expectations.

Ending managed receivables grew to $6.2 billion at quarter end with ending owned receivables totaling $1.2 billion. During the quarter, over 74,000 new customers were added and transaction volume totaled $3.6 billion. The *managed net credit loss rate was 3.87% and the owned net credit loss rate was 3.52%.*

"Over the past years, we've been planning for a potentially more difficult environment *by focusing on high credit quality customers,*" said Dennis Alter Chairman and CEO. "This strategy continues to look good to us now."

101.   On the conference call, defendants further disclosed that Advanta's delinquency rates had increased from 2.7% to 3.15% for 30 days and from 1.23% to 1.41% for 90 days, and managed net charge-offs had ballooned from $38.4 million to $59.1 million. Because of these declines in its credit portfolio, the Company reported a $4 million jump in credit loss reserves:

[ALTER:]   I'm happy to report that for the third quarter we earned $0.50 per combined diluted share. *This reflects net income from Advanta Business Cards of $22.1 million. So three quarters into the year, our earnings from continuing operations were $1.49 per combined diluted share toward our guidance range of $2.10 to $2.17.* We currently believe we're positioned to achieve this, but we continue to monitor retail sales, the housing market, job formation, and the general economy. All of these and other economic trends have an impact on everyone, including our customers and our Company.

Credit performance is certainly central to any lending business, so let me address our credit results next. *At the end of the quarter, our 30 days or more and 90 days or more managed delinquency rates were 3.15% and 1.41%, respectively.* Consistent with what the industry is experiencing, these rates are up from a year ago. However, *our rates are still at the lower end of those reported by other card issuers. In addition to the high credit quality of our customers, we've enhanced our collection efforts and strategies using what we believe to be very sophisticated analytic techniques.* We believe these will further mitigate some of the possible negative effects of a weakening economy.

*          *          *

[BROWNE:]   *Our managed net charge-offs totaled $59.1 million for the quarter. Total managed net charge-offs during the same quarter of last year totaled $38.4 million.* Last quarter, we updated you on expectations for our full-year managed net credit loss rate and indicated that we expect it to be at the higher end of our guidance range.

- 46 -

*On a year-to-date basis, we're slightly above the high end at about 3.6%, and we now expect the full-year rate to be in a range of 3.6% to 3.7%*, consistent with Dennis' comments about the economy and what we are seeing with competitors. This modest increase is being driven by higher losses generally in our industry segments. This is a change from what we saw in the second quarter and what we spoke about at our Investor Day. What we saw then was increased rates in a portion of three industry segments. This is all, of course, within the context we mentioned earlier below absolute rates, which are below end of industry rates. *The allowance for credit losses was increased by $4 million this quarter. At the end of September, our reserve as a percentage of ending owned receivables was 4.6%*.

102.    These disclosures stunned investors. Both classes of Advanta stock dropped more than 20% in response to the news, falling from $19.77 to $15.67 for Class A shares and from $22.21 to $17.69 for Class B shares.

103.    The Company, however, continued to press its supposedly "high credit quality customers," which it claimed would "mitigate" Advanta's delinquency-related problems (although defendants disingenuously placed full blame on a weakening economy). Defendant Rosoff in the third quarter 2007 conference call to analysts and investors even went so far as to claim that Advanta was "positioned by design for strength in a weaker economy and to strive over the long haul." He claimed:

*We have built an engine to prevail in good times and bad. A business built around high credit quality customers that anyone would want regardless of the environment. That does not mean that we are unaffected by the economy, we are. But we are positioned by design for strength in a weaker economy and to strive over the long haul*.

104.    But defendants' statements and omissions alleged in ¶¶100-101 and 103 were still materially misleading. As a result, Advanta stock continued to trade at artificially inflated, albeit lower, prices. Defendants knew that the Company's increasingly poor credit portfolio did not display the "strength" to withstand a weaker economy and therefore materially misled investors with these statements. They also knew that Advanta's reported income and their claims about Advanta's "high credit quality" customers were false and misleading for the reasons alleged in ¶¶12-25, 27-28, 61-63, 69, 77, 84, 91-92 and 98.

- 47 -

105.    Defendants had long known about Advanta's true financial condition and had dumped large percentages of their holdings.  Eight days before the third quarter 2007 announcement that crushed Advanta's share prices by more than 20% in a single day, CFO defendant Browne sold off the remainder of the Advanta shares that he sold during the Class Period.  In total, during the Class Period, Browne had grossed over $2.7 million by selling 38.16% of his stock (excluding vested options).  Chief Accounting Officer defendant Weinstock had also dumped the remainder of the stock that he sold during the Class Period before the third quarter 2007 announcement.  His gross proceeds during the Class Period on sales of a total of 61.34% of his Advanta shares (excluding vested options) was almost $2.2 million.  ¶158.

106.    Though Advanta reported deteriorated third quarter 2007 results, defendants' previous false and misleading optimistic statements, together with their assurances that Advanta would meet full-year guidance and that its portfolio of "high credit quality customers" was one that "anyone would want regardless of the environment," had convinced analysts like Davenport Equity Research in its report on October 25, 2007 that the lowered outlook was "inappropriate for a company with Advanta's growth potential."

107.    On November 8, 2007, Advanta filed a Form 10-Q with the SEC for the third quarter of 2007, setting forth the financial results described in the above paragraph.  The Form 10-Q was signed by defendants Browne and Weinstock and was accompanied by certifications pursuant to the Sarbanes-Oxley Act signed by defendants Alter and Browne substantially identical to the certification quoted above.  *See* ¶65.

108.    On November 27, 2007, defendants continued to drip information into the market about the true condition of the Company with its earnings guidance announcement.  Not only did defendants suddenly reduce their guidance for 2007, they refused to provide guidance for 2008, despite only a month earlier insisting that Advanta was a "business built around high credit quality

- 48 -

customers that anyone would want regardless of the environment."  Disregarding the evidence offered by their previously masked delinquencies that had been unraveling, defendants continued to materially mislead investors by claiming that they had "not cut corners at all" with regard to the credit quality of their customers.  But, in fact, throughout the Class Period, defendants had been pursuing a risky strategy of short-term gains by deteriorating their customer portfolio.  They had aggressively grown the number of customers to whom Advanta issued cards by extending credit lines to even sub-prime and below sub-prime customers in order to show growth. *See, e.g.*, ¶¶12-19. And they had recklessly re-priced customer accounts to meet earnings expectations, driving away their best customers. *See, e.g.*, ¶¶20-21.  Advanta was left with a book of business that was deteriorating due to increasing delinquencies and charge-offs.  And this effect was aggravated because the Company could no longer mask delinquencies with improper Collections department practices.  After the final internal audit report was issued, and with the FDIC on the look-out for manipulations, defendants were forced to report Advanta's true delinquency and charge-off rates, which had become substantially worse with its deteriorated credit portfolio.

109.    That day, defendants were forced to admit that their "delinquency buckets have been negatively impacted as a higher percentage of customers than [supposedly] anticipated have rolled into delinquency, and a lower percentage of our customers have made payments."  In particular, the Company admitted that its expected managed net charge-off rate for 2007 increased to 3.75%, compared to its most recent estimate of 3.6% to 3.7% for the year.  And its expected net charge-off rate jumped from its most recent estimate of between 3.25% and 3.35% to 3.4% for 2007.  This jump was material as defendants had reported in Advanta's Form 10-K for 2006 that "[a] 10% change in the allowance for business credit card receivable losses . . . would impact the allowance for receivable losses and pretax income of the Advanta Business Cards segment by $5.0 million":

> [ALTER:]  Since we last spoke to you, ***our delinquency buckets have been negatively impacted as a higher percentage of customers than anticipated have***

*rolled into delinquency, and a lower percentage of our customers have made payments*.

\*  \*  \*

  *If current entry rates and collection rates for delinquent customers continue for the rest of the year or get modestly worse, we would expect 2007 earnings per share from continuing operations to be between $1.90 and $2.  This is lower than our previous guidance of $2.10 to $2.17.*  If we assume more than modest worsening, then the earnings would be less.

  *One very significant factor is the amount of reserves we establish in the fourth quarter which are directly impacted by the amount of delinquency.  If we assume current collection rates and recovery expectations, our managed net chargeoff rate would be about 3.75% for the year.  On our last call, we had estimated the high end of managed net credit loss range to be 3.7%.*

\*  \*  \*

  We can say this.  We do expect to be profitable, and we do expect to continue our quarterly dividend at its present level.  We'll continue to operate the business in a thoughtful and prudent way that achieves long-term profitability.  But given the dislocations taking place in the economy, *we cannot give guidance for '08 at this time*.

\*  \*  \*

[BROWNE:] [N]ot only didn't we dramatically change credit over the last period of time when we were growing at the rates we have been for the last couple of years, *we have been improving credit quality, and we have not cut corners at all so that everything we said about the quality of the customers that we've been putting on and the core of them is exactly right*.

  110. Following the conference call, Advanta filed a Form 8-K with the SEC on November 29, 2007, which confirmed the adverse information discussed on the Company's conference call:

  With respect to fiscal year 2007, management addressed the impact of the current economic environment on business performance.  Specifically, management addressed, among other things, the following items during the conference call:

  • *Since the Company announced third quarter 2007 earnings results, delinquency buckets have been negatively impacted as a higher percentage of customers than anticipated have rolled into delinquency and a lower percentage of delinquent customers have made payments*.  Management indicated that, consistent with what other credit card issuers are anticipating, the Company now believes

- 50 -

that *these higher delinquency rates, and therefore charge-off trends, will continue for some time before they improve*.

- *The Company indicated that if current entry rates and collections rates for delinquent customers continue for the rest of this year, or get modestly worse, it expects 2007 earnings per share from continuing operations to be between $1.90 and $2.00 per combined diluted share. This is lower than the Company's previous guidance range of $2.10 and $2.17 per combined diluted share.* Management further noted that if there were more than modest worsening in delinquency entry rates and/or collections rates, then earnings per share would be less.

- *The Company indicated that, based on current collection rates and recovery expectations, the managed net charge-off rate is expected to be about 3.75% for the 2007 fiscal year, as compared to its most recent estimate of 3.6% to 3.7% for the year. Based on the same assumptions, the owned net charge-off rate is expected to be about 3.4% for the 2007 fiscal year, as compared to the Company's most recent estimate of 3.25% to 3.35% for the year*.

* * *

- The Company expects to acquire approximately 330,000 new customers in fiscal year 2007. The Company indicated that its marketing campaigns continue to do well and that management is pleased with the results of its marketing investments.

* * *

*With respect to expectations for 2008, the Company stated that it would not be providing guidance for earnings or other 2008 financial measures at this time*. Management commented that it believes it is prudent not to give guidance for 2008 at this time given the degree of volatility and uncertainty in the current economic environment. Management stated that the Company expects to be profitable and to continue to pay its quarterly dividend at its present level.

Following the Company's prepared remarks, there was a question and answer session with institutional investors and analysts. Management responded to questions about various items, including the following:

- With respect to credit trends in the current portfolio, management indicated that the deteriorating credit trends were not limited to any specific segments of the portfolio and that the trends are being experienced throughout the portfolio.

- *There were questions about various aspects of the Company's business, plans and expectations, including, among others, questions about plans for managing growth, marketing campaigns,*

*expectations for credit quality and the possibility of authorizing a stock buyback. The Company reiterated that it would not give guidance for 2008 and, consistent with that, management declined to speculate or offer predictions in any of these areas.* However, management indicated that it plans to continue to monitor all aspects of the business, including these areas, and to evaluate opportunities and make prudent decisions that are focused on the long-term health of the business.

111.    Despite these disclosures, defendants' continued false and misleading statements about Advanta's "high credit quality customers" were still believed by investors and analysts. The analyst at Davenport Equity Research reiterated the Company's mantra on November 27, 2007 by saying: "Advanta has increased the credit quality of its portfolio significantly over the past few years. This should help to limit credit losses in a down cycle." The analyst also noted: "Outside of credit quality, Advanta's business is still functioning well."

112.    After the November 27, 2007 disclosures, both Advanta Class A and Class B share prices fell, dropping in one day by as much as 9.5% and 10.0%, respectively, to lows of $10.04 per Class A share and $11.01 per Class B share. The next day, the stock price continued to tumble, hitting as low as $8.53 per Class A share and $9.35 per Class B share. Because of Advanta's November 27, 2007 disclosure, the price per share decreased from November 26, 2007 to November 28, 2008 by 23.2% and 23.5% for the Class A and Class B shares, respectively. However, as a result of defendants' materially false and misleading statements and omissions alleged in ¶¶107-110, Advanta's stock continued to trade at artificially inflated, albeit lower, prices.

113.    On January 30, 2008, defendants belatedly disclosed the ultimate effects on earnings of their Class Period scheme to defraud investors. Advanta issued its press release entitled, "Advanta Reports Earnings for 2007; *Substantial Reserves Added in the Fourth Quarter*." Defendants disclosed that the Company's earnings had been significantly affected by charges taken to build credit loss reserves. Because it had not previously accounted for the full extent of loss contingencies, Advanta had to suddenly record a charge of *$0.39 per share* in order to build its

- 52 -

reserves for loans losses caused by the increasing numbers of customers unable make their payments:

> Advanta Corp. today reported full year 2007 net income from continuing operations of $71 million or $1.61 per diluted share for Class A and Class B shares combined, including an after-tax charge of $0.17 per share relating to contingency reserves associated with Visa's litigation with third parties.  Fourth quarter earnings of $0.17 per share include an $0.11 per share after-tax charge also associated with Visa litigation matters.
>
> *In addition, the fourth quarter earnings incorporate $0.39 per share of after-tax balance sheet charges and reserve build resulting primarily from recent credit trends*, and a $0.05 per share after-tax gain on the sale of a portion of the Company's MasterCard shares.

114.    Defendants elaborated on these disastrous results on a conference call the same day:

[ALTER:]  Today we reported that for '07 we earned $1.61 per combined diluted share from continuing operations including an after-tax charge of $0.17 per share relating to contingency reserves associated with Visa's litigation with third parties.  Fourth-quarter earnings were $0.17 per share which again included an $0.11 per share after tax charge also associated with the Visa litigation matters.

> *In addition the fourth-quarter earnings incorporated $0.39 per share of after-tax balance sheet charges and reserve build resulting primarily from our recent credit trends*.  Consistent with the direction of other credit card issuer statistics, our managed credits losses for '07 increased to 3.71 % of average receivables.  *And we ended the year with a managed 30-day plus delinquency rate of 4.29% and a 90-day plus delinquency rate of 1.97%.*

*                *                *

We added a little over 335,000 new customers during the year and we continued to see low portfolio attrition rates.  *Needless to say, our earnings this quarter for the full year were disappointing.  The negative movement in our delinquency rates was greater than we anticipated and this coupled with greater macro market movements caused us to have earnings lower than our expectations*.

*                *                *

> [BROWNE:]  *First, we increased our allowance for credit losses by $10 million.  This reflects higher estimated risk against owned principal receivables due to the increased delinquencies that Dennis discussed earlier.  The diluted after-tax earnings per combined share equivalent for this charge was $0.14.  In addition, we reduced our retained interest in securitization by $17.2 million to reflect higher credit risks related to our securitized receivables and higher market credit spreads.  Stated on an earnings per share bases this charge reduced after tax earnings by $0.25*.

- 53 -

*     *     *

*We had about a 40 basis point impact this quarter due to provisioning for delinquent interest and charge-off of uncollectible interest which impacted the trends compared to what they otherwise would be. And that was a sizable impact.* It breaks down in dollar amount about $700,0000 or so on balance sheet and about $4.5 million or $4.7 million off-balance sheet which according to Reg G, I kind of have to mention the on and off balance sheet breakdown.

115.    Analysts who had been covering Advanta were caught off-guard by the disclosure.

For example, Everett Reveley, an equity analyst for Davenport Equity Research, reported on

January 30, 2008:

Advanta reported earnings for the fourth quarter of $0.17 per diluted share, ***well below our estimate of $0.41. The miss was largely due to higher than expected build in reserves***. The provision for credit losses in the quarter amounted to 5.85% of average receivables while the net charge offs in the quarter were 4.13%. ***The increased reserves and balance-sheet charges decreased earnings by $0.39 per share after taxes***.

. . . As Advanta's master trust data has been indicating over the past several months, the credit quality of Advanta's portfolio deteriorated in the fourth quarter as delinquencies and charge-offs increased. Loans delinquent 30 days or more increased to 4.29% from 3.15% in Q3 and 2.58% in the prior year. Loans delinquent more than 90 days increased from 1.97% from 1.41% in Q3 and 1.25% last year. Net charge offs increased to 4.13% from 3.87% in Q3 and 3.40% last year. Lastly the provision for credit losses increased to 5.85% from 4.14% in Q3 and 3.47% last year.

116.    Advanta stock dropped another 7% in response to this disclosure, falling from $8.38

to a low of $7.85 for Class A shares and $9.65 to a low of $9.00 for Class B shares in one day.

117.    Through the false and misleading statements and omissions regarding the credit

quality of its customer portfolio and the provisions it was required to take based on its credit quality,

Advanta inflated its stock price, reaching a Class Period high on June 4, 2007 of $31.15 per share for

its Class A shares, while its Class B shares traded at $34.07. When Advanta ultimately disclosed on

January 30, 2008 the effects on its earnings of its scheme to defraud investors, its shares depleted to

a quarter of their value in June 2007, with the price per share for Class A and Class B shares

plunging 74.8% and 73.6%, respectively.

- 54 -

**AFTERMATH**

118.    As the financial conditions precipitously worsened at Advanta following the Class Period, the Company came under greater regulatory scrutiny.  In 2009, the FDIC issued two Cease and Desist Orders against Advanta Bank Corp.  One of the Orders required Advanta Bank Corp. to pay restitution of approximately $14 million to businesses who used Advanta's Cash Back Reward program and $21 million to accountholders whose accounts were re-priced.  At a minimum, the FDIC found that improper re-pricing occurred from "June 1, 2007 through 2008."  However, Advanta insiders confirmed that these practices dated back to 2006.  In particular, the FDIC found:

> The FDIC considered the matter and determined that it has reason to believe that ***the Bank committed violations of law and/or regulations and engaged in unsafe or unsound banking practices***, including, but not limited to, violations of section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (1) ("Section 5") ***in connection with the marketing of the Cash Back Reward feature of the Bank's credit card products and acts or practices related to the repricing of credit card accounts***; the adverse action notification requirements of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq*. ("ECOA"), set forth at 15 U.S.C. § 1691 (d), and Regulation B of the Board of Governors of the Federal Reserve System, 12 C.F.R. Part 202 *et seq*. ("Regulation B"), set forth at 12 C.F.R. § 202.9 (collectively "Adverse Action Notification Requirements"); ***and operating the Bank without effective oversight and supervision of the Bank's credit card products***; that the Bank was unjustly enriched in connection with such violations or practices; and that the Bank should be required to make restitution to remedy the injuries resulting from such violations or practices.

119.    The other Cease and Desist Order was also for "unsafe and unsound" banking practices and required Advanta Bank Corp. to cease and desist from:

1.    . . . [O]perating . . . in a manner that causes the Bank's significant financial deterioration;

2.    Operating with inadequate capital for the Bank's risk profile; and

3.    Operating in a manner that does not sustain satisfactory earnings performance to maintain sufficient capital in relation to the Bank's risk profile.

120.    The Stipulations and Consents to the issuance of Orders to Cease and Desist were signed by defendants Alter, Browne and Moore as directors of Advanta Bank Corp.

## ADVANTA'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP AND SEC RULES

**Background**

121.    As detailed herein, Advanta's publicly issued financial statements and related earnings releases during the Class Period were materially false and misleading in violation of Generally Accepted Accounting Principles ("GAAP") because defendants purposely failed to record adequate and timely provisions for both credit losses and allowances for receivable losses ("ARL"). Advanta's improper accounting for these accounts adversely affected Advanta's income statements and balance sheets.  Advanta also misled investors regarding its significant loss exposure related to the Company's portfolio of loans.[5]

122.    On Advanta's publicly issued income statement during the Class Period, the provision for credit losses and the provision for interest and fee losses directly reduces pretax earnings.  By improperly understating the provision for credit losses and interest and fee losses, Advanta falsely overstated reported pretax earnings, reported net income and EPS from third quarter 2006 to third quarter 2007.  By improperly understating the provisions for credit and fee losses, Advanta also improperly understated the ARL reserve balance on the balance sheet, which falsely increased reported assets.

**Applicable Accounting Rules**

123.    The accounting treatment for the provisions for credit losses and ARL is governed by specific GAAP provisions and SEC rules.  GAAP constitutes those standards recognized by the

---

[5]     The allowance for receivables losses and the provision for credit losses are equivalent to (and are generally referred to as) the allowance for loan losses ("ALL") and the provision for loan losses, respectively, in the banking industry and in the accounting literature and SEC rules pertaining to the banking industry.  For clarity with respect to defendants' false statements, however, plaintiff will continue to use Advanta's original terminology whenever describing accounts in the Company's published financial statements.

accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board.  SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.  Regulation S-X, 17 C.F.R. §210.10-01(a), requires that interim financial statements, such as quarterly financial statements, must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.

124.    Because there is and was ample guidance on the appropriate accounting treatment for these accounts during the Class Period, defendants were well informed of how to properly account for the ARL and provisions for credit losses during the Class Period.  Because Advanta is a finance company, these accounting items were among the most important estimates Advanta made in its public financial statements.  For example, SEC Staff Accounting Bulletin No. 102, *Selected Loan Loss Allowance Methodology and Documentation Issues* ("SAB 102"), states:  "For many entities engaged in lending activities, the allowance and provision for loan losses are significant elements of the financial statements."  Advanta was no exception, and, as a result of defendants' failure to record adequate and timely provisions for credit and interest/fee losses, Advanta's publicly issued financial statements during the Class Period were presented in violation of GAAP and materially misstated.

125.    GAAP, specifically Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("SFAS 5"), requires that the impairment of Advanta's credit card loans to be recognized through an addition to the ARL reserve during 2006 and 2007 (by increasing the loan loss allowance via a charge to earnings for credit losses) when, based on all available information, it

- 57 -

was probable that a loss had been incurred based on past events and conditions existing at the date of the financial statements.  As alleged below, Advanta failed to do this.

**Defendants Concealed Impairments and Losses in
Advanta's Loan Portfolio in Violation Of GAAP**

126.   The defendants knowingly failed to adequately increase the provisions for credit losses and the allowances for receivables losses during the Class Period in contravention of GAAP and SEC rules, and hid these failures by employing various improper credit quality concealment techniques:

(a)   engaging in systematic falsification of accounts receivables records;

(b)   improperly recording many customers' accounts as paid, when, in fact, they continued to be delinquent;

(c)   failing to adequately consider the adverse impact of the Company's improper interest rate re-pricing policies on delinquencies; and

(d)   failing to properly and adequately consider the impact of the deterioration in the FICO scores of the Company's customer base, or credit delinquencies.

**Falsification of Receivables and Collections Records**

127.   Advanta tracked customers' credit card loans by assigning various "ages" or "buckets" to those accounts receivable.  For example, those accounts that were up-to-date, and in which no amounts were past due, were considered to be in the "current" bucket.  Accounts that were delinquent, however, were assigned to various other buckets based on the ages of the delinquencies: *e.g.*, 30 to 60 days delinquent; 61 to 90 days delinquent; 91 to 120 days delinquent; and so forth.  As an account moved to a higher age bucket over time due to non-payment, the likelihood of collection on that account became more remote.

128.   Advanta stated that its policy was to charge-off an unpaid receivable no later than the end of the month in which it became past due 180 cumulative days from the contractual due date.

- 58 -

Accordingly, ensuring that customers' accounts were maintained in their correct respective buckets was critical to establishing an adequate allowance for receivable losses and, accordingly, to accurate financial reporting.  Improperly maintaining or concealing customer balances, for example, that were actually 180 days or more delinquent in earlier age buckets meant that those accounts remained on the books as "collectible" when, in fact, they should have been written off as loan principal, interest, and fee charge-offs against earnings, as appropriate.  Moreover, falsely posting accounts from later age buckets to earlier age buckets created a false receivables history that helped conceal the delinquency in future periods.  Falsely recording delinquent accounts as paid when they were, in reality, still outstanding resulted in Advanta reporting inflated net income and EPS in its public financial statements filed with the SEC on Forms 10-K and 10-Q for the periods third quarter 2006 to third quarter 2007.

129.    According to a senior internal auditor at Advanta, the significantly weak internal controls over the accounts receivable collections process was originally identified in a 2005 investigation.  This internal auditor subsequently conducted a "full-blown" internal audit into the Company's collections practices between November 2006 and July 2007.  According to the witness, this follow-on internal audit conducted from November 2006 to July 2007 was much more substantive and in-depth than the 2005 investigation.  This internal audit confirmed what Chief Credit Officer and defendant Carroll had already reported to other defendants, *i.e.*, that Collections staff were improperly and purposely indicating in the records that past due accounts had been paid, when in fact they were not, in order to effectively conceal the true proportions of Advanta's delinquent receivables.  By masking the true extent of 180 day delinquent receivables, Advanta was able to improperly understate its provision for credit losses, and thereby artificially inflate net income.  The consensus amongst members of the internal audit group was that the Collections management had engaged in "gross mismanagement" for allowing the improper conduct to continue

for so long.  The fact that the internal auditors confirmed that the same improper practices that were reported by defendant Carroll in 2005, and again in 2006, were still taking place in 2006 and 2007, is evidence that Advanta's practice of concealing delinquencies to artificially boost net income and EPS was solidly in place throughout the Class Period.

130.    Among the fraudulent collections practices that were in effect at Advanta prior to and during the Class Period were the following, according to the senior internal auditor:

(a)    Advanta knowingly falsified delinquency records by accepting customers' "promise to pay" in lieu of actual cash payments for purposes of aging receivables, thereby keeping certain accounts in more current aged buckets than they actually should have been;

(b)    Advanta knowingly used certain borrowers' bank routing information to initiate and process Automated Clearing House ("ACH") transfer payments to Advanta's own account without the customers' knowledge, when such transactions were generally cancelled because the transfers were unauthorized, there were insufficient funds in customers' accounts and, in some cases, the accounts no longer existed; and

(c)    Advanta knowingly did not charge-off accounts more than 180 days delinquent during the Class Period.

131.    Evidence of customers' "approval" of phone payments did not exist.  According to the senior internal auditor, when payments were made by phone, the Network of Automated Clearing House Association ("NACHA") required that such calls be recorded and maintained for at least one year, for the protection of customers as well as the financial institutions making such payments.  But Advanta failed to comply with NACHA and made no recordings of those payments by telephone.

132.    Advanta's credit quality concealment techniques, fraudulent collections practices, along with defendants' false statements during the Class Period, gave investors the false impression

that Advanta's customer base was of higher credit quality, and collections on receivables were much more effective than they really were.  Furthermore, Advanta used the fraudulently maintained receivables buckets as a bogus rationale for failing to increase the provisions for credit losses, interest and fee losses, and allowances for receivables losses during the Class Period.

133.   By altering the receivables history, Advanta falsely and knowingly inflated receivables, understated the provisions for credit losses and the allowances for receivable losses, and inflated pretax income and net income.

**Failure to Adequately Consider Adverse Impact of Re-Pricings**

134.   Another important factor that should have but did not lead to an increase in the provision for credit losses and higher ARLs during the Class Period was Advanta's re-pricing campaigns.  The senior internal auditor noted that increasing interest rates resulted in noticeable "pockets of delinquencies," even among Advanta's higher quality customers.  Imposing higher interest rates on borrowers had the adverse impact of causing Advanta's most credit-worthy customers to reduce or cease using Advanta's credit cards and tended to leave the Company with an overall customer base that posed greater risks of default.

135.   According to witnesses, the re-pricing campaigns were widely known throughout the Company and were a frequent topic of discussion at weekly management meetings during the Class Period, where, according to the senior information solutions manager who attended the meetings, Dave Griffith presented analyses of how re-pricing campaigns would "degrade the book" compared to the benefit of making short-term numbers.

136.   In fact, the senior internal auditor and the executive assistant noted that the re-pricing campaigns were aggressive in 2006 and 2007 – a time period that coincided directly with Advanta's supposedly strong earnings growth.  These campaigns became so commonplace that, according to a former financial business modeling analyst, Advanta used a dedicated re-pricing group to select

accounts for re-pricing *on a monthly basis*.  A former VP of Innovation and Business Development corroborated this account and added that Dave Griffith and Alev Seur (a frequent visitor to the top floor offices where defendants Alter and Rosoff were located) tracked customer retention following the re-pricing campaigns.  The executive assistant noted that it was definitely known and understood amongst the executives when evaluating a re-pricing campaign that re-pricing customer accounts could have "an impact on profit" if the campaign results in customer losses.

137.    Despite this knowledge, Advanta failed to adequately increase its provisions for credit losses and allowances for receivables losses when the Company made the decision to re-price customers' accounts.  By failing to do so, defendants inflated Advanta's pre-tax income, net income and EPS in its public financial statements filed with the SEC on Forms 10-K and 10-Q during the Class Period.

### Failure to Adequately Consider Impact of Deteriorating FICO Scores

138.    Advanta was issuing cards to customers with credit scores much closer (and even below) the cut-off in the industry considered to be sub-prime.  A former collector with Advanta who explained that collectors assigned borrowers to categories A-D according to their creditworthiness – the highest caliber borrowers were in the A category – reported that FICO scores dropped during the Class Period into the 600-650 range and in some cases were as low as 575.  The collector, and the senior information solutions manager who attended weekly management meetings with defendants, both explained  that Advanta had no choice but to lower its credit standards to obtain the type of growth that Advanta was reporting during the Class Period.  Advanta knew this would increase delinquencies and thus require larger provisions for credit losses and ARL.  However, Advanta continued to employ the credit quality concealment techniques alleged herein to avoid recording the necessary loss increases.

139.    Additionally, the senior internal auditor noted that Advanta did not report to any of the credit bureaus the cardholder delinquencies because the Company knew that by doing so that competitors would have access to Advanta's customer information.  Advanta's failure to report those cardholder delinquencies, however, had the impact of keeping customers with FICO scores higher than they would have been otherwise.

140.    The senior information solutions manager noted that defendants were building advertising campaigns specifically designed to make Advanta's quarterly earnings target numbers, and were trying to add hundreds of thousands of new customers, even as Advanta knew many of these new accounts were already showing delinquencies.  The collector added that the Company's focus in 2003 and 2004 was on signing up high-caliber customers with typically very high FICO scores, including lawyers, physicians and "blue-chip" professionals.  But, in 2006 and 2007,  as noted by the senior internal auditor, a particularly high percentage of Advanta's loan portfolio had shifted to construction subcontractors and small business start-ups – a clear shift in customer concentration and credit risk.  As the senior information solutions manager put it, Advanta was "stepping on the gas" as delinquencies were going up.

141.    However, despite this massive shift to subprime or risky borrowers, Advanta failed to adequately increase its provisions for credit losses and allowances for receivables losses and, in fact, continued to employ the credit quality concealment techniques alleged herein to hide the need to increase its loan loss provision and allowance.

142.    By employing the credit quality concealment techniques alleged above, and failing to adequately increase its provisions for credit losses and allowances for receivable losses, defendants caused Advanta's accounts receivable, net income and EPS reported in its public financial statements during the Class Period to be false and misleading by *at least* the following amounts:

| Advanta: Summary of Reported and Corrected Income Statement Line Items (In Thousands of Dollars, Except Percentages) | | | | | |
|---|---|---|---|---|---|
| | 3Q-06 | 4Q-06 | 1Q-07 | 2Q-07 | 3Q-07 |
| Reported provisions for credit losses | $9,202 | $9,969 | $10,083 | $11,806 | $14,724 |
| Corrected provisions for credit losses | $16,002 | $17,569 | $15,983 | $15,206 | $16,224 |
| Understated provisions for credit losses | $6,800 | 7,600 | $5,900 | $3,400 | $1,500 |
| | | | | | |
| Reported pretax income | $34,342 | $29,557 | $35,276 | $36,645 | $35,914 |
| Corrected pretax income | $27,542 | $21,957 | $29,376 | $33,245 | $34,414 |
| Overstated pretax income | $6,800 | $7,600 | $5,900 | $3,400 | $1,500 |
| Percentage of overstated pretax income | 24.7% | 34.6% | 20.1% | 10.2% | 4.4% |
| | | | | | |
| Reported net income | $21,120 | $18,178 | $21,448 | $23,734 | $22,051 |
| Corrected net income | $16,938 | $13,504 | $17,861 | $21,627 | $21,130 |
| Overstated net income | $4,182 | $4,674 | $3,587 | $2,107 | $921 |
| Percentage of overstated net income | 24.7% | 34.6% | 20.1% | 9.7% | 4.4% |
| | | | | | |
| Reported Diluted EPS (Class B shares)* | $0.73 | $0.63 | $0.73 | $0.54 | $0.51 |
| Corrected Diluted EPS (Class B shares) | $0.59 | $0.47 | $0.61 | $0.49 | $0.49 |
| Overstated Diluted EPS (Class B shares) | $0.14 | $0.16 | $0.12 | $0.05 | $0.02 |
| Percentage overstated Diluted EPS | 24.7% | 34.6% | 20.1% | 9.7% | 4.4% |

\* Effective June 18, 2007, Advanta's
Class B shares were split three-for two.

**Defendants Violated GAAP in Accounting for
Allowance for Receivables Losses**

143.    During a November 2000 speech to the American Institute of Certified Public

Accountants National Conference on Banks and Savings Institutions, the Deputy Chief Accountant

of the SEC stated the following:

> In plain English, the allowance for loan losses must reflect, on a timely basis, the
> changes in the credit quality of an institution's loan portfolio.  ***As credit quality***

***deteriorates, the allowance should be adjusted upward in a timely fashion to reflect the additional losses that have been incurred***.[6]

144.    However, during the Class Period, Advanta knew its ARL failed to cover the likely and estimable losses associated with the Company's portfolio of risky credit card loans because of the credit quality concealment and delinquency re-aging techniques explained above.  In fact, Advanta's receivables allowances ***decreased*** as a percentage of receivables for much of the Class Period and were below the percentages Advanta used in 2005.

145.    Under GAAP, a loss contingency is an existing condition, situation or set of circumstances involving uncertainty as to possible loss.  *See* SFAS 5, ¶1.  The collectibility of loans is an example of a loss contingency.  GAAP requires that an estimated loss from a loss contingency be accrued by a charge to income if both of the following conditions are met: (a) ***information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (b) the amount of loss can be reasonably estimated***.  *See* SFAS 5, ¶8.  As alleged herein, however, Advanta knew material portions of its loan portfolio were impaired (delinquent and unlikely to be collected) by the date quarterly financial statements were issued during the Class Period, but employed various improper techniques alleged herein to conceal the delinquency in order to avoid recording a loss on the write-off.

146.    Even if no accrual is made for a loss contingency because one or both of the above conditions of SFAS 5 are not met, or if an exposure to loss exists in excess of the amount accrued, defendants were still required to disclose the contingency when there is at least a "***reasonable***

---

[6]    As previously noted, the term "allowance for loan losses" or "ALL" is equivalent to Advanta's "allowance for receivables losses" or ARL.

*possibility*" that a loss or an additional loss may have been incurred.[7]  SFAS 5, ¶10.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.  *See* SFAS 5, ¶10.

147.    However, Advanta concealed the extent of its contingent losses (accounts receivable delinquencies) throughout the Class Period and disclosed neither the level of true delinquencies nor its practice of concealing the true delinquencies.

148.    Section 9.20 of the American Institute of Certified Public Accountants Audit and Accounting Guide for Depository and Lending Institutions provides that financial institutions are responsible for "***maintain[ing] adequate controls to ensure the [ARL] is consistently determined in accordance with GAAP, stated policies and procedures, and relevant supervisory guidance***."

149.    Section 9.04 of the same Accounting Guide for Depository and Lending Institutions also provides: "***Management is responsible*** for estimating credit losses. . . .  [M]anagement [must] mak[e] careful judgments about collectibility and estimates of losses.  Management's judgments often depend on micro- and macro-economic factors; past, current, and anticipated events based on facts in evidence at the balance-sheet date; and realistic courses of action it expects to take."

**SEC Rules Violated by Defendants in Accounting**
**for Allowances for Receivables Losses**

150.    The SEC provides explicit guidance on the proper accounting for loan losses that defendants were required to follow, but did not.  SAB 102 states in pertinent part:

> It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a ***disciplined and consistently applied process***. . . .  A registrant's loan loss allowance methodology generally should . . . *[c]onsider all known relevant internal and external factors that may affect loan collectibility; . . . [c]onsider the particular*

---

[7]    GAAP defines "reasonably possible" as "[t]he chance of the future event or events occurring is ***more than remote but less than likely***."  SFAS 5, ¶3.

*risks inherent in different kinds of lending; . . . [c]onsider current collateral values (less costs to sell) . . . [and] [b]e based on current and reliable data . . . .*

151.     SAB 102 also provides:

Factors that should be considered in developing loss measurements include . . . *[l]evels of and trends in delinquencies and impaired loans; . . . [l]evels of and trends in charge-offs and recoveries; . . . [e]ffects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices . . . .*

152.     The SEC further states:

For many entities engaged in lending activities, *the allowance and provision for loan losses are significant elements of the financial statements*. Therefore, the staff believes it is appropriate for an entity's management to *review, on a periodic basis, its methodology for determining its allowance for loan losses*.

153.     Advanta failed to adequately record the ARL in order to overstate its earnings prior to and during the Class Period in violation of GAAP and SEC rules.  Defendants knew that the ARL was understated because they failed to adequately consider the adverse impact of Advanta's re-pricing policies and the deterioration in the FICO scores of the Company's customer base. Defendants also knew that Advanta's ARL was understated because the Company was improperly recording many customers' accounts as paid when they were, in fact, delinquent, and that the Company was engaging in systematic falsification of accounts receivables records.  Advanta also failed to properly disclose the true facts regarding these customer delinquencies, credit losses and loan loss reserves in the MD&A section of its Forms 10-K and 10-Q filed during the Class Period.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

154.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose material adverse facts known to them about Advanta.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Advanta Class A and Class B common stock was a success, as it: (i) deceived the investing public regarding Advanta's prospects and business; (ii) artificially inflated the prices of Advanta Class A and Class B common stock; and (iii)

- 67 -

caused plaintiff and other members of the Class to purchase Advanta Class A and Class B common stock at inflated prices.

## SCIENTER ALLEGATIONS

155.    As alleged herein, defendants acted with scienter in that had the motive and opportunity to commit fraud and they either knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; that such statements or documents would be issued or disseminated to the investing public; and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Advanta, their control over, and/or receipt and/or modification of Advanta's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Advanta, participated in the fraudulent scheme alleged herein.

156.    Most of the defendants were Advanta's top insiders charged with not only developing Advanta's business strategy, but also overseeing the implementation and execution of that strategy during the Class Period.  Due to the circumstances described in this Complaint, nothing was more important to defendants than aggressively increasing Advanta's credit portfolio, masking delinquencies and re-pricing customer accounts to meet Wall Street expectations.  They consequently monitored and reviewed specific reports on these practices at times on at least a weekly basis (as detailed below) and knew, based on their review of such information, that their Class Period misrepresentations were false and misleading and their forecasts were made without a reasonable basis and were false and misleading.

**Defendants' Insider Sales**

157.     As set forth in the Company's 1992 Proxy Statement, in response to defendant Alter's concerns about maintaining the "voting power" of the Alter family and management team, the Company divided its common stock into Class A and Class B common stock.  Class A common stock has voting rights – one vote per share on all matters, and Class B common stock does not have voting rights.  Thus, throughout the Class Period, defendants had the best of both worlds as they were able to dump large quantities of their Class B equity holdings in the Company without diluting their relative voting rights.

158.     Defendants were motivated to engage in the course of conduct alleged herein in order to sell over 900,000 shares of their personally held Class B common stock and thereby reap over $27.5 million in insider trading proceeds:

Advanta Corp.
Insider Sales in Class B Common Stock: 10/16/06 - 1/30/08

| Last Name | Date | Shares | Price | Proceeds | End of CP Unrestricted Stockholdings | % Sold | Vested In the Money Options & Unrestricted Stock | % Sold |
|---|---|---|---|---|---|---|---|---|
| BLANK | 04/26/07 | 13,013 | $31.80 | $413,798 | | | | |
| | 04/26/07 | 8,325 | $31.97 | $266,123 | | | | |
| | 04/26/07 | 1,200 | $32.05 | $38,456 | | | | |
| | 04/26/07 | 900 | $31.98 | $28,782 | | | | |
| | 04/26/07 | 750 | $31.87 | $23,900 | | | | |
| | 04/26/07 | 750 | $32.04 | $24,030 | | | | |
| | 04/26/07 | 591 | $32.09 | $18,967 | | | | |
| | 04/26/07 | 488 | $31.85 | $15,525 | | | | |
| | 04/26/07 | 450 | $32.11 | $14,448 | | | | |
| | 04/26/07 | 450 | $32.34 | $14,553 | | | | |
| | 04/26/07 | 450 | $32.37 | $14,565 | | | | |
| | 04/26/07 | 450 | $32.00 | $14,400 | | | | |
| | 04/26/07 | 450 | $32.03 | $14,415 | | | | |
| | 04/26/07 | 450 | $32.09 | $14,439 | | | | |
| | 04/26/07 | 450 | $32.10 | $14,445 | | | | |
| | 04/26/07 | 300 | $32.11 | $9,634 | | | | |
| | 04/26/07 | 300 | $32.12 | $9,636 | | | | |
| | 04/26/07 | 300 | $32.18 | $9,654 | | | | |
| | 04/26/07 | 300 | $31.81 | $9,544 | | | | |
| | 04/26/07 | 300 | $31.81 | $9,544 | | | | |
| | 04/26/07 | 300 | $31.83 | $9,550 | | | | |
| | 04/26/07 | 300 | $31.83 | $9,550 | | | | |
| | 04/26/07 | 300 | $32.38 | $9,714 | | | | |
| | 04/26/07 | 300 | $31.99 | $9,596 | | | | |

- 69 -

**Advanta Corp.**

**Insider Sales in Class B Common Stock: 10/16/06 - 1/30/08**

| Last Name | Date | Shares | Price | Proceeds | End of CP Unrestricted Stockholdings | % Sold | Vested In the Money Options & Unrestricted Stock | % Sold |
|---|---|---|---|---|---|---|---|---|
| | 04/26/07 | 300 | $32.03 | $9,608 | | | | |
| | 04/26/07 | 300 | $32.06 | $9,618 | | | | |
| | 04/26/07 | 300 | $32.08 | $9,624 | | | | |
| | 04/26/07 | 231 | $32.01 | $7,395 | | | | |
| | 04/26/07 | 150 | $32.13 | $4,820 | | | | |
| | 04/26/07 | 150 | $31.83 | $4,774 | | | | |
| | 04/26/07 | 150 | $31.84 | $4,776 | | | | |
| | 04/26/07 | 150 | $31.87 | $4,781 | | | | |
| | 04/26/07 | 150 | $31.88 | $4,782 | | | | |
| | 04/26/07 | 150 | $32.02 | $4,803 | | | | |
| | 04/26/07 | 150 | $32.07 | $4,810 | | | | |
| | 04/27/07 | 1,500 | $31.50 | $47,250 | | | | |
| | 05/18/07 | 7,500 | $31.30 | $234,750 | | | | |
| | 05/18/07 | 4,500 | $31.54 | $141,930 | | | | |
| | 05/18/07 | 4,500 | $31.55 | $141,990 | | | | |
| | 05/18/07 | 3,000 | $31.53 | $94,600 | | | | |
| | 05/18/07 | 2,250 | $31.50 | $70,875 | | | | |
| | 05/18/07 | 2,250 | $31.51 | $70,890 | | | | |
| | 05/31/07 | 5,850 | $33.17 | $194,025 | | | | |
| | 05/31/07 | 1,350 | $33.17 | $44,784 | | | | |
| | 05/31/07 | 450 | $33.18 | $14,931 | | | | |
| | 05/31/07 | 450 | $33.20 | $14,940 | | | | |
| | 05/31/07 | 150 | $33.19 | $4,979 | | | | |
| | 05/31/07 | 150 | $33.21 | $4,982 | | | | |
| | 05/31/07 | 150 | $33.24 | $4,986 | | | | |
| | | 68,097 | | $2,172,970 | 0 | 100.00% | 0 | 100.00% |
| | | | | | | | | |
| BOTEL | 11/06/06 | 10,401 | $26.63 | $277,013 | | | | |
| | 11/06/06 | 3,150 | $26.60 | $83,790 | | | | |
| | 11/06/06 | 900 | $26.61 | $23,946 | | | | |
| | 11/06/06 | 900 | $26.63 | $23,970 | | | | |
| | 11/06/06 | 450 | $26.62 | $11,979 | | | | |
| | 11/06/06 | 324 | $26.64 | $8,631 | | | | |
| | 02/01/07 | 4,500 | $30.74 | $138,330 | | | | |
| | 02/01/07 | 1,500 | $30.83 | $46,250 | | | | |
| | 02/01/07 | 1,500 | $30.94 | $46,410 | | | | |
| | 02/01/07 | 1,350 | $30.89 | $41,697 | | | | |
| | 02/01/07 | 1,350 | $30.90 | $41,715 | | | | |
| | 02/01/07 | 150 | $30.83 | $4,625 | | | | |
| | 02/01/07 | 150 | $30.91 | $4,636 | | | | |
| | 04/30/07 | 1,650 | $30.89 | $50,974 | | | | |
| | 04/30/07 | 1,350 | $30.90 | $41,715 | | | | |
| | 06/05/07 | 3,372 | $34.03 | $114,760 | | | | |
| | 06/05/07 | 1,350 | $34.05 | $45,963 | | | | |
| | 06/05/07 | 828 | $33.93 | $28,091 | | | | |
| | 06/05/07 | 300 | $34.03 | $10,210 | | | | |
| | 06/05/07 | 150 | $34.04 | $5,106 | | | | |
| | | 35,625 | | $1,049,812 | 3,750 | 90.48% | 27,375 | 56.55% |

**Advanta Corp.**

**Insider Sales in Class B Common Stock: 10/16/06 - 1/30/08**

| Last Name | Date | Shares | Price | Proceeds | End of CP Unrestricted Stockholdings | % Sold | Vested In the Money Options & Unrestricted Stock | % Sold |
|---|---|---|---|---|---|---|---|---|
| BROWNE | 11/01/06 | 1,575 | $26.23 | $41,318 | | | | |
| | 11/01/06 | 600 | $26.22 | $15,732 | | | | |
| | 11/01/06 | 525 | $26.16 | $13,734 | | | | |
| | 11/01/06 | 300 | $26.24 | $7,872 | | | | |
| | 11/15/06 | 600 | $28.50 | $17,100 | | | | |
| | 11/15/06 | 525 | $28.47 | $14,945 | | | | |
| | 11/15/06 | 450 | $28.43 | $12,792 | | | | |
| | 11/15/06 | 450 | $28.43 | $12,795 | | | | |
| | 11/15/06 | 450 | $28.63 | $12,885 | | | | |
| | 11/15/06 | 300 | $28.51 | $8,552 | | | | |
| | 11/15/06 | 225 | $28.48 | $6,408 | | | | |
| | 12/01/06 | 3,779 | $30.03 | $113,481 | | | | |
| | 12/01/06 | 3,285 | $30.11 | $98,922 | | | | |
| | 12/01/06 | 1,916 | $30.00 | $57,465 | | | | |
| | 12/01/06 | 600 | $30.01 | $18,008 | | | | |
| | 12/01/06 | 300 | $30.01 | $9,002 | | | | |
| | 12/01/06 | 300 | $30.09 | $9,028 | | | | |
| | 12/01/06 | 150 | $30.02 | $4,503 | | | | |
| | 12/01/06 | 150 | $30.03 | $4,504 | | | | |
| | 12/01/06 | 150 | $30.07 | $4,511 | | | | |
| | 12/01/06 | 150 | $30.09 | $4,513 | | | | |
| | 12/06/06 | 2,100 | $29.66 | $62,286 | | | | |
| | 12/06/06 | 900 | $29.73 | $26,760 | | | | |
| | 12/20/06 | 975 | $28.83 | $28,113 | | | | |
| | 12/20/06 | 900 | $28.76 | $25,884 | | | | |
| | 12/20/06 | 281 | $28.87 | $8,097 | | | | |
| | 12/20/06 | 225 | $30.85 | $6,942 | | | | |
| | 12/20/06 | 150 | $28.85 | $4,327 | | | | |
| | 12/20/06 | 150 | $28.86 | $4,329 | | | | |
| | 12/20/06 | 150 | $28.91 | $4,336 | | | | |
| | 12/20/06 | 150 | $28.92 | $4,338 | | | | |
| | 12/20/06 | 20 | $28.93 | $564 | | | | |
| | 01/03/07 | 3,000 | $28.99 | $86,980 | | | | |
| | 01/10/07 | 4,688 | $30.67 | $143,750 | | | | |
| | 01/17/07 | 3,000 | $31.33 | $94,000 | | | | |
| | 01/17/07 | 2,400 | $31.07 | $74,560 | | | | |
| | 01/17/07 | 450 | $31.08 | $13,986 | | | | |
| | 01/17/07 | 150 | $31.13 | $4,670 | | | | |
| | 02/07/07 | 1,881 | $30.90 | $58,123 | | | | |
| | 02/07/07 | 600 | $30.99 | $18,596 | | | | |
| | 02/07/07 | 519 | $30.97 | $16,072 | | | | |
| | 02/21/07 | 1,731 | $30.23 | $52,334 | | | | |
| | 02/21/07 | 825 | $30.27 | $24,970 | | | | |
| | 02/21/07 | 150 | $30.28 | $4,542 | | | | |
| | 02/21/07 | 150 | $30.29 | $4,543 | | | | |
| | 02/21/07 | 144 | $30.30 | $4,363 | | | | |
| | 03/07/07 | 1,275 | $26.91 | $34,306 | | | | |
| | 03/07/07 | 900 | $26.97 | $24,270 | | | | |
| | 03/07/07 | 525 | $26.92 | $14,133 | | | | |

- 71 -

**Advanta Corp.**

**Insider Sales in Class B Common Stock: 10/16/06 - 1/30/08**

| Last Name | Date | Shares | Price | Proceeds | End of CP Unrestricted Stockholdings | % Sold | Vested In the Money Options & Unrestricted Stock | % Sold |
|---|---|---|---|---|---|---|---|---|
| | 03/07/07 | 300 | $26.88 | $8,064 | | | | |
| | 03/21/07 | 1,725 | $28.61 | $49,358 | | | | |
| | 03/21/07 | 750 | $28.63 | $21,475 | | | | |
| | 03/21/07 | 375 | $28.67 | $10,750 | | | | |
| | 03/21/07 | 150 | $28.62 | $4,293 | | | | |
| | 04/04/07 | 2,148 | $30.00 | $64,440 | | | | |
| | 04/04/07 | 852 | $30.10 | $25,645 | | | | |
| | 04/18/07 | 2,025 | $31.23 | $63,248 | | | | |
| | 04/18/07 | 450 | $31.13 | $14,010 | | | | |
| | 04/18/07 | 384 | $31.25 | $11,999 | | | | |
| | 04/18/07 | 141 | $31.25 | $4,407 | | | | |
| | 05/02/07 | 1,575 | $30.03 | $47,303 | | | | |
| | 05/02/07 | 750 | $30.15 | $22,615 | | | | |
| | 05/02/07 | 675 | $30.13 | $20,336 | | | | |
| | 05/04/07 | 960 | $29.85 | $28,659 | | | | |
| | 05/16/07 | 2,253 | $30.73 | $69,242 | | | | |
| | 05/16/07 | 443 | $30.74 | $13,602 | | | | |
| | 05/16/07 | 305 | $30.75 | $9,364 | | | | |
| | 05/23/07 | 2,183 | $32.69 | $71,353 | | | | |
| | 05/23/07 | 150 | $32.70 | $4,905 | | | | |
| | 05/23/07 | 14 | $32.71 | $442 | | | | |
| | 06/06/07 | 1,125 | $33.38 | $37,553 | | | | |
| | 06/06/07 | 750 | $33.23 | $24,925 | | | | |
| | 06/06/07 | 600 | $33.36 | $20,016 | | | | |
| | 06/06/07 | 375 | $33.32 | $12,495 | | | | |
| | 06/06/07 | 75 | $33.35 | $2,502 | | | | |
| | 06/06/07 | 75 | $33.37 | $2,503 | | | | |
| | 06/20/07 | 1,400 | $33.97 | $47,558 | | | | |
| | 06/20/07 | 500 | $34.04 | $17,020 | | | | |
| | 06/20/07 | 500 | $34.05 | $17,025 | | | | |
| | 06/20/07 | 400 | $34.08 | $13,632 | | | | |
| | 06/20/07 | 200 | $34.07 | $6,814 | | | | |
| | 07/05/07 | 400 | $32.63 | $13,052 | | | | |
| | 07/05/07 | 400 | $32.50 | $13,000 | | | | |
| | 07/05/07 | 400 | $32.57 | $13,028 | | | | |
| | 07/05/07 | 300 | $32.58 | $9,774 | | | | |
| | 07/05/07 | 300 | $32.60 | $9,780 | | | | |
| | 07/05/07 | 300 | $32.62 | $9,786 | | | | |
| | 07/05/07 | 300 | $32.55 | $9,765 | | | | |
| | 07/05/07 | 200 | $32.56 | $6,512 | | | | |
| | 07/05/07 | 200 | $32.65 | $6,530 | | | | |
| | 07/05/07 | 100 | $32.61 | $3,261 | | | | |
| | 07/05/07 | 100 | $32.64 | $3,264 | | | | |
| | 07/18/07 | 31 | $32.15 | $997 | | | | |
| | 07/19/07 | 1,900 | $30.54 | $58,026 | | | | |
| | 07/19/07 | 500 | $30.99 | $15,495 | | | | |
| | 07/19/07 | 200 | $30.98 | $6,196 | | | | |
| | 07/19/07 | 169 | $30.97 | $5,234 | | | | |
| | 07/19/07 | 100 | $30.57 | $3,057 | | | | |

- 72 -

**Advanta Corp.**
**Insider Sales in Class B Common Stock: 10/16/06 - 1/30/08**

| Last Name | Date | Shares | Price | Proceeds | End of CP Unrestricted Stockholdings | % Sold | Vested In the Money Options & Unrestricted Stock | % Sold |
|---|---|---|---|---|---|---|---|---|
| | 07/19/07 | 100 | $31.03 | $3,103 | | | | |
| | 08/01/07 | 900 | $26.80 | $24,120 | | | | |
| | 08/01/07 | 600 | $26.20 | $15,720 | | | | |
| | 08/01/07 | 400 | $26.30 | $10,520 | | | | |
| | 08/01/07 | 400 | $26.35 | $10,540 | | | | |
| | 08/01/07 | 300 | $26.38 | $7,914 | | | | |
| | 08/01/07 | 100 | $26.32 | $2,632 | | | | |
| | 08/01/07 | 100 | $26.33 | $2,633 | | | | |
| | 08/01/07 | 100 | $26.36 | $2,636 | | | | |
| | 08/01/07 | 100 | $26.37 | $2,637 | | | | |
| | 08/15/07 | 1,875 | $25.33 | $47,494 | | | | |
| | 08/15/07 | 1,125 | $24.20 | $27,225 | | | | |
| | 09/05/07 | 1,169 | $25.80 | $30,160 | | | | |
| | 09/05/07 | 541 | $25.75 | $13,931 | | | | |
| | 09/05/07 | 256 | $25.85 | $6,618 | | | | |
| | 09/05/07 | 200 | $26.04 | $5,208 | | | | |
| | 09/05/07 | 175 | $25.98 | $4,547 | | | | |
| | 09/05/07 | 121 | $25.76 | $3,117 | | | | |
| | 09/05/07 | 38 | $25.77 | $979 | | | | |
| | 09/06/07 | 207 | $25.75 | $5,330 | | | | |
| | 09/06/07 | 200 | $25.90 | $5,180 | | | | |
| | 09/06/07 | 93 | $25.80 | $2,399 | | | | |
| | 09/19/07 | 2,452 | $28.40 | $69,637 | | | | |
| | 09/19/07 | 400 | $28.60 | $11,440 | | | | |
| | 09/19/07 | 148 | $28.41 | $4,205 | | | | |
| | 10/03/07 | 800 | $29.00 | $23,200 | | | | |
| | 10/03/07 | 600 | $28.65 | $17,190 | | | | |
| | 10/03/07 | 462 | $28.60 | $13,213 | | | | |
| | 10/03/07 | 419 | $28.61 | $11,988 | | | | |
| | 10/03/07 | 400 | $28.75 | $11,500 | | | | |
| | 10/03/07 | 200 | $28.71 | $5,742 | | | | |
| | 10/03/07 | 100 | $28.74 | $2,874 | | | | |
| | 10/03/07 | 19 | $28.63 | $544 | | | | |
| | 10/17/07 | 1,500 | $27.00 | $40,500 | | | | |
| | 10/17/07 | 500 | $27.08 | $13,540 | | | | |
| | 10/17/07 | 500 | $27.20 | $13,600 | | | | |
| | 10/17/07 | 400 | $26.60 | $10,640 | | | | |
| | 10/17/07 | 100 | $26.80 | $2,680 | | | | |
| | | 93,773 | | $2,779,685 | 151,973 | 38.16% | 365,723 | 20.41% |
| | | | | | | | | |
| CARROLL | 10/16/06 | 3,150 | $25.48 | $80,262 | | | | |
| | 10/16/06 | 2,630 | $25.47 | $66,965 | | | | |
| | 10/16/06 | 2,453 | $25.53 | $62,621 | | | | |
| | 10/16/06 | 1,646 | $25.55 | $42,048 | | | | |
| | 10/16/06 | 1,286 | $25.63 | $32,952 | | | | |
| | 10/16/06 | 1,191 | $25.51 | $30,378 | | | | |
| | 10/16/06 | 1,130 | $25.50 | $28,802 | | | | |
| | 10/16/06 | 600 | $25.55 | $15,328 | | | | |
| | 10/16/06 | 600 | $25.40 | $15,240 | | | | |

- 73 -

**Advanta Corp.**

**Insider Sales in Class B Common Stock: 10/16/06 - 1/30/08**

| Last Name | Date | Shares | Price | Proceeds | End of CP Unrestricted Stockholdings | % Sold | Vested In the Money Options & Unrestricted Stock | % Sold |
|---|---|---|---|---|---|---|---|---|
| | 10/16/06 | 450 | $25.49 | $11,469 | | | | |
| | 10/16/06 | 450 | $25.64 | $11,538 | | | | |
| | 10/16/06 | 285 | $25.60 | $7,296 | | | | |
| | 10/16/06 | 69 | $25.59 | $1,765 | | | | |
| | 10/17/06 | 5,108 | $25.37 | $129,560 | | | | |
| | 10/17/06 | 1,902 | $25.43 | $48,374 | | | | |
| | 10/17/06 | 1,200 | $25.40 | $30,480 | | | | |
| | 10/17/06 | 750 | $25.43 | $19,070 | | | | |
| | 10/17/06 | 416 | $25.41 | $10,556 | | | | |
| | 11/06/06 | 4,688 | $26.67 | $125,000 | | | | |
| | 11/14/06 | 4,500 | $28.00 | $126,000 | | | | |
| | 11/27/06 | 4,500 | $29.33 | $132,000 | | | | |
| | | 39,000 | | $1,027,705 | 13,035 | 74.95% | 13,035 | 74.95% |
| | | | | | | | | |
| DUNN | 02/09/07 | 3,375 | $31.00 | $104,625 | | | | |
| | 03/21/07 | 16,875 | $29.33 | $495,000 | | | | |
| | | 20,250 | | $599,625 | 0 | 100.00% | 16,875 | 54.55% |
| | | | | | | | | |
| LUBNER | 11/02/06 | 36,750 | $25.51 | $937,370 | | | | |
| | | 36,750 | | $937,370 | 86,339 | 29.86% | 99,839 | 26.91% |
| | | | | | | | | |
| MOORE | 01/03/07 | 4,200 | $29.02 | $121,884 | | | | |
| | 01/03/07 | 2,100 | $29.00 | $60,900 | | | | |
| | 01/03/07 | 900 | $29.07 | $26,160 | | | | |
| | 01/03/07 | 300 | $29.01 | $8,702 | | | | |
| | 02/01/07 | 2,550 | $30.96 | $78,948 | | | | |
| | 02/01/07 | 1,241 | $30.89 | $38,315 | | | | |
| | 02/01/07 | 788 | $30.73 | $24,203 | | | | |
| | 02/01/07 | 771 | $30.93 | $23,850 | | | | |
| | 02/01/07 | 710 | $30.82 | $21,867 | | | | |
| | 02/01/07 | 600 | $31.13 | $18,680 | | | | |
| | 02/01/07 | 579 | $31.03 | $17,968 | | | | |
| | 02/01/07 | 300 | $31.27 | $9,380 | | | | |
| | 02/01/07 | 150 | $31.30 | $4,695 | | | | |
| | 03/01/07 | 1,950 | $27.70 | $54,015 | | | | |
| | 03/01/07 | 1,650 | $27.83 | $45,914 | | | | |
| | 03/01/07 | 1,650 | $27.95 | $46,112 | | | | |
| | 03/01/07 | 1,200 | $27.77 | $33,328 | | | | |
| | 03/01/07 | 1,050 | $27.83 | $29,225 | | | | |
| | 03/01/07 | 900 | $27.84 | $25,056 | | | | |
| | 03/01/07 | 750 | $28.00 | $21,000 | | | | |
| | 03/01/07 | 600 | $27.78 | $16,668 | | | | |
| | 03/01/07 | 600 | $27.80 | $16,680 | | | | |
| | 03/01/07 | 300 | $27.75 | $8,324 | | | | |
| | 03/01/07 | 300 | $27.97 | $8,390 | | | | |
| | 03/01/07 | 150 | $27.73 | $4,160 | | | | |
| | 03/01/07 | 150 | $27.74 | $4,161 | | | | |
| | 04/02/07 | 5,595 | $28.70 | $160,577 | | | | |
| | 04/02/07 | 2,730 | $28.66 | $78,242 | | | | |

- 74 -

**Advanta Corp.**
**Insider Sales in Class B Common Stock: 10/16/06 - 1/30/08**

| Last Name | Date | Shares | Price | Proceeds | End of CP Unrestricted Stockholdings | % Sold | Vested In the Money Options & Unrestricted Stock | % Sold |
|---|---|---|---|---|---|---|---|---|
| | 04/02/07 | 300 | $28.73 | $8,620 | | | | |
| | | 35,063 | | $1,016,022 | 47,108 | 42.67% | 70,733 | 33.14% |
| | | | | | | | | |
| OLAFSSON | 05/14/07 | 70,886 | $30.33 | $2,150,194 | | | | |
| | 05/14/07 | 22,451 | $30.67 | $688,482 | | | | |
| | 05/14/07 | 9,750 | $30.53 | $297,700 | | | | |
| | 05/14/07 | 9,602 | $30.47 | $292,526 | | | | |
| | 05/14/07 | 5,297 | $30.73 | $162,779 | | | | |
| | 05/14/07 | 5,279 | $30.72 | $162,156 | | | | |
| | 05/14/07 | 4,950 | $30.34 | $150,183 | | | | |
| | 05/14/07 | 1,650 | $30.35 | $50,072 | | | | |
| | 05/14/07 | 1,200 | $30.37 | $36,448 | | | | |
| | 05/14/07 | 1,035 | $30.74 | $31,816 | | | | |
| | 05/14/07 | 900 | $30.71 | $27,642 | | | | |
| | 05/14/07 | 600 | $30.57 | $18,340 | | | | |
| | 05/14/07 | 600 | $30.44 | $18,264 | | | | |
| | 05/14/07 | 450 | $30.73 | $13,827 | | | | |
| | 05/14/07 | 450 | $30.69 | $13,812 | | | | |
| | 05/14/07 | 450 | $31.27 | $14,070 | | | | |
| | 05/14/07 | 450 | $30.46 | $13,707 | | | | |
| | 05/14/07 | 300 | $30.71 | $9,212 | | | | |
| | 05/14/07 | 300 | $30.55 | $9,166 | | | | |
| | 05/14/07 | 300 | $30.42 | $9,126 | | | | |
| | 05/14/07 | 300 | $30.35 | $9,106 | | | | |
| | 05/14/07 | 201 | $30.43 | $6,117 | | | | |
| | 05/14/07 | 152 | $30.56 | $4,630 | | | | |
| | 05/14/07 | 150 | $30.54 | $4,581 | | | | |
| | 05/14/07 | 150 | $30.45 | $4,567 | | | | |
| | 05/14/07 | 150 | $30.39 | $4,559 | | | | |
| | | 138,000 | | $4,203,081 | 0 | 100.00% | 110,250 | 55.59% |
| | | | | | | | | |
| ROSOFF | 04/26/07 | 375,000 | $30.82 | $11,557,500 | | | | |
| | | 375,000 | | $11,557,500 | 434,379 | 46.33% | 1,635,504 | 18.65% |
| | | | | | | | | |
| WEINSTOCK | 10/16/06 | 975 | $25.53 | $24,895 | | | | |
| | 10/16/06 | 150 | $25.54 | $3,831 | | | | |
| | 11/01/06 | 675 | $26.16 | $17,658 | | | | |
| | 11/01/06 | 450 | $26.23 | $11,805 | | | | |
| | 11/16/06 | 4,346 | $29.21 | $126,947 | | | | |
| | 11/16/06 | 2,250 | $29.11 | $65,505 | | | | |
| | 11/16/06 | 1,497 | $29.17 | $43,663 | | | | |
| | 11/16/06 | 1,275 | $29.19 | $37,213 | | | | |
| | 11/16/06 | 600 | $29.23 | $17,540 | | | | |
| | 11/16/06 | 450 | $29.07 | $13,080 | | | | |
| | 11/16/06 | 300 | $29.24 | $8,772 | | | | |
| | 11/16/06 | 225 | $29.03 | $6,533 | | | | |
| | 11/16/06 | 150 | $29.12 | $4,368 | | | | |
| | 11/16/06 | 150 | $29.19 | $4,379 | | | | |
| | 11/16/06 | 5 | $29.22 | $131 | | | | |

**Advanta Corp.**
**Insider Sales in Class B Common Stock: 10/16/06 - 1/30/08**

| Last Name | Date | Shares | Price | Proceeds | End of CP Unrestricted Stockholdings | % Sold | Vested In the Money Options & Unrestricted Stock | % Sold |
|---|---|---|---|---|---|---|---|---|
| | 11/16/06 | 3 | $29.25 | $88 | | | | |
| | 12/01/06 | 567 | $30.07 | $17,048 | | | | |
| | 12/01/06 | 258 | $30.50 | $7,869 | | | | |
| | 12/01/06 | 150 | $30.07 | $4,511 | | | | |
| | 12/01/06 | 150 | $30.37 | $4,555 | | | | |
| | 12/18/06 | 300 | $29.43 | $8,828 | | | | |
| | 12/18/06 | 150 | $29.29 | $4,393 | | | | |
| | 12/18/06 | 150 | $29.41 | $4,411 | | | | |
| | 12/18/06 | 150 | $29.42 | $4,413 | | | | |
| | 12/18/06 | 149 | $29.29 | $4,350 | | | | |
| | 12/18/06 | 149 | $29.30 | $4,351 | | | | |
| | 12/18/06 | 78 | $29.28 | $2,284 | | | | |
| | 01/03/07 | 1,125 | $28.99 | $32,618 | | | | |
| | 01/16/07 | 675 | $31.23 | $21,083 | | | | |
| | 01/16/07 | 300 | $31.21 | $9,364 | | | | |
| | 01/16/07 | 150 | $31.22 | $4,683 | | | | |
| | 02/01/07 | 675 | $31.27 | $21,105 | | | | |
| | 02/01/07 | 450 | $31.17 | $14,025 | | | | |
| | 02/16/07 | 4,500 | $29.88 | $134,460 | | | | |
| | 02/16/07 | 1,650 | $29.87 | $49,280 | | | | |
| | 02/16/07 | 1,350 | $29.97 | $40,455 | | | | |
| | 02/16/07 | 1,149 | $29.89 | $34,347 | | | | |
| | 02/16/07 | 1,050 | $29.81 | $31,304 | | | | |
| | 02/16/07 | 900 | $30.01 | $27,012 | | | | |
| | 02/16/07 | 750 | $29.83 | $22,375 | | | | |
| | 02/16/07 | 525 | $30.08 | $15,792 | | | | |
| | 02/16/07 | 435 | $29.93 | $13,021 | | | | |
| | 02/16/07 | 66 | $29.89 | $1,973 | | | | |
| | 03/01/07 | 675 | $27.55 | $18,594 | | | | |
| | 03/01/07 | 450 | $27.45 | $12,354 | | | | |
| | 03/16/07 | 450 | $28.00 | $12,600 | | | | |
| | 03/16/07 | 375 | $27.78 | $10,418 | | | | |
| | 03/16/07 | 300 | $28.01 | $8,404 | | | | |
| | 04/02/07 | 825 | $28.97 | $23,898 | | | | |
| | 04/02/07 | 300 | $28.99 | $8,696 | | | | |
| | 04/16/07 | 675 | $30.98 | $20,912 | | | | |
| | 04/16/07 | 450 | $30.99 | $13,944 | | | | |
| | 05/01/07 | 825 | $29.83 | $24,613 | | | | |
| | 05/01/07 | 189 | $29.72 | $5,617 | | | | |
| | 05/01/07 | 111 | $29.73 | $3,300 | | | | |
| | 05/16/07 | 3,687 | $30.80 | $113,560 | | | | |
| | 05/16/07 | 3,375 | $30.73 | $103,725 | | | | |
| | 05/16/07 | 2,313 | $30.75 | $71,132 | | | | |
| | 05/16/07 | 1,800 | $30.77 | $55,380 | | | | |
| | 05/16/07 | 900 | $30.83 | $27,750 | | | | |
| | 05/16/07 | 750 | $30.69 | $23,020 | | | | |
| | 05/16/07 | 600 | $30.74 | $18,444 | | | | |
| | 05/16/07 | 450 | $30.87 | $13,893 | | | | |
| | 05/16/07 | 300 | $30.79 | $9,238 | | | | |

- 76 -

**Advanta Corp.**
**Insider Sales in Class B Common Stock: 10/16/06 - 1/30/08**

| Last Name | Date | Shares | Price | Proceeds | End of CP Unrestricted Stockholdings | % Sold | Vested In the Money Options & Unrestricted Stock | % Sold |
|---|---|---|---|---|---|---|---|---|
| | 05/16/07 | 300 | $30.81 | $9,244 | | | | |
| | 05/16/07 | 225 | $30.75 | $6,918 | | | | |
| | 05/16/07 | 150 | $30.70 | $4,605 | | | | |
| | 05/16/07 | 150 | $30.84 | $4,626 | | | | |
| | 05/17/07 | 4,950 | $30.93 | $153,120 | | | | |
| | 05/17/07 | 3,900 | $30.87 | $120,380 | | | | |
| | 05/17/07 | 1,050 | $30.97 | $32,515 | | | | |
| | 05/17/07 | 891 | $31.00 | $27,621 | | | | |
| | 05/17/07 | 300 | $30.90 | $9,270 | | | | |
| | 05/17/07 | 150 | $31.01 | $4,651 | | | | |
| | 05/17/07 | 150 | $30.91 | $4,636 | | | | |
| | 05/17/07 | 150 | $30.87 | $4,631 | | | | |
| | 05/17/07 | 84 | $31.08 | $2,611 | | | | |
| | 06/01/07 | 750 | $33.59 | $25,195 | | | | |
| | 06/01/07 | 278 | $33.60 | $9,324 | | | | |
| | 06/01/07 | 98 | $33.46 | $3,262 | | | | |
| | 06/18/07 | 1,025 | $33.60 | $34,440 | | | | |
| | 06/18/07 | 100 | $33.62 | $3,362 | | | | |
| | 07/02/07 | 900 | $31.82 | $28,638 | | | | |
| | 07/02/07 | 225 | $31.65 | $7,121 | | | | |
| | 07/16/07 | 625 | $32.03 | $20,019 | | | | |
| | 07/16/07 | 500 | $32.02 | $16,010 | | | | |
| | 08/01/07 | 525 | $26.40 | $13,860 | | | | |
| | 08/01/07 | 500 | $26.45 | $13,225 | | | | |
| | 08/01/07 | 100 | $26.47 | $2,647 | | | | |
| | 08/16/07 | 1,125 | $23.55 | $26,494 | | | | |
| | 09/04/07 | 300 | $25.90 | $7,770 | | | | |
| | 09/04/07 | 300 | $25.95 | $7,785 | | | | |
| | 09/04/07 | 200 | $25.80 | $5,160 | | | | |
| | 09/04/07 | 125 | $26.07 | $3,259 | | | | |
| | 09/04/07 | 100 | $26.09 | $2,609 | | | | |
| | 09/04/07 | 100 | $26.11 | $2,611 | | | | |
| | 09/17/07 | 725 | $26.85 | $19,466 | | | | |
| | 09/17/07 | 400 | $26.90 | $10,760 | | | | |
| | | 72,750 | | $2,173,650 | 45,859 | 61.34% | 77,734 | 48.34% |
| | | **914,307** | | **$27,517,421** | | | | |

159.   Defendants' insider sales were suspicious in timing and timed to maximize their personal benefit.  Defendants' sales were predominantly made between April and June 2007, at prices near the Class Period high of approximately $34 per share in June 2007.  Not surprisingly, defendants Botel, Browne, Carroll, Lubner and Weinstock initiated their selling sprees in October

and November 2006 concurrently with defendant Carroll's discovery that, even after the 2005 internal audit, the Company's collectors were still manipulating the collections system to mask true delinquency rates.  Then, as the "full-blown" internal audit intensified and the resulting FDIC investigation ensued, defendants Blank, Botel, Browne, Dunn, Moore, Olafsson, Rosoff and Weinstock scrambled to profit off the Company's purported success.  Similarly suspicious, defendant Blank suddenly announced that he was not seeking re-election as the Board's Audit Committee Chair at the Company's June 2007 Annual Meeting and immediately sold 100% of his Advanta stock holdings in April and May 2007 – having never sold a single share since he started on the Board in 2001.  Only defendants Browne and Weinstock (described as best friends by the senior information solutions manager) were bold enough to sell subsequent to the issuance of the internal audit department's formal report and shortly before Advanta's stock tumbled from over $23 per share on July 31, 2007 for Class A shares, and over $25 per share for Class B shares to $15 and $17 by October 25, 2007, respectively, a more than 30% decline in just 11 weeks.  Advanta's stock never recovered.  The suspiciousness of defendants' stock sales and their proximity to the progression of the internal audit and the market learning of Advanta's true delinquency rates and credit quality problems raises a strong inference that defendants knew of the internal audit and that Advanta had been masking its true delinquency rates and credit quality problems when they sold their shares and used that information in connection with the sales.

160.    Defendants' insider sales were also suspicious in amount.  Defendants Blank, Botel, Dunn and Olafsson all sold over 90% of their Advanta holdings (excluding vested options) during the Class Period for a combined total of over $8 million.  Including vested options, the percentages remain suspicious at between 54.55% and 100%.  Defendant Carroll dumped approximately 75% of his Advanta holdings in October and November 2006 when he realized that Advanta had been masking its delinquency rates, using the same improper practices found to exist since 2005.

161.    Defendants' insider sales were also unusual compared to their prior trading history. The following chart shows defendants' insider sales in the five years prior to the Class Period – paltry in comparison to defendants' Class Period sales:

**Advanta Corp.**
**Insider Sales in Class B Common Stock: 10/31/01 - 10/15/06**

| Last Name | Date | Shares | Price | Proceeds |
|-----------|------|--------|-------|----------|
| BOTEL | 08/03/04 | 2,100 | $14.26 | $29,946 |
| | 08/03/04 | 1,650 | $14.24 | $23,496 |
| | 08/03/04 | 1,500 | $14.17 | $21,250 |
| | 08/03/04 | 1,500 | $14.17 | $21,250 |
| | 08/03/04 | 450 | $14.20 | $6,390 |
| | 08/03/04 | 300 | $14.17 | $4,252 |
| | 08/06/04 | 4,883 | $13.98 | $68,257 |
| | 08/06/04 | 1,118 | $14.15 | $15,809 |
| | 08/06/04 | 818 | $14.08 | $11,510 |
| | 08/06/04 | 750 | $14.11 | $10,580 |
| | 08/06/04 | 450 | $14.02 | $6,309 |
| | 08/06/04 | 300 | $14.15 | $4,244 |
| | 08/06/04 | 300 | $14.11 | $4,234 |
| | 05/02/05 | 3,600 | $16.01 | $57,648 |
| | 05/02/05 | 1,800 | $16.07 | $28,920 |
| | 05/02/05 | 890 | $16.04 | $14,268 |
| | 05/02/05 | 300 | $16.05 | $4,816 |
| | 08/28/06 | 4,725 | $21.97 | $103,824 |
| | 08/28/06 | 4,050 | $21.99 | $89,073 |
| | 08/28/06 | 1,797 | $21.99 | $39,510 |
| | 08/28/06 | 1,428 | $21.98 | $31,387 |
| | 08/29/06 | 3,000 | $21.93 | $65,800 |
| | 08/29/06 | 1,610 | $21.41 | $34,465 |
| | 08/29/06 | 1,500 | $21.40 | $32,100 |
| | 09/06/06 | 11,223 | $22.73 | $255,136 |
| | 09/06/06 | 777 | $22.74 | $17,669 |
| | | 52,817 | | $1,002,144 |
| | | | | |
| BROWNE | 01/09/04 | 630 | $8.83 | $5,565 |
| | 01/12/04 | 5,630 | $8.83 | $49,727 |
| | 02/10/04 | 24,702 | $10.33 | $255,254 |
| | 05/04/04 | 31,268 | $10.53 | $329,351 |
| | 05/04/04 | 2,739 | $10.57 | $28,942 |
| | 05/04/04 | 1,436 | $10.63 | $15,255 |
| | 05/04/04 | 450 | $10.54 | $4,743 |
| | 05/04/04 | 315 | $10.57 | $3,331 |
| | 05/04/04 | 300 | $10.55 | $3,164 |
| | 05/04/04 | 150 | $10.58 | $1,587 |
| | 07/01/04 | 21,510 | $15.07 | $324,084 |
| | 07/01/04 | 4,082 | $15.23 | $62,175 |
| | 07/01/04 | 1,316 | $15.11 | $19,873 |

**Advanta Corp.**
**Insider Sales in Class B Common Stock: 10/31/01 - 10/15/06**

| Last Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 07/01/04 | 1,263 | $15.33 | $19,366 |
| | 07/01/04 | 1,080 | $15.17 | $16,387 |
| | 07/01/04 | 750 | $15.17 | $11,375 |
| | 02/01/05 | 3,750 | $15.17 | $56,875 |
| | 02/16/05 | 3,750 | $15.78 | $59,175 |
| | 03/01/05 | 3,299 | $16.03 | $52,886 |
| | 03/01/05 | 452 | $16.13 | $7,284 |
| | 03/16/05 | 2,250 | $15.81 | $35,580 |
| | 03/16/05 | 1,500 | $15.67 | $23,500 |
| | 04/01/05 | 1,500 | $15.33 | $23,000 |
| | 04/01/05 | 1,200 | $15.33 | $18,392 |
| | 04/01/05 | 1,050 | $15.40 | $16,170 |
| | 04/18/05 | 1,950 | $16.17 | $31,525 |
| | 04/18/05 | 1,200 | $16.03 | $19,240 |
| | 04/18/05 | 600 | $16.23 | $9,740 |
| | 05/02/05 | 3,750 | $16.03 | $60,125 |
| | 05/03/05 | 8,178 | $16.07 | $131,393 |
| | 05/03/05 | 5,550 | $16.05 | $89,096 |
| | 05/03/05 | 3,900 | $16.10 | $62,790 |
| | 05/03/05 | 3,300 | $16.03 | $52,910 |
| | 05/03/05 | 35 | $16.13 | $557 |
| | 05/16/05 | 3,600 | $15.27 | $54,960 |
| | 05/16/05 | 150 | $15.30 | $2,295 |
| | 06/01/05 | 2,700 | $16.58 | $44,766 |
| | 06/01/05 | 900 | $16.59 | $14,934 |
| | 06/01/05 | 150 | $16.59 | $2,488 |
| | 06/16/05 | 2,250 | $17.53 | $39,450 |
| | 06/16/05 | 1,500 | $17.57 | $26,350 |
| | 07/01/05 | 1,950 | $18.57 | $36,205 |
| | 07/01/05 | 1,800 | $18.60 | $33,480 |
| | 07/11/05 | 63 | $18.46 | $1,163 |
| | 07/18/05 | 1,437 | $18.60 | $26,728 |
| | 07/18/05 | 1,380 | $19.04 | $26,275 |
| | 07/18/05 | 395 | $18.61 | $7,343 |
| | 07/18/05 | 300 | $19.27 | $5,780 |
| | 07/18/05 | 105 | $18.80 | $1,974 |
| | 07/18/05 | 71 | $18.63 | $1,313 |
| | 08/01/05 | 1,500 | $19.82 | $29,730 |
| | 08/01/05 | 1,200 | $19.90 | $23,880 |
| | 08/01/05 | 1,050 | $19.88 | $20,874 |
| | 08/17/05 | 1,650 | $18.33 | $30,250 |
| | 08/17/05 | 1,200 | $18.43 | $22,120 |
| | 08/17/05 | 900 | $18.40 | $16,560 |
| | 09/01/05 | 1,161 | $18.93 | $21,982 |
| | 09/01/05 | 825 | $19.19 | $15,835 |
| | 09/01/05 | 600 | $19.19 | $11,512 |
| | 09/01/05 | 345 | $19.23 | $6,636 |
| | 09/01/05 | 300 | $19.20 | $5,760 |

- 80 -

**Advanta Corp.**
**Insider Sales in Class B Common Stock: 10/31/01 - 10/15/06**

| Last Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 09/01/05 | 294 | $19.26 | $5,662 |
| | 09/01/05 | 225 | $19.18 | $4,316 |
| | 09/16/05 | 1,800 | $19.53 | $35,160 |
| | 09/16/05 | 900 | $19.59 | $17,628 |
| | 09/16/05 | 750 | $19.66 | $14,745 |
| | 09/16/05 | 300 | $19.67 | $5,900 |
| | 10/03/05 | 1,737 | $18.81 | $32,679 |
| | 10/03/05 | 813 | $18.75 | $15,241 |
| | 10/03/05 | 741 | $18.77 | $13,906 |
| | 10/03/05 | 309 | $18.87 | $5,830 |
| | 10/03/05 | 150 | $18.75 | $2,813 |
| | 10/17/05 | 1,200 | $17.55 | $21,064 |
| | 10/17/05 | 900 | $17.73 | $15,960 |
| | 10/17/05 | 750 | $17.63 | $13,225 |
| | 10/17/05 | 750 | $17.67 | $13,250 |
| | 10/17/05 | 150 | $17.67 | $2,651 |
| | 11/01/05 | 2,360 | $18.70 | $44,123 |
| | 11/01/05 | 1,391 | $18.77 | $26,095 |
| | 11/16/05 | 1,307 | $19.87 | $25,956 |
| | 11/16/05 | 1,200 | $19.40 | $23,280 |
| | 11/16/05 | 750 | $19.73 | $14,800 |
| | 11/16/05 | 150 | $19.99 | $2,999 |
| | 11/16/05 | 150 | $20.01 | $3,002 |
| | 11/16/05 | 150 | $20.02 | $3,003 |
| | 11/16/05 | 44 | $20.03 | $871 |
| | 12/01/05 | 3,488 | $21.60 | $75,330 |
| | 12/01/05 | 263 | $21.63 | $5,677 |
| | 12/16/05 | 2,700 | $20.13 | $54,360 |
| | 12/16/05 | 1,050 | $20.23 | $21,245 |
| | | 201,081 | | $2,951,829 |
| | | | | |
| CARROLL | 08/15/05 | 12,075 | $18.67 | $225,400 |
| | 08/15/05 | 11,172 | $19.24 | $214,949 |
| | 08/15/05 | 9,483 | $19.27 | $182,706 |
| | 08/15/05 | 2,250 | $19.23 | $43,275 |
| | 08/15/05 | 1,350 | $19.26 | $26,001 |
| | 08/15/05 | 1,200 | $19.30 | $23,160 |
| | 08/15/05 | 848 | $19.27 | $16,334 |
| | 08/15/05 | 450 | $19.19 | $8,634 |
| | 08/15/05 | 150 | $19.19 | $2,879 |
| | 08/15/05 | 150 | $19.20 | $2,880 |
| | 08/15/05 | 45 | $19.25 | $866 |
| | 08/16/05 | 2,453 | $18.40 | $45,126 |
| | 08/16/05 | 1,650 | $18.73 | $30,910 |
| | 08/16/05 | 1,350 | $18.43 | $24,885 |
| | 08/16/05 | 375 | $18.67 | $7,003 |
| | 09/01/05 | 3,000 | $19.03 | $57,100 |
| | 09/01/05 | 2,100 | $18.97 | $39,830 |

**Advanta Corp.**
**Insider Sales in Class B Common Stock: 10/31/01 - 10/15/06**

| Last Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | 09/01/05 | 1,800 | $18.98 | $34,164 |
| | 09/01/05 | 1,650 | $18.99 | $31,339 |
| | 09/01/05 | 1,575 | $18.93 | $29,820 |
| | 09/01/05 | 1,500 | $19.00 | $28,500 |
| | 09/01/05 | 1,125 | $18.95 | $21,315 |
| | 09/01/05 | 150 | $18.97 | $2,846 |
| | 09/02/05 | 9,914 | $18.69 | $185,316 |
| | 09/02/05 | 3,150 | $18.69 | $58,863 |
| | 09/02/05 | 2,520 | $18.67 | $47,040 |
| | 09/02/05 | 1,740 | $18.72 | $32,573 |
| | 09/02/05 | 1,622 | $18.70 | $30,322 |
| | 09/02/05 | 1,500 | $18.71 | $28,060 |
| | 09/02/05 | 600 | $18.68 | $11,208 |
| | 09/06/05 | 1,650 | $18.47 | $30,470 |
| | 09/06/05 | 1,125 | $18.85 | $21,203 |
| | 09/06/05 | 975 | $18.47 | $18,012 |
| | | 82,695 | | $1,562,988 |
| | | | | |
| DUNN | 08/02/04 | 13,740 | $14.33 | $196,940 |
| | 08/02/04 | 4,605 | $14.46 | $66,588 |
| | 08/02/04 | 4,350 | $14.47 | $62,930 |
| | 08/02/04 | 3,450 | $14.43 | $49,772 |
| | 08/02/04 | 2,700 | $14.43 | $38,970 |
| | 08/02/04 | 2,550 | $14.41 | $36,737 |
| | 08/02/04 | 1,500 | $14.44 | $21,660 |
| | 08/02/04 | 810 | $14.35 | $11,626 |
| | 08/02/04 | 750 | $14.35 | $10,760 |
| | 08/02/04 | 750 | $14.36 | $10,770 |
| | 08/02/04 | 300 | $14.45 | $4,336 |
| | 08/02/04 | 300 | $14.48 | $4,344 |
| | 08/02/04 | 300 | $14.49 | $4,346 |
| | 08/02/04 | 300 | $14.40 | $4,320 |
| | 08/02/04 | 300 | $14.34 | $4,302 |
| | 08/02/04 | 300 | $14.47 | $4,342 |
| | 08/02/04 | 150 | $14.45 | $2,167 |
| | 08/02/04 | 150 | $14.53 | $2,179 |
| | 08/02/04 | 150 | $14.41 | $2,162 |
| | 08/02/04 | 150 | $14.39 | $2,159 |
| | 08/02/04 | 150 | $14.42 | $2,163 |
| | 08/02/04 | 150 | $14.51 | $2,176 |
| | 08/02/04 | 150 | $14.38 | $2,157 |
| | 08/02/04 | 150 | $14.39 | $2,158 |
| | 05/24/05 | 11,813 | $16.50 | $194,906 |
| | 09/12/06 | 13,500 | $23.67 | $319,500 |
| | 09/12/06 | 2,295 | $23.00 | $52,785 |
| | 09/13/06 | 10,125 | $24.00 | $243,000 |
| | | 75,938 | | $1,360,256 |

**Advanta Corp.**
**Insider Sales in Class B Common Stock: 10/31/01 - 10/15/06**

| Last Name | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| MOORE | 11/04/04 | 5,288 | $16.44 | $86,927 |
| | 11/04/04 | 3,600 | $16.46 | $59,256 |
| | 11/04/04 | 300 | $16.45 | $4,936 |
| | 06/08/05 | 15,000 | $17.33 | $260,000 |
| | | 24,188 | | $411,119 |
| | | | | |
| OLAFSSON | 01/27/04 | 41,700 | $9.50 | $396,150 |
| | | 41,700 | | $396,150 |
| | | | | |
| WEINSTOCK | 05/04/04 | 11,945 | $10.50 | $125,417 |
| | 07/01/04 | 7,500 | $15.07 | $113,000 |
| | 02/01/05 | 5,325 | $15.17 | $80,763 |
| | 02/01/05 | 4,200 | $15.13 | $63,560 |
| | 02/01/05 | 2,715 | $15.20 | $41,268 |
| | 05/03/05 | 11,624 | $16.08 | $186,906 |
| | 05/03/05 | 6,450 | $16.04 | $103,458 |
| | 05/03/05 | 3,150 | $16.13 | $50,799 |
| | 05/03/05 | 377 | $16.03 | $6,037 |
| | 08/01/05 | 5,700 | $19.82 | $112,974 |
| | 08/01/05 | 3,600 | $19.89 | $71,616 |
| | 08/01/05 | 1,500 | $19.95 | $29,920 |
| | 08/01/05 | 450 | $19.89 | $8,949 |
| | 10/03/06 | 675 | $24.44 | $16,497 |
| | 10/03/06 | 450 | $24.43 | $10,995 |
| | | 65,660 | | $1,022,158 |

162.   During the *five* years prior to the Class Period, defendants Botel, Browne, Carroll, Dunn, Moore, Olafsson and Weinstock sold only 544,079 shares of their Advanta stock, resulting in gross proceeds of approximately $8.7 million.  During a *15-month* span of the Class Period, however, these same defendants engaged in a selling spree of 434,461 shares of their Advanta stock for gross proceeds of more than $12.8 million.  Moreover, defendants Blank, Lubner and Rosoff did not sell a single share on the open market in the five years preceding the Class Period.  Even more suspicious, according to Thompson Research, defendant Rosoff's April 26, 2007 sale of 46.33% of his Advanta holdings (excluding vested options) was his first ever open market sale.

163.   Due to the apparent success of Advanta's business, the defendants were well compensated:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Dennis Alter | 08 | 1,000,000 | | 199,401 | 1,016,456 | 0 | 3,056,841 | 306,085 | 5,578,783 |
| Chairman of the Board of | 07 | 992,212 | 0 | 356,971 | 843,850 | 1,026,875 | 1,493,017 | 167,572 | 4,880,497 |
| Directors and Chief Executive Officer | 06 | 595,000 | 334,723 | 446,214 | 499,338 | 0 | 833,409 | 119,762 | 2,828,446 |
| William A. Rosoff | 08 | 750,000 | 0 | 199,401 | 992,382 | 0 | 399,248 | 157,407 | 2,498,438 |
| President and Vice | 07 | 750,000 | 0 | 356,971 | 843,850 | 339,375 | 298,840 | 159,285 | 2,748,321 |
| Chairman of the Board | 06 | 595,000 | 489,723 | 446,214 | 499,338 | 0 | 0 | 137,098 | 2,167,373 |
| Philip M. Browne | 2008 | 597,141 | 0 | 310,142 | 158,331 | 0 | 0 | 114,226 | 1,179,840 |
| Senior Vice President and | 2007 | 577,024 | 6,622 | 220,048 | 168,550 | 0 | 0 | 56,544 | 1,028,788 |
| Chief Financial Officer | 2006 | 558,842 | 123,784 | 275,072 | 125,181 | 0 | 0 | 43,259 | 1,126,138 |
| David B. Weinstock | 2008 | 312,718 | 0 | 132,326 | 71,705 | 0 | 0 | 55,100 | 571,849 |
| Vice President and Chief Accounting Officer | 2007 | 302,222 | 2,771 | 93,386 | 82,040 | 0 | 0 | 35,478 | 515,897 |
| John F. Moore | 2008 | 350,914 | 0 | 133,707 | 60,115 | 0 | 0 | 130,144 | 674,880 |
| President, Advanta | 2007 | 301,204 | 2,764 | 94,409 | 76,601 | 0 | 0 | 103,775 | 578,753 |
| Bank Corp. | 2006 | 292,430 | 11,410 | 117,177 | 54,191 | 0 | 0 | 108,832 | 584,040 |
| Christopher J. Carroll | 2007 | 277,265 | 0 | 0 | 16,072 | 0 | 0 | 340,211 | 633,548 |
| Chief Credit Officer, Advanta Corp. and Advanta Bank Corp. | 2006 | 293,657 | 11,509 | 123,382 | 57,408 | 0 | 0 | 36,800 | 522,756 |

164.     Defendants' insider sales were also unusual in scope compared to their compensation. For example, defendant Rosoff's one-day sale of 375,000 shares resulted in proceeds of over $11.5 million, which was ***more than four times*** his total compensation of approximately $2.1 and $2.7 million for 2006 and 2007, respectively.  Similarly, defendants Browne, Moore, Weinstock and Carroll received approximately $1.02 million, $584,000, $515,000 and $633,000 in total compensation for 2007, respectively.  Yet, their Class Period insider sales earned them much more – profiting more than $2.77 million, $1.01 million, $2.17 million and $1.02 million, respectively.

165.     Defendants Alter and Rosoff were particularly motivated to grow the number of new accounts as transaction volume, the number of new customers, and EPS were the measures that determined whether Alter and Rosoff would receive additional bonuses of over $4.1 million and $1.3 million, respectively, from Advanta's Cash Bonus Plan in 2007.

**Defendants' Actual Knowledge of the Facts Alleged**

166.    Defendants Alter and Rosoff had actual knowledge throughout the Class Period that Advanta's financial results and their statements about those results and the benefits that the supposed "high credit quality customers" were bestowing on the Company were false.  Witnesses, a senior information solutions manager, an executive assistant, and a senior financial/planning analyst have confirmed that, throughout the Class Period, Alter and Rosoff were "hands-on" executives and intimately knowledgeable about Advanta's Business Card segment's business and operations.  A senior financial/planning analyst described Rosoff, Browne, Weinstock and Alter as "100% hands-on."  The senior information solutions manager described Alter as "well-informed," as he literally attended "every meeting imaginable" and was "best friends" with Rosoff.  The senior information solutions manager explained that Alter "knew what was going on," was "extremely hands on," attended "every meeting," and "understood all he needed to support Rosoff."  This is further corroborated by Rosoff's signed Declaration to the United States Bankruptcy Court District of Delaware dated November 8, 2009.  In his Declaration, Rosoff stated that as President and Vice Chairman of Advanta's Board, he was "familiar with the Company's day-to-day operations, business, and financial affairs."  The declaration defined the term "Company" to include Advanta Bank Corp.

167.    Witnesses, the senior information solutions manager, the VP of Innovation and Business Development, and the executive assistant, confirmed that Alter and Rosoff directly oversaw and had final approval authority over the customer credit quality requirements for marketing campaigns and interest rate increases for re-pricing campaigns.  According to the senior information solutions manager, once Rosoff and Alter decided on a re-pricing initiative, Rosoff would issue the directive to carry out that initiative.  The senior information solutions manager explained that Rosoff "saw everything" at Advanta, was intimately connected to every meaningful

detail of the Company's operations, and "nothing surprised Rosoff . . . he knew every number he needed," including anticipated "degradation" of customer accounts, before authorizing a re-pricing initiative. As the senior information solutions manager described it, Rosoff was a "student of the book" (*i.e.*, Advanta's book of business).

168. According to a business modeling analyst, throughout the Class Period, Advanta maintained a modeling group that drew data from Advanta's databases to perform different analytical studies of proposed business plans, including the relative costs and effectiveness of marketing campaigns, and a re-pricing group that generated a model every month to select customers whose interest rates were going to be increased. As the senior information solutions manager confirmed, Advanta's databases contained historical data regarding some of its customers going as far back as 1994, which included every charge, every transaction, every payment, and a myriad other data for every customer. Advanta's databases, according to the senior information solutions manager, also contained the results of every marketing campaign for the preceding 12 years. A business modeling analyst and the senior information solutions manager explained that Advanta's IT systems allowed Advanta employees to easily extract the data from Advanta's databases.

169. The senior information solutions manager said that, through a "management information portal" that served as a daily dashboard reporting system, all senior executives were updated ***daily*** on "all the key drivers of the book of business," such as delinquencies, charge-offs and other data. According to the senior information solutions manager, all senior executives, including defendants Rosoff and Alter, also utilized numerous electronic devices, such as laptop computers and PDAs, in order to keep them completely connected to what was going on at the Company at any time from anywhere, including complete access to the Company's information systems from the executives' homes.

170.   Prior to and throughout the Class Period, defendants Alter and Rosoff met on a regular and ad hoc basis together and with others to discuss every facet of the Business Card segment's business and operations and economic developments in the credit card/lending industry:

(a)   For example, the senior information solutions manager and an executive assistant confirmed that defendants Alter and Rosoff hosted weekly "management roundtable" meetings, known as "Business Card" meetings, every Monday in conference room 3A in the Johnson & Johnson building located in Spring House, Pennsylvania.  According to an executive assistant, these meetings were attended by defendants Browne and Weinstock and involved detailed updates from numerous executives concerning their respective departments.   The senior information solutions manager further detailed that, in total, these meetings were attended by a dozen employees, including defendants Browne and Weinstock, and Dave Griffith and Larry Blackmon.  According to the senior information solutions manager, most attendees utilized "paper decks" during the meetings that set forth the agenda items for discussion, and the meetings generally lasted 90 to 120 minutes. The senior information solutions manager confirmed through first-hand knowledge that "no stone was left unturned" at these Business Card meetings, as the participants regularly discussed the terms and status of marketing and re-pricing campaigns, competitors' operations and economic developments, such as bankruptcy trends.   The senior information solutions manager further explained, for example, that executives at these meetings would discuss how to account for marketing campaigns, whether the various vintages of marketing campaign customers were performing in-line with expectations, and whether re-pricing campaigns were overly "degrad[ing] the book" despite achieving the benefits of meeting analysts' short-term, quarterly expectations through re-pricing campaigns.

(b)   According to the senior information solutions manager, defendants Rosoff and Alter regularly hosted one-on-one meetings with senior executives.  In that regard, according to the

- 87 -

senior information solutions manager, defendant Browne was "always" bringing Alter and Rosoff "updates about whatever was going on in the [lending/credit card] industry," including what was going on with Advanta's competitors, as well as wider economic matters.

(c)     Similarly, defendants Rosoff and Alter regularly met with Chief Credit Officer, defendant Carroll, to discuss the Company's credit standards.  A senior information solutions manager with Advanta for over a decade explained that Carroll also "knows everything" at Advanta and was a key "decision-maker" regarding the Company's credit standards.  The senior information solutions manager also explained that defendant Carroll set and provided the revenue goals for the Business Card segment.  Based on these goals, the analytics and marketing departments communicated their recommendations concerning the number and credit quality of new customers needed to achieve these goals.  Carroll then made a presentation to Rosoff and Alter in order to finalize the details of marketing campaign, including credit-quality standards.

(d)     According to the VP of Innovation and Business Development, defendant Rosoff and other senior executives frequently met with Alev Suer, "especially at the ends of quarters."  Suer, as VP of Marketing and Credit Analytics, was the individual in charge of tracking customer retention figures.  Alev Suer reported to Dave Griffith, the Chief Analytics Officer and SVP, and Griffith reported to defendant Alter.

(e)     Similarly, the senior information solutions manager explained that defendants Alter and Rosoff closely monitored the performance of "vintages."  Dave Griffith regularly reported to Alter and Rosoff on the performance compared to expectations of Advanta's "vintages," which were each associated with a different marketing campaign.  At the outset of a campaign, every vintage had a model of how it was expected to perform and the actual performance of each vintage.

(f)     An executive assistant to various senior executives, including executives involved in discussing re-pricing decisions, for eight years and throughout the Class Period reported

573821_1

that the topic of the Company's re-pricing was the subject of many discussions and meetings among the executives and the impact of the re-pricing campaigns on profit was one of the concerns discussed.

171.    The senior information solutions manager reported that, as part of defendant Rosoff's job responsibilities, Rosoff reviewed the state of the economy, on a daily, weekly and monthly basis.

172.    According to a senior internal auditor, in 2005 and until defendant Carroll left Advanta, Carroll reviewed monthly collections reports for trends that would indicate whether the Company lacked sufficient internal controls to accurately report its delinquency rates and credit losses.  A senior internal auditor explained that prior to October 17, 2005 and November 2006, Carroll reported to senior management that the monthly collections reports revealed a trend of masking customers' delinquencies:

(a)    In response to Carroll's report to senior management in 2005 and 2006, the internal audit department conducted a non-routine audit into whether the "Collections Quality Group" – the collection agents – were masking delinquency rates.  The senior internal auditor, who directly participated in these audits and the formal reports to certain defendants that resulted, explained that Carroll requested through Advanta's chain of command for the audits to be performed.  Carroll directly reported to Tom Mahoney, VP of Corporate Audit.  Tom Mahoney directly reported to defendant Browne, CFO.

(b)    Based on the internal auditor's knowledge of and experience with Company chain of command for authorizing internal audits, the final authorization for the formal initiation of the internal audits came from the Audit Committee of the Board (Blank (until June 4, 2007), Botel, Costello and Stolper), Weinstock, and/or the "Office of the Chair" (which was comprised of Alter, Rosoff and Browne).  The internal auditor explained that regardless of who gave the final authorization, the members of the Audit Committee of the Board, Weinstock, and the Office of the

Chair would all have been contemporaneously informed about the initiation of the non-routine internal audits in 2005 and 2006.

(c)     The internal auditor, who drafted portions of the internal audit's formal reports in 2005 and 2007, recalled that the formal reports were sent on October 17, 2005 and on July 16, 2007 directly to senior management, including defendants Alter, Rosoff, Browne, Weinstock and Carroll, and non-defendants Elizabeth Mai (Chief Administrative Officer, Senior Vice President, Secretary and General Counsel), Michael Coco (Advanta Treasurer), Anne Howley (SVP of Operations/Client Services), Dave Griffith (SVP Credit and Marketing Analysis), Bob Cardwell (Chief Compliance Officer), a KPMG auditor, Kreg Monson (VP Operations) and Tony Morelli (SVP Collections).

(d)     The internal auditor, who directly participated in the 2005 and 2006 internal audits, confirmed through first-hand knowledge that both audits' final findings and corrective recommendations were first orally communicated and then in draft report form to Larry Blackmon and Sue Nocero (Vice President of Collection Services and Fraud Operations in charge of the Collections Quality Group).  Blackmon reported to defendant Browne, and Sue Nocero had a close relationship with defendant Alter.

(e)     The internal auditor stated that "everyone" at the Company became aware of the 2006 audit because, once defendant Carroll went to the FDIC in May of 2007, the FDIC began an investigation that included interviews of Company insiders and the senior internal auditor, which created a "firestorm" at the Company.

173.     As reported in the Company's Forms 10-K for the Class Period, Advanta's "only reportable business segment" was Advanta Business Cards, which issues business purpose credit cards through Advanta Bank Corp.  Thus, Advanta Business Cards was the Company's core operation, representing practically all of the Company's income and revenues – for 2007, 92% of

- 90 -

Advanta's total revenues were derived from Advanta Business Cards as compared to 94% for 2006 and 82% for 2005.  For 2006, over $135.5 million of Advanta's total pretax income of approximately $136.9 million was attributed to Advanta Business Cards.  Advanta also reported that the pretax income generated in 2007 from Advanta Business Cards (over $126.4 million) *exceeded its total pretax income for the entire year* ($115.6 million).

174.    Defendants' statements described herein concerning Advanta Business Cards give rise to a strong inference that defendants knew about the Company's practices that masked delinquency rates, relaxed credit standards, increased the number of poor credit quality customers, and that defendants were sufficiently knowledgeable about the Company and market conditions to know that their statements concerning the Company's core products were false.  In Advanta's Form 10-K Annual Reports for the 2006 and 2007 fiscal years, defendants reported that "Advanta's exclusive focus on the small business market, as well as our size, experience in the small business market and commitment to developing meaningful product offerings and a high level of service tailored to the needs of small businesses, differentiate us from other credit card issuers."  Defendants Alter, Rosoff, Browne, Weinstock, Blank, Botel, Costello, Dunn, Lubner, Olafsson and Stolper signed Advanta's 2006 Form 10-K on February 28, 2007.  With the exception of defendant Blank, who did not seek re-election to the Board in 2007, the same defendants signed Advanta's 2007 Form 10-K on February 28, 2008.  In the Company's 2007 Form 10-K, defendants reported that "We believe that our exclusive focus on the small business market . . . and size enable us to quickly respond to the market environment."

175.    Defendant Carroll "resigned" on November 29, 2007, two days after the partial disclosure on November 27, 2007, announcing the Company's greater exposure to delinquencies.  On December 20, 2007, Carroll signed a Separation Agreement and General Release, in which he was granted $305,787 of separation pay that "exceed[ed] the money and benefits to which he

otherwise would be entitled."  Larry Blackmon, Senior Vice President of Collections, from 2005 through the end of the Class Period left Advanta in the same period as Carroll.  Completing the exodus, Dave Griffith, Chief Analytics Office and SVP, left the Company in November 2007 as well.

### PLAINTIFF'S CONFIDENTIAL SOURCES

176.    The allegations herein are supported by first-hand accounts of confidential sources. These sources are comprised of former employees of Advanta and Advanta Bank Corp. employed during or for many years, including the years just prior to the Class Period, and/or with knowledge of the events alleged herein.  The confidential sources provided facts from different departmental and geographic vantage points within the Company.

177.    The former "senior information solutions manager" was employed by Advanta for over a decade until leaving the Company in the fall of 2006.  Despite the senior information solutions manager's departure, the manager maintained regular contact with Advanta employees during the Class Period concerning the poor credit quality of Advanta's customers and increasing delinquencies in 2007.  As part of the senior information solutions manager's job responsibilities at Advanta, the manager regularly attended and actively participated in weekly Business Card meetings and one-on-one meetings with both defendants Alter and Rosoff.  As the different department heads attended and participated in these meetings, discussing every facet of the Business Card segment, the senior information solutions manager was in a position to know first-hand Advanta's business and operations and how specific Company insiders contributed to the Business Card segment.  The senior information solutions manager's job responsibilities also included ensuring and overseeing that all senior executive officers, including Alter and Rosoff, had constant, comprehensive and trouble-free remote access to the Company's systems and data both at home and while travelling abroad.  Therefore, the senior information solutions manager had first-hand knowledge of the

technology and data readily and frequently utilized by all senior executives in conducting business, especially defendants Alter and Rosoff. For example, as part of this former senior information solutions manager's job responsibilities, the manager was responsible for maintaining the Company's databases, including the Company's "management information portal," an electronic monitoring system that set forth "all the key drivers of the business," including daily electronic updates regarding delinquencies, charge-offs, and other data. In addition, this manager was responsible for building a database at Advanta that allowed all senior executive to access historical data concerning customers, their delinquencies, and the credit metrics of the marketing campaigns. Thus, this confidential source was in a position to know the facts attributed to the former senior information solutions manager throughout this Complaint and is sufficiently reliable.

178.    The former "senior collector" worked for Advanta in Utah for several years before, during and after the Class Period. During this senior collector's tenure, the collector was in good standing and was predominantly assigned to the team responsible for delinquent accounts that were 31-60 days past due, but also worked on accounts that were 91-120 days past due. As an employee in the Collections department, the former senior collector had direct knowledge of the department's policies and the lack of internal controls over Advanta's collection practices. Thus, this confidential source was in a position to know the facts attributed to the former senior collector throughout this Complaint and is sufficiently reliable.

179.    The former "senior internal auditor" worked for Advanta before, during and after the Class Period. The former senior internal auditor reported to and had regular in-person interactions with defendant Carroll, Chief Credit Officer of Advanta. The former senior internal auditor has first-hand knowledge of the two internal audits of the Company's collections practices that masked delinquency rates. The senior internal auditor's first-hand knowledge of these audits stems from the fact that the auditor, while employed by Advanta, conducted due diligence, drafted and edited

- 93 -

portions of the internal audit department's formal reports, discussed the internal audit department's findings with senior management, and reviewed the final formal reports, including their distribution lists, before they were submitted to senior executives, management and the Board in both 2005 and 2007.  Thus, the senior internal auditor had direct and extensive involvement in both the 2005 and the 2006-2007 internal audits of the Company's collections practices.  The senior internal auditor was also in a position to know that defendant Carroll approached the FDIC about the collection practices in May 2007.  Not only did he/she mention that it was a common question to ask at Advanta "did you hear what Chris [Carroll] told the FDIC?", but he/she was personally interviewed by the FDIC in connection with its investigation of Advanta.  As demonstrated herein, the former senior internal auditor's detailed level of knowledge and job responsibilities demonstrate that the auditor was in a position to know first-hand the facts attributed to the former senior internal auditor in the Complaint and is sufficiently reliable.

180.    The former "VP of Innovation and Business Development" worked for Advanta for over a decade before leaving in September 2007.  As part of the VP of Innovation and Business Development's job responsibilities, the VP consulted with other vice presidents on projects to improve Advanta's collection practices and minimize cardholder delinquencies.  During the VP of Innovation and Business Development's tenure, the VP reported to someone the VP considered to be a mentor – the VP of Relationship Consulting (the "Mentor"), who then directly reported to Alter. The former VP of Innovation and Business Development learned from the Mentor that disputes with Alter would lead to early and unexpected retirement.  Upon the Mentor's early and unexpected retirement in the summer of 2006, former VP of Innovation and Business Development received a promotion to replace the Mentor.  Thus, this confidential source was in a position to know the facts attributed to the former VP of Innovation and Business Development throughout this Complaint and is sufficiently reliable.

181.    The former "business modeling analyst" worked for Advanta from 2004 until June 2007.  This business modeling analyst performed analytic work for Advanta's business and re-pricing "modeling" group.  In this capacity, the business modeling analyst was responsible for studying proposed business plans to determine, for example, the relative costs and effectiveness of certain marketing campaigns designed to generate new customers.  As part of this business modeling analyst's work for the re-pricing modeling team, the analyst performed analysis and modeling of proposed re-pricing campaigns to test the accuracy of anticipated profits.  In performing this work, the business modeling analyst relied directly and heavily on the Company's internal data and IT systems.  Thus, this confidential source was in a position to know the facts attributed to the former re-pricing/business modeling analyst throughout this Complaint and is sufficiently reliable.

182.    The former "senior financial/planning analyst" worked for Advanta at its customer call center location for over a decade – before, during and after the Class Period.  During the Class Period, the senior financial/planning analyst's job responsibilities included forecasting and variance analyses for the Company's third-party credit card vendor (First Data Resources) and the IT and customer service departments.  For example, when Advanta expected a marketing campaign to generate new customers, this senior financial/planning analyst was charged with determining the necessary staffing levels for the expected volume, monitoring increases in and reasons for the volume of customer service calls received, and conducting monthly analyses of the impact on staffing of variances from the expected volume.  This senior financial/planning analyst reported to and had regular interactions with VP-level employees who attended and discussed weekly Business Segment meetings with this analyst.  Thus, this confidential source was in a position to know the facts attributed to the former senior financial/planning analyst throughout this Complaint and is sufficiently reliable.

183.    The former "executive assistant" worked for Advanta for many years, including the years before, during and after the Class Period.  This executive assistant provided administrative support to Advanta's Chief Compliance Officer, Chief Risk Officer and VP of Internet Security concerning, *inter alia*, risk issues and re-pricing initiatives.  In this role, the executive assistant learned both first- and second-hand (from conversations with other executives) that many of the discussions and meetings among Advanta's executives involved re-pricing initiatives, and that there was "always a concern" about quantifying the re-pricing initiatives' "impact on profit."  Executives supported by this former executive assistant attended weekly Business Card meetings where the topic of repricing was the subject of many discussions, including compliance with legal and regulatory standards.  Thus, this confidential source was in a position to know the facts attributed to the former executive assistant throughout this Complaint and is sufficiently reliable.

184.    The former "director of strategic operations for client services" worked for Advanta for over a decade, including the years before, during, and after the Class Period.  This director's job responsibilities included supervising and drafting scripts for customer service representatives assigned to Advanta's "main portfolio" and high value portfolio of business card customers.  In this capacity, this director of strategic operations for client services oversaw the content and volume of customer complaints concerning Advanta's re-pricing initiatives and cash rewards program.  As a result, this director of strategic operations for client services attended business meetings wherein the director discussed issues affecting Advanta's different classes of customers and the consequences to Advanta and customers of both re-pricing initiatives and the cash rewards program.  During the Class Period, this director's high-level position resulted in interactions with senior executives.  Thus, this confidential source was in a position to know the facts attributed to the former director of strategic operations for client services throughout this Complaint and is sufficiently reliable.

## LOSS CAUSATION/ECONOMIC LOSS

185.    The markets for Advanta common stock were open, well-developed and efficient at all relevant times.  During the Class Period, as detailed herein, defendants made false and misleading statements regarding the Company's financial results and underlying credit portfolio, and engaged in a scheme to deceive the market.  This artificially inflated Advanta's stock price and operated as a fraud or deceit on the Class.  Later, when defendants' prior misrepresentations and fraudulent conduct began to be revealed to the market, Advanta's stock price fell precipitously, as the prior artificial inflation came out of the stock price.  Plaintiff and other members of the Class purchased or otherwise acquired Advanta's common stock relying upon the integrity of the market price of Advanta's common stock and market information relating to Advanta.  As a result of their purchases of Advanta's securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

186.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Advanta's business, prospects and operation.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Advanta and its business, prospects and operations, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein, upon defendants' revelations of the truth and resulting collapse of Advanta's stock price.

- 97 -

187.    Defendants' false and misleading statements had the intended effect and caused Advanta stock to trade at artificially inflated levels throughout the Class Period, reaching a high of $31.15 per Class A share and $34.07 per Class B share at the close of the markets on June 19, 2007.

188.    On October 25, 2007, the market learned that Advanta's delinquencies and credit losses had significantly increased.  As this information was digested in the market, Advanta's stock price plummeted from a closing price on October 24, 2007 of $19.77 and $22.21, for the Class A and Class B, respectively, to a low of $15.51 and $17.67, respectively.  This represented a 21.5% drop in the Class A shares' value, and a 20.4% drop in the Class B shares' value.  This immediate decrease in Advanta's stock price was a result of the artificial inflation caused by defendants' misleading statements concerning the high credit quality of its portfolio and low delinquency and credit loss rates coming out of the stock price.  This partial revelation was a proximate cause of plaintiff's and Class members' losses.

189.    On November 27, 2007, Advanta announced that it was reducing guidance for 2007, would not be giving earnings guidance for 2008, and that it was reporting higher-than-anticipated delinquencies and charge-offs.  On this news, Advanta's stock price fell from its close the previous day of $11.10 to as low as $10.04 per Class A share, and from $12.23 to as low as $11.01 per Class B share.  The loss in value of the Class A and Class B shares on this day was 9.5% and 10.0%, respectively.  This immediate decrease in Advanta's stock price was a result of the artificial inflation caused by defendants' misleading statements concerning the high credit quality of its portfolio and low delinquency and credit loss rates coming out of the stock price.  This partial revelation was a proximate cause of plaintiff's and Class members' losses.

190.    On January 30, 2008, Advanta admitted that it had to drastically increase its loan loss provisions for the fourth quarter of 2007, representing a charge of $0.39 per share.  Since it had covered up the true condition of its credit quality portfolio by, among other deceptive practices,

masking delinquencies, it had not properly accounted for EPS, net income, pre-tax income, net receivables, credit losses and receivable losses during the Class Period. As the market learned the full extent of the truth about the Company's financial condition that had resulted from Advanta's false characterization of the quality of its credit portfolio and its delinquency and credit loss rates, the stock price slid. As a result of this revelation, Advanta's stock price dropped during unusually heavy trading volume from the previous day's close of $8.38 by 6.3% to a low of $7.85 per Class A share, and from $9.65 by 6.7% to a low of $9.00 per Class B share.

191.    In sum, the significant decline in Advanta's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Advanta's stock price decline negates any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate Advanta's stock price and the subsequent significant decline in the value of Advanta stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

## NO SAFE HARBOR

192.    Advanta's written "Safe Harbor" warnings accompanying its written forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. Its oral "Safe Harbor" warnings accompanying its oral FLS were equally ineffective to shield those statements from liability.

193.    The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Advanta who knew that the FLS was false. In

addition, when defendants chose to communicate information on an issue regarding the company, defendants had a duty to communicate fully so as not to mislead investors.

194.   None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underling or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.   On the contrary, such statements concealed critical information about Advanta's financial performance.

**APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET**

195.   Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   The Company's stock traded in an efficient market;

(d)   The misrepresentation alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)   Plaintiff and other members of the Class purchased Advanta stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

196.   At all relevant times, the market for Advanta stock was efficient for the following reasons, among others:

(a)     Since October 1985, Advanta's stock has been listed and actively traded on the NASDAQ National Market, a highly efficient and automated market;

(b)     As a regulated issuer, Advanta filed periodic public reports with the SEC; and

(c)     Advanta regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## CLASS ACTION ALLEGATIONS

197.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Advanta Class A and/or Class B common stock during the Class Period (the "Class").  Excluded from the Class are defendants.

198.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Before its bankruptcy, Advanta had over 14 million shares of Class A common stock outstanding and nearly 30 million shares of Class B common stock outstanding, owned by hundreds if not thousands of persons.

199.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the prices of Advanta Class A and Class B common stock were artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

200.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

201.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

202.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

**For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against Defendants Alter, Rosoff, Browne, Weinstock, Blank, Botel, Costello, Dunn, Lubner, Olafsson and Stolper**

203.    Plaintiff incorporates ¶¶1-202 by reference.

204.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

205.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Advanta common stock during the Class Period.

206.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Advanta common stock.  Plaintiff and the Class would not have purchased Advanta Class A and Class B common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' false and misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act Against All Defendants

207.    Plaintiff incorporates ¶¶1-206 by reference.

208.    Defendants acted as controlling persons of Advanta within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Advanta stock, defendants had the power and authority to cause Advanta to engage in the wrongful conduct complained of herein.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## COUNT III

### For Violation of §20A of the 1934 Act Against Defendants Blank, Botel, Browne, Carroll, Dunn, Lubner, Moore, Olafsson, Rosoff and Weinstock

209.    Plaintiff incorporates ¶¶1-208 by reference.

210.    Defendants violated §20A of the 1934 Act in that they sold Advanta stock while in possession of material non-public information.

573821_1

211.     During the Class Period, each defendant occupied a position that made him or her privy to non-public information concerning Advanta.  Because of this access, each of the defendants knew that the adverse facts specified herein were being concealed and that false and misleading statements were being made.  Notwithstanding their duty to refrain from trading in Advanta stock while in the possession of material, non-public information concerning Advanta, defendants sold over 900,000 shares of the Company's stock, profiting to the tune of over $27.5 million from their fraudulent scheme while plaintiff purchased contemporaneously.

212.     Plaintiff acquired Advanta Class B common stock on the following days and for the following amounts during the Class Period:

### PLAINTIFF'S SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---------------|------------------------------------|-------|
| 04/19/2007 | 10,650 | $31.30 |
| 05/03/2007 | 600 | $29.99 |
| 07/20/2007 | 150 | $30.21 |

213.     Defendants' Class Period stock sales are set forth in ¶158.

214.     Plaintiff and all other members of the Class who purchased shares of Advanta stock contemporaneously with the sales of Advanta stock by defendants: (1) have suffered substantial damages in that they paid artificially inflated prices for Advanta stock as a result of the violations of §10(b) and Rule 10b-5 herein described; and (2) would not have purchased Advanta stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by defendants' false and misleading statements.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.   Awarding plaintiff and the members of the Class damages, including interest;

C.   Awarding plaintiff's reasonable costs and attorneys' fees; and

D.   Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: August 3, 2010

ROBBINS GELLER RUDMAN
   & DOWD LLP
DOUGLAS R. BRITTON
SHANNON M. MATERA

*Shannon Matera*

SHANNON M. MATERA

655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

LAW OFFICES OF BERNARD M.
   GROSS, P.C.
DEBORAH R. GROSS
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA 19107
Telephone: 215/561-3600
215/561-3000 (fax)

Liaison Counsel

573821_1

<u>DECLARATION OF SERVICE BY MAIL</u>

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.     That on August 3, 2010, declarant served the AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.     That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 3, 2010, at San Diego, California.

_____
KATHLEEN R. JONES

ADVANTA 09

Service List - 8/3/2010     (09-0186)

Page 1 of 1

**Counsel For Defendant(s)**

Michael L. Kichline
Steven B. Feirson
Sarah L. Westbrook
Dechert LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA  19104
   215/994-4000
   215/994-2222 (Fax)

**Counsel For Plaintiff(s)**

Deborah R. Gross
Law Offices Bernard M. Gross, P.C.
100 Penn Square East, Suite 450
Wanamaker Bldg.
Philadelphia, PA  19107
   215/561-3600
   215/561-3000 (Fax)

Darren J. Robbins
Douglas R. Britton
Danielle S. Myers
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
   619/231-1058
   619/231-7423 (Fax)