**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEAMFITTERS LOCAL 449 | : | |
| PENSION FUND, | : | |
|     Plaintiff, | : | |
| | : | CIVIL ACTION |
|        v. | : | NO. 09-4730 |
| | : | |
| DENNIS ALTER, *et al.* | : | |
|     Defendants. | : | |
| | : | |

## MEMORANDUM OPINION AND ORDER

**Rufe, J.**                                                                   **September 30, 2011**

Lead Plaintiff Steamfitters Local 449 Pension Fund ("Plaintiff") brings this securities

fraud class action on behalf of persons and entities that purchased publically traded Advanta

Corp. ("Advanta") securities between October 16, 2006 and January 30, 2008 (the "Class

Period").  The Complaint alleges that Defendants had information about the true state of

Advanta, but engaged in deceptive practices to artificially inflate Advanta's financial results and

stock prices.[1]  Plaintiff also alleges that some Defendants engaged in insider trading, dumping

their stock at high prices based on non-public information about the company, while issuing

announcements designed to keep the stock prices artificially high.

Because Advanta is now in bankruptcy, Plaintiff brings its claims for violations of

---

[1] This Court has also issued a ruling on motions to dismiss in *Underland v. Alter, et al., Case No. 10-3621,* a case which stated claims against Advanta directors and officers pursuant to §§ 11, 12, and 15 of the 1933 Securities Act, and issues a ruling on the motion to dismiss the ERISA claims against Advanta employees and officers, set forth in *Ragan v. Alter, et al., Case No. 09-4974,* contemporaneously with the present ruling.  The Court has separately analyzed each of the complaints in these related cases on its own merits to determine whether the plaintiffs have adequately pled their claims.

Sections 10(b),[2] 20(a),[3] and 20A[4] of the Securities Exchange Act of 1934 ("Exchange Act")

against Advanta's officers and directors, and also against John F. Moore, the president of

Advanta's subsidiary Advanta Bank Corporation ("Bank Corp.").  Defendants move for

dismissal of all counts set forth in Plaintiff's Amended Complaint,[5]  for failure to state a claim

under the Federal Rule of Civil Procedure 12(b)(6) and/or the Private Securities Litigation

Reform Act of 1995 ("PSLRA").  For the reasons set forth herein, Carroll and Moore's Motions

will be granted, the Management Defendants' Motion will be granted in part and denied in part,

and the Outside Director Defendants' Motion will be granted.

## I. FACTUAL BACKGROUND

Plaintiff has filed a detailed, 105-page complaint.  It bases its allegations in large part on

the assertions of a confidential insider witnesses, including a senior information solutions

manager, an executive assistant, a vice-president of innovation and business development, a

senior information solutions manager, and other Advanta employees.[6]

---

[2] 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 ("SEC Rule 10b-5").

[3] 15 U.S.C. §78t(a).

[4] 15 U.S.C. § 78t-1(a).

[5] There are four motions to dismiss before the Court, filed by 1) Christopher J. Carroll; 2) John F. Moore; 3) the Management Defendants (Dennis Alter, William Rosoff, Philip M. Browne, and David B. Weinstock); and 4) the Outside Director Defendants (Robert S. Blank, Max Botel, Thomas P. Costello, Dana Becker Dunn, Ronald Lubner, Olaf Olafsson, and Michael A. Stolper).

[6] The PSLRA does not require plaintiffs to name confidential sources of information, but requires the Court to consider the reliability of the sources, their basis for knowledge, corroborative facts, plausibility of allegations, and other indicia of reliability.  Cal. Pub. Empl. Retirement Sys. v. Chubb Corp., 394 F.3d 126, 147 (3d Cir. 2004). Here, Plaintiff does not name its sources but identifies their former positions in the company, when they held those positions, and how each came to obtain the information upon which Plaintiff relies. Where Plaintiff cites to the content of reports, it indicates who worked on the report, when it was written, and summarizes data the report analyzed.  The Court also finds that the allegations made based on confidential informants are consistent with facts alleged based upon other sources.

Prior to its collapse, Advanta was an issuer of credit cards to small businesses.[7]  It operated its business primarily through its wholly-owned subsidiary, Bank Corp.[8]  Advanta's former senior information solutions manager describes a drastic change in Advanta's formerly conservative approach to adding new customers beginning in 2005.[9]  According to Plaintiff, the new, aggressive approach to the company's growth led the company to engage in problematic business practices during the Class Period, and misleading Advanta investors about the unsound practices.  The material misstatements and omissions to investors led to artificially inflated stock prices.  By fall 2007, Defendants could no longer conceal the truth about Advanta's financial condition, and stock prices began to fall.  Eventually, Plaintiff alleges, the same practices about which investors were misled caused the collapse of the company.

A.  The Misstatements and Omissions

Plaintiff's allegations regarding Advanta's misstatements and omissions to investors fall into three categories: 1) credit quality; 2) delinquency; and 3) repricing.

(1)  *Credit Quality*

Plaintiff alleges that Advanta exaggerated the credit quality of its customers, telling investors it was adding "high credit quality" customers and maintaining average FICO scores above 700,[10] when in fact the credit quality was declining due both to the company's practice of

---

[7] Am. Compl. ¶ 7.

[8] Am. Compl. ¶ 8.

[9] Am. Compl. ¶ 9-11.

[10] For example, on October 31, 2006, Advanta told investors that it had experienced lower than expected net credit losses because it had focused on adding higher quality credit customers, and claimed that Advanta had added 85,000 new customers with an average credit score of 728.

accepting new credit customers with lower and even sub-prime FICO scores[11] and to the loss of more credit-worthy customers because of repricing practices.  In addition, Advanta was issuing cards to riskier businesses, such as construction subcontractors and small start-up companies, for which high FICO scores were not good predictors of Advanta's ability to collect.[12]

(2) *Delinquency*

In 2005, Defendant Carroll initiated an internal audit of the collections department. Plaintiff alleges that the audit resulted in recommendations designed to prevent collections employees from masking true delinquency rates,[13] but by October 2006 the recommendations had not been implemented and the problems persisted.[14]  Carroll initiated another audit at that time.[15] Both audits found that certain collections employees were inaccurately recording loans as current based on "promises to pay," and recording very delinquent loans as less delinquent.[16]  The most past due accounts were most significantly distorted, so that the loans would not be "charged off" and would not deplete the company's loss reserves.[17]  Plaintiff further alleges that company incentive programs rewarded employees who misrepresented delinquency rates, as their financial bonuses (between 25% and 37% of their annual salary) were tied to reducing delinquencies on

---

[11] Am. Compl. ¶ 20.  A former collector for Advanta told Plaintiff that the FICO scores of new customers dropped into the 575-650 range during the Class Period.

[12] Am. Compl. ¶ 21.

[13] Am. Compl. ¶ 23.

[14] Am. Compl. ¶ 24.

[15] Am. Compl. ¶ 25.

[16] Id.

[17] Am. Compl. ¶ 25.

paper, rather than to cash actually collected.[18]  Lack of oversight by management allowed the practice to continue.[19]  This practice caused falsely positive reports of Advanta's receivables, loss reserves, and charge-offs, which are calculated directly from delinquency rates.[20]  Plaintiff alleges that Advanta continued telling investors that its delinquency and charge-off rates were low while conducting the internal audits, and even after it received the results of those audits.[21]  In early 2007, Advanta reported that delinquency rates had improved in the prior fiscal year, and that it was seeing lower losses from newer customers than from older customers.[22]  According to Plaintiff, Advanta continued to misrepresent the credit quality of its customers and the delinquency rates throughout the Class Period.

(3) *Repricing*

Plaintiff alleges that Advanta was repricing its credit cards, i.e. raising interest rates (to 30% for most cardholders) and minimum payments, regardless of the account holder's payment history and credit-worthiness.[23]  Defendants Alter and Rosoff implemented the repricing scheme as a way to raise capital in the short term, despite known, adverse, long-term consequences to the company.[24]  The repricing did lead to short-term increases in revenue, but over time Advanta's high credit-quality customers took their business to other banks where they could get better credit

---

[18] Am. Compl. ¶¶ 22, 24.

[19] Am. Compl. ¶ 24-25.

[20] Am. Compl. ¶ 25.

[21] Am. Compl. ¶ 26-27.

[22] Am. Compl. ¶ 14.

[23] Am. Compl. ¶¶ 17-19.

[24] Am. Compl. ¶ 17.

terms, and its low-credit-quality customers were more likely to default.[25]  Plaintiff alleges that Advanta misled investors by failing to disclose its repricing campaign.  For example, its Form 10-K filed in February 2007 stated that Advanta's products were designed to attract and retain high credit quality customers,[26] when in fact the repricing campaign caused it to lose good customers and created increased delinquencies.[27]

Throughout the Complaint, Plaintiff gives examples of actual statements Advanta made to investors during the Class Period about the company's earnings, credit losses, delinquency rates, and the credit quality of its customers.  These statements, according to the Complaint, were supported with facts and figures about the number of new customers, the average FICO scores, the credit losses, etc., and were not mere "puffery."[28]  Plaintiff also alleges that Defendants had incentives to make false statements about the financial condition of Advanta because they each personally held large quantities of stock in Advanta.[29]

The false statements continued through the end of October 2007.  By the end of October, the company was forced to disclose deteriorating financial results and delinquency problems for the third quarter of 2007.[30]  Upon release of this news, Advanta stock collapsed more than 20%.[31]

-----

[25] Am. Compl. ¶ 18.

[26] Am. Compl. ¶ 15.

[27] Am. Compl. ¶ 18.

[28] See, e.g., Am. Compl. ¶ 26.

[29] Am. Compl. ¶ 158.

[30] Am. Compl. ¶ 30.

[31] Am. Compl. ¶ 31.

More bad news followed in November 2007, when stock values dropped another 9%, [32] and in

January 2008, when stock values fell 6%.[33]

     B.  Culpability of Defendants

     Plaintiff alleges that as officers and directors of Advanta, Defendants had access to

confidential and material information about Advanta's practices, policies, customer base,

financial status, internal audits, and future prospects, and could control both the business itself

and public statements about Advanta (including reports, press releases, statements to securities

analysts, etc.).  Plaintiff also points to some Defendants' sale of their own personal holdings in

Advanta during the Class Period as evidence that Defendants had personal financial incentives to

mislead investors, that they possessed non-public information indicating that Advanta shares

were overvalued, and that their assurances to investors were false.[34]  Plaintiff alleges, for

example, that Carroll sold $644,000 in shares just before Advanta authorized the second internal

audit he requested in October 2006; Rosoff sold $11.9 million in shares just as Carroll was

reporting Advanta to the FDIC; and other Defendants also allegedly sold their shares at key

moments during the Class Period.[35]

     C.  Injury

     Finally, Plaintiff alleges that during the Class Period, when Advanta stock prices were

artifically inflated (allegedly due to Advanta's misrepresentations about the credit quality of the

---

[32] Am. Compl. ¶ 32-33.

[33] Am. Compl. ¶ 35-36.

[34] Am. Compl. ¶ 27.

[35] Am. Compl. ¶ 25, 27, 158.

company's customers, repricing practices, and delinquency rates), some Defendants sold large

percentages of their own Class B shares in Advanta.[36]  Named Plaintiff alleges that it bought

those shares at the inflated prices, in reliance on Advanta's misstatements, beginning in April

2007.[37]

## II.  STANDARD OF REVIEW

Dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure

to state a claim upon which relief can be granted is appropriate where a plaintiff's "plain

statement" does not possess enough substance to show that plaintiff is entitled to relief.[38]  In

determining whether a motion to dismiss should be granted the court must consider those facts

alleged in the complaint, accepting the allegations as true and drawing all logical inferences in

favor of the non-moving party.[39]  Courts are not bound to accept as true legal conclusions

couched as factual allegations.[40]  Something more than a mere *possibility* of a claim must be

alleged; plaintiff must allege "enough facts to state a claim to relief that is plausible on its

face."[41]  The complaint must set forth "direct or inferential allegations respecting all the material

elements necessary to sustain recovery under *some* viable legal theory."[42]  The court has no duty

---

[36] Am. Compl. ¶ 158.

[37] Am. Compl. ¶ 212.

[38] Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007).

[39] ALA Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994); Fay v. Muhlenberg Coll., No. 07-4516, 2008 WL 205227, at *2 (E.D. Pa. Jan. 24, 2008).

[40] Twombly, 550 U.S. at 555, 564.

[41] Id. at 570.

[42] Id. at 562 (quoting CarCariers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984)).

to "conjure up unpleaded facts that might turn a frivolous . . . action into a substantial one."[43]

Securities fraud claims are subject to a heightened pleading standard.[44]  In alleging fraud, a plaintiff must state with particularity the circumstances constituting fraud.  A complaint must identify specific statements alleged to be misleading and the reason why those statements are misleading.[45]

While Rule 9(b) does not require a plaintiff to plead scienter with particularity in a typical fraud claim, the Private Securities Litigation Reform Act ("PSLRA") adds a heightened pleading requirement as to scienter for securities fraud cases.[46]  Plaintiff must state with particularity the facts from which the court can infer that defendant acted with the required scienter.[47]   Then, the Court must look at the complaint as a whole to determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter," and consider "plausible opposing inferences" to determine whether the inference of scienter is "at least as compelling as any opposing inference one could draw from the facts alleged."[48]

## III.  DISCUSSION

### A.  Statute of Limitations for Claims Against Outside Directors, Carroll, and Moore

---

[43] Id. at 562 (citing McGregor v. Industrial Excess Landfill, Inc., 856 F.2d 39, 42-43 (6th Cir. 1988)).

[44] Fed. R. Civ. P. 9(b); 15 U.S.C. §78u-4(b) (the PSLRA); Oran v. Stafford, 226 F.3d 275, 288 (3d Cir. 2000); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997).

[45] Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321 (2007).

[46] 15 U.S.C. § 78u-4(b)(2); In re Suprema Specialties Inc. Sec. Litig., 438 F.3d 256, 277 (3d Cir. 2006) (scienter pleading requirement under the PSLRA is more stringent than the requirements of Rule 9(b) and supercedes Rule 9(b) in Rule 10b-5 actions).

[47] Tellabs, Inc., 551 U.S. at 321.

[48] Id. at 323, 324.

Plaintiff filed its Complaint against Advanta and the Management Defendants (Alter, Rosoff, Browne and Weinstock) on October 14, 2009.  On August 4, 2010, the Complaint was amended to add the Outside Director Defendants (Blank, Botel, Costello, Dunn, Lubner, Olafsson and Stolper), Christopher J. Carroll and John F. Moore.[49]  Those later-added Defendants now argue that the statue of limitations bars Plaintiff's claims against them.

Securities fraud actions must be filed within two years of discovery of the fraud, or five years after the event, whichever is earlier.[50]  The period begins to run at the point that plaintiff knew or reasonably should have discovered facts constituting the violation, including the requisite scienter.[51]  Defendants argue that the facts Plaintiff relies upon in the Amended Complaint to establish Defendants' violation of securities laws were known to Plaintiff no later than January 30, 2008, the last day of the Class Period.  At that time, Plaintiffs knew or could have known, from publically available information, that the company had made the alleged false or misleading statements, that the stock price was plummeting, and that certain managers and directors had sold stock during the class period.  As such, Defendants argue, the August 3, 2010 Amended Complaint must be dismissed as barred by the statute of limitations as to the Outside Directors, Carroll, and Moore.

Plaintiff argues that Defendants have not met their burden of proving that the Amended Complaint was untimely as to the later-added Defendants.  In fact, Plaintiff notes, it did not learn

---

[49] The relation-back doctrine under Fed. R. Civ. P. 15(c)(3) does not apply, as the identities of the Outside Directors, Chief Credit Officer Carroll and Moore were publically available in SEC filings and hence considered to be known to Plaintiff when the initial complaint was filed.  Allen v. AMTRAK, No. 03-3497, 2004 U.S. Dist. LEXIS 24846, at * 32-33 (E.D. Pa. Dec. 7, 2004).

[50] 28 U.S.C. § 1658(b)(1).

[51] Merck & Co., Inc. v. Reynolds, 130 S. Ct. 1784, 1790, 1798 (2010).

until 2010 that the Outside Directors and Moore were aware of the internal audits and the

resulting reports, that Carroll had initiated the internal audits, and that all later-added Defendants

had knowledge of all three alleged fraudulent schemes.  Plaintiff was unable to state claims

against these Defendants until it had evidence of scienter.  When it discovered such evidence,

Plaintiff argues, it timely amended its complaint.  The Court cannot find, as a matter of law, that

Plaintiff's allegations against the later-added defendants are time-barred.  Accordingly, the Court

will consider their Motions to Dismiss on the merits.

B.  Claims Under 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5

In Count I, Plaintiff alleges that Defendants,[52] as well as Advanta itself, which is not a

party to this lawsuit, violated Section 10(b) of the Exchange Act and Rule 10b-5[53] by

disseminating or approving misleading public statements about the company's financial status,

defrauding Plaintiffs and others similarly situated, and causing them to purchase Advanta

common stock during the Class Period at artificially inflated prices.

 Section 10(b) and Rule 10b-5 broadly prohibit misrepresentation by misstatements or

omissions of material information, and fraud.[54]   To state a § 10(b) claim, Plaintiff must allege: 1)

---

[52] The 10(b) claims are not brought against Defendants Carroll and Moore, but are brought against the
Management and Outside Director Defendants.

[53] The Supreme Court has held that a private right of action is implied in the Securities Exchange Act.
Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157, 165-66 (2008).

[54] Section 10(b) reads: "It shall be unlawful for any person, directly or indirectly . . . [t]o use or employ, in
connection with the purchase or sale of any security registered on a national securities exchange . . . any
manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission
may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. §78j.
The Commission implemented Rule 10b-5, which makes it unlawful:

 (a) To employ any device, scheme or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in
 order to make the statements made, in light of the circumstances under which they were made, not

a material misstatement or omission of fact; 2) made with scienter;[55] 3) in connection with the

purchase or sale of a security; 4) upon which Plaintiff relied; 5) economic loss; and 6) loss

causation.[56]  Here, Defendants challenge the adequacy of Plaintiff's allegations regarding the first

and second elements of a § 10(b) claim.

Non-disclosed or misleading information is *material* if a reasonable investor would have

viewed that information "as having *significantly* altered the 'total mix' of information made

available."[57]  Notably, the Securities Exchange Act does not impose "an affirmative duty to

disclose any and all material information," but only that information which is necessary to keep

statements the company opts to provide from being misleading.[58]  The allegations in the

Complaint must "raise a reasonable expectation that discovery will reveal evidence satisfying the

materiality requirement . . . and to allow the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."[59]

Plaintiff must also allege facts from which the Court can plausibly infer that Defendants

acted with the required level of scienter.  To establish that a forward-looking misstatement was

---

misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a
fraud or deceipt upon any person in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5 (2011).

[55] Scienter refers to the mental state of a party; in this context, it refers to an intent to deceive, manipulate or
defraud.  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).

[56] Dura Pharm. Inc. v. Broudo, 544 U.S. 336, 342 (2005).

[57] Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1321 (2011) (internal citations omitted).

[58] Id. at 1321-22.

[59] Id. at 1323 (internal citations omitted).

made with the requisite scienter, Plaintiff must demonstrate that the Defendant had actual knowledge that the information was false.[60]  To establish that other misstatements or omissions were made with the requisite scienter, Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,"[61] and the inference of scienter must be at least as compelling as any plausible opposing inferences which could be drawn from the Complaint.[62]  In this case, the Court will assess whether the inference that Defendants intentionally made material misrepresentations regarding the credit quality, re-pricing, and delinquency issues is *at least as compelling* as the inference that Defendants believed that the information provided to investors was accurate, or that any omissions and misstatements were immaterial.

(1)  *Management Defendants*

Management Defendants argue that Plaintiff's § 10(b) claim against them should be dismissed because: 1) Plaintiff does not plead facts establishing that the challenged statements about credit quality were false or misleading; 2) Plaintiff does not establish that the challenged statements regarding delinquency and omissions regarding the re-pricing strategy were material; and 3) Plaintiff does not adequately plead scienter.

(a) *Misstatements*

Management Defendants argue that they made no misstatements as to FICO scores;   their

---

[60] 15 U.S.C. §78u-5(c)(1)(B).

[61] 15 U.S.C. §78u-4(b)(2)(A).

[62] Tellabs, 551 U.S. at 323; Matrixx, 131 S. Ct. at 1324.

statements about the credit quality of their customers conveyed accurate *average* FICO scores,[63] so although some new customers had lower or even subprime scores, others had higher scores and the overall average was not false or misleading.

While Defendants' contention may ultimately prove to be true, for the purpose of this Motion to Dismiss the Court must accept Plaintiff's allegations as true.  Plaintiff has pled sufficient facts to support their claim that Management Defendants representations regarding the FICO scores and credit quality of their customers were factually inaccurate.

*(b)  Materiality*

Management Defendants also argue that their statements regarding credit quality were "mere puffery" and immaterial even if they were misleading.  In addition, Management Defendants argue that they made no material misstatements or omissions regarding repricing strategies or delinquency reporting.  Statements are immaterial when they are so exaggerated or vague that reasonable investors would not rely on them in considering the total mix of available information.[64]  Omissions are material when there is a substantial likelihood that disclosure of the omitted fact would have significantly altered a reasonable investor's opinion of the total mix of information available.[65]

While statements such as "Advanta's credit quality continues to be among the best in the business" may be mere puffery, Advanta issued other statements which were not "vague and

---

[63] It is not clear whether they used the mean, median, or mode to calculate the average score.

[64] Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 200-01 (3d Cir. 1990).

[65] Id. at 200.

general statements of optimism."[66]   For example, Plaintiff alleges that Advanta informed

investors that it had attracted 97,000 new customers with an average FICO score of 726 during

one quarter.[67]  This is the type of statement upon which reasonable investors might rely in

making investment decisions.

Defendants also argue that the challenged statements are immaterial because Advanta

made other information about the distribution of customers' FICO scores available to investors.

However, taking Plaintiff's allegations as true, there are questions as to the accuracy of this

information as well, including a factual dispute as to whether Advanta used "refresh" scores.[68]

Therefore, the Court cannot find that Advanta's statements about its customers FICO scores were

accurate or immaterial as a matter of law at this stage of the proceedings.

Management Defendants attempt to frame Advanta's statements about credit quality as

forward looking statements protected by the bespeaks caution and safe harbor doctrines.

However, while FICO scores may be used to predict credit worthiness, the actual data collected

about credit quality is not forward looking, and the truth of the statements about credit quality

was knowable at the time the statements were made.  Therefore, while statements predicting

future payments based on credit quality are forward looking, statements describing the credit

quality of customers are not.  Cautionary statements about the predictive value do not change the

materiality of any misstatements made about the credit quality data.

Regarding the repricing strategy, Management Defendants first argue that they made no

---

[66] In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3d Cir. 1999)

[67] Am. Compl. ¶ 26.  See also Am. Compl. ¶¶ 58, 74, 87, 96.

[68] A credit card issuer may opt to obtain the credit scores of its customers only once, at the time of application, or may "refresh" scores by periodically updating the credit ratings for existing customers.

material omissions, as they informed investors that they engaged in ongoing credit monitoring of customers and adjusted pricing and credit lines when factors indicated a risk of future non-payment.  What Plaintiff alleges, however, is that Defendants neglected to tell investors that they were adversely adjusting pricing *even for those customers who did not pose a risk of non-payment*.  This led credit-worthy customers to take their business to other banks where they could obtain more favorable credit terms.

Management Defendants also argue that Plaintiff does not link the repricing strategy to financially meaningful outcomes, and therefore has not adequately alleged that the omitted fact would have significantly altered a reasonable investor's opinion of the total mix of information available.  The Court disagrees.  For the purpose of this motion, Plaintiff's allegations that the repricing scheme affected all customers, regardless of credit history, and that it increased delinquencies and caused the loss of high-credit-quality customers, are sufficient.  The degree of impact is a matter for discovery, but the Court can readily infer, from the facts alleged, that the repricing did create a negative financial impact in the longer term.

Defendants also argue that their internal audits found that only two of their hundreds of employers in collections were misreporting delinquencies, and the audit did not show that these misreports had a material effect on the financial performance of the company.  While discovery may bear out this argument, at this stage in the litigation Plaintiff's allegations that delinquencies were misreported, Management Defendants knew of the misreporting, and Management Defendants calculated and reported other financial statistics and made projections based on these inaccurate delinquency numbers, understating credit losses by at least $25.2 million, are

16

sufficient.[69]  In finding that the Amended Complaint adequately alleged that the collection

practices had a material impact on the company's statements to investors, the Court also

considers the fact that the company itself found the collections department practices warranted

two internal audits, and the FDIC launched an investigation of the collections department

practices and found problematic practices.

*(c)  Scienter*

Management Defendants argue that Plaintiff has not adquately pled scienter, as it has not

created a strong inference of scienter which is "cogent and at least as compelling as any opposing

inference of non-fraudulent intent."[70]  Defendants focus their argument on whether Plaintiff has

clearly established motive.

Plaintiffs may use factual allegations demonstrating that Defendants had a motive to

commit fraud to bolster a inference of scienter.[71]  In this case, Plaintiff alleges two sources of

motive: 1) Alter's and Rosoff's compensation was tied to the Company's financial growth; and

2) all Management Defendants owned large amounts of stock in the company, and benefitted by

sale of their shares which were unusual in scope and/or timing.  While the first is not a strong

indicator of scienter,[72] the latter can be where: 1) insiders sold stock during the Class Period; 2)

insiders did not purchase stock during the class period; and 3) sales were significant in relation to

their holdings.

---

[69] Am. Compl. ¶ 22.

[70] Tellabs, 551 U.S. at 314.

[71] Tellabs, 551 U.S. at 325; Instit. Investors Grp. V. Avaya, Inc., 564 F.3d 242, 277 (3d Cir. 2009);  Leder v. Shinfeld, No. 06-1805, 2008 U.S. Dist. LEXIS 40925, at *23 (E.D. Pa. May 22, 2008).

[72] See GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2004).

Most Defendants in this case did sell large percentages (ranging from 26% to 100%) of their unrestricted shares in the company during the Class Period, and the timing of these sales could give rise to an inference that Defendants timed the trades based on inside information they possessed.  Management Defendants point out that three of the eleven Defendants named in Count I did not sell stock during the Class Period, including Management Defendant Alter, and two members of the audit committee, Outside Director Defendants Costello[73] and Stolper. Defendants Lubner,[74] Costello and Stolper actually purchased Advanta shares during the Class Period (specifically, in October and November 2007, after stock prices began to fall).  However, Plaintiff alleged that three of the four Management Defendants sold significant amounts of stock during this period (Browne sold 38% of his unrestricted shares, Rosoff sold 46%, and Weinstock sold 61%), and Alter sold a large percentage of his stock just before the Class Period began.

Additionally, Defendants point out that many of the sales occurred months in advance of the announcements which caused the stock prices to fall, and that this temporal distance between stock sales and the disclosure of disadvantageous news can defeat an inference of scienter.[75] Many Defendants sold their stock four months or more before the first disclosure of negative financial news– a gap significant enough to defeat an inference of scienter if other facts do not give rise to such an inference.[76]  However, Plaintiff has alleged that five of the Defendants initiated their selling sprees concurrently with the discovery the company had not corrected its

---

[73] Plaintiff notes that Costello was a new employee and did not own any Advanta stock.

[74] Lubner sold shares during the Class Period also, but Defendant says that he bought 13,250 more shares than he sold during that period.

[75] In re Party City Sec. Litig., 147 F. Supp. 2d 282, 313 (D.N.J. 2001).

[76] Id.

18

collection practices following the 2005 audit, and additional Defendants sold large amounts of stock after the second audit was completed but before the devastating announcements in Fall 2007.

In addition, Defendants argue that the stock options were part of Defendants' compensation packages year after year, and therefore they were sold in the ordinary course of events.[77]  Plaintiff  provides some information about Defendants' stock sales in previous years, presumably so that the Court can compare prior sales to Class Period sales.  Unfortunately Plaintiff does not provide key information about the number of shares each Plaintiffs earned as compensation, the percentage they sold, etc. prior to 2006,[78] and so the Court cannot determine whether the Class Period stock sales were truly unusual in scope or timing.[79]

Taken as a whole, although Plaintiff's pleadings regarding motive are suggestive, they are not conclusive.  However, the Court can also infer fraudulent intent (scienter) from facts demonstrating an extreme and reckless or conscious departure from standards of ordinary care.[80] In this context, Plaintiff has alleged that Management Defendants were in possession of information which contradicted their representations to investors, and knowingly or recklessly mislead investors.[81]

---

[77] In re Burlington Coat Factory, 114 F. 3d at 1424.

[78] Am. Compl. ¶ 161, 163.

[79] In re Party City, 147 F. Supp. 2d at 313.

[80] In re Party City, 147 F. Supp. 2d at 315 (citing In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 40 (2d Cir. 2000)) (holding that it is sufficient for Plaintiffs to allege defendants' knowledge of facts or access to information contradicting their public statements; inference of recklessness may also be inferred from refusal to see the obvious, or to investigate the doubtful).

[81] Avaya, 564 F.3d at 268-69.

First, Plaintiff alleges that Alter and Rosoff had actual knowledge that Advanta's reported financial results and statements about the financial health of the company were false or misleading, and cite insider reports that Alter and Rosoff were "hands-on" executives to support this conclusion.[82]  Plaintiff also alleges that Alter and Rosoff directly approved the customer credit quality requirements and the repricing schemes.[83]  Plaintiff further alleges that all senior executives were informed of the three allegedly fraudulent schemes, through management roundtables, one-on-one meetings, and other means.[84]  Specific facts are alleged to show that all Management Defendants were aware of the repricing scheme, the credit quality of customers, and/or the delinquency issue, and that they allowed the practices to continue in order to meet short-term Wall Street expectations, knowing the long-term risks.  In addition, Plaintiff alleges that Alter, Rosoff, Browne, and Weinstock prepared, controlled, and/or signed SEC filings, quarterly reports, press releases, and other presentations to investors, and knew that the contents of those message were contradicted by facts in their possession.[85]  Therefore, Plaintiff has sufficiently pled that Management Defendants knew or should have known about the serious problems with Advanta and recklessly or consciously made false and misleading statements about the company's financial status.

(d)  *Conclusion*

---

[82] Am. Compl. ¶ 166-167.

[83] Am. Compl. ¶ 167.

[84] Am. Compl. ¶ 170.

[85] Am. Compl. ¶¶ 42, 43, 44, 46, 55.

20

Taking the allegations as a whole, the Court finds that they give rise to a cogent and compelling inference that the Management Defendants elected to issue misstatements about credit quality and delinquencies, and to omit statements about their re-pricing scheme, with knowledge that the information was materially misleading and of the likely effect the information would have on the market.[86]  This inference is at least as compelling as the opposing inferences Defendants urge the Court to draw from the allegations.  Hence, the Court finds that Plaintiff has adequately pled a Section 10(b) claim at this stage of the proceedings.

(2) *Outside Directors*

Outside Director Defendants (Blank, Botel, Costello, Dunn, Lubner, Olafsson and Stolper) join in Management Defendants' Motion to Dismiss, and also file their own Motion to Dismiss.  Outside Director Defendants argue: 1) Plaintiff failed to plead facts demonstrating that the Outside Directors, individually, made false statements to investors; and 2) Plaintiff failed to create a strong inference of scienter for any of the Outside Director Defendants.

(a) *False Statements*

Plaintiff alleges that each of the Outside Director Defendants personally signed an SEC Form 10-K filing during the class period, and that the filing contained materially false or misleading statements about the company.[87]   If the individual Outside Director Defendants acted with the requisite scienter, misrepresentations in the filings they signed may be attributed to them in a § 10(b) claim, regardless of whether they participated in drafting the document.[88]  Courts

---

[86] See Matrixx, 131 S. Ct. at 1324-25.

[87] Am. Compl. ¶ 174.

[88] In re DVI, Inc. Sec. Litig., No. 03-5336, 2010 WL 3522086, at *5 (E.D. Pa., Sept. 3, 2010); In re Reliance Sec. Litig., 135 F. Supp. 2d 480, 504 (D. Del. 2001).

assume that corporate officers have read the SEC filings they sign, and in signing attest to their accuracy and accept responsibility for the contents.[89]   Therefore, whether or not Plaintiff has stated a claim will turn on whether Plaintiff has adequately alleged that each Outside Director acted with scienter.

(b) *Scienter*

Defendants argue that Plaintiff's allegations of scienter are inadequate.  Plaintiff contends that it has adequately pled that Outside Director Defendants were involved in and knew the results of the internal audits, and knowingly or recklessly sanctioned misstatements based upon under-reported delinquency rates.  Plaintiff also points to various Outside Director Defendant's stock sales, which are alleged to be suspect in timing and scope, to bolster an inference of scienter.

Defendants Blank, Botel, Costello and Stolper held positions on Advanta's Audit Committee, and as committee members are alleged to have authorized the internal audits on the collection department in 2005 and 2006.[90]   Plaintiff does not specifically allege that these Defendants were privy to the findings of the audit, but rather generally alleged that "everyone" at the company became aware of them.[91]   This is insufficient to satisfy the heightened pleading standard imposed by the PSLRA.  As such, the Court can infer that they were aware of the concerns which led to the audits, and not necessarily to the problems disclosed by the audits. Plaintiff alleges that the other three Outside Directors also had actual knowledge of the audits

---

[89] <u>Howard v. Everex Sys. Inc.</u>, 228 F.3d 1057, 1061-62 (9th Cir. 2000); <u>In re Cabletron Sys. Inc.</u>, 311 F.3d 11, 41 (1st Cir. 2002).

[90] Am. Compl. ¶ 25, 172.

[91] Am. Compl. ¶ 172.

and their reports, without any factual support for these allegations.  Taking the Complaint as a whole, the Court cannot infer that Outside Director Defendants had knowledge that the SEC filings they signed were false or misleading, or that these Defendants were reckless as to the truth of the filings.

The Court turns, then, to Plaintiff's argument that the Court can infer scienter from stock sales which were unusual in scope or timing.  Plaintiff alleges that Blank sold all of his shares in Advanta when he resigned from the Board of Directors in May 2007, at which time he sold all of his shares.  However, courts have generally found that "sales by corporate insiders in anticipation of their departures from a company [are not] suspicious."[92]  Costello and Stolper did not sell any shares, and in fact purchased shares; Lubner bought more shares than he sold.  Botel, Dunn, and Olafsson did sell large amounts of personally-held Advanta stock during the Class Period, but as these purchases occurred months prior to the public announcements which caused stock prices to fall,[93] and there are no factual allegations that these particular individuals had insider knowledge which made the timing of their sales unusual or suspicious, the Court cannot infer scienter from the sale of their stock.

Accordingly, Count I of Plaintiff's complaint against the Outside Director Defendants will be dismissed for failure to state a claim.

C.  Claims Under Section 20(a) of the Securities Exchange Act

Count II of the Complaint alleges that each Defendant had the power and authority to

---

[92] In re Radian Sec. Litig., 612 F. Supp. 2d 594, 612 (E.D. Pa. 2009).

[93] See In re Party City, 147 F. Supp. 2d at 313 (a stretch of weeks or months between stock sales and disclosure of bad news defeats an inference of scienter).

control Advanta and to prevent the wrongful conduct complained of in Count I, but failed to do so.

Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.[94]

Under Third Circuit law, it is not necessary that "the controlled [entity, in this case Advanta,] be named as a defendant as a predicate to imposing liability upon the controlling individual defendants. A plaintiff need only establish the controlled [entity's] liability."[95] Plaintiff has adequately pled Advanta's liability in making its Section 10(b) claims, and can proceed against Defendants notwithstanding the fact that Advanta is no longer named as a defendant in this case due to bankruptcy.

Plaintiff argues that it has adequately pled that all Defendants violated § 20(a) of the Exchange Act as it has alleged: (1) Defendants had the ability to exert control over Advanta, and (2) Defendants and/or Advanta committed a primary violation of securities law (in this case § 10(b)).[96]

(1)  *Management Defendants*

Plaintiff has adequately stated a Section 20(a) claim against the Management Defendants at this stage in the proceedings, because Plantiff has alleged that they had the ability to exert

---

[94] 15 U.S.C. § 78t(a).

[95] In re Suprema, 438 F.3d at 284.

[96] Id. at 285.

control over Advanta, and Plaintiff has adequately stated a claim against them under Section 10(b), as the Court has already determined *supra*.[97]

### (2) *Outside Director Defendants*

Since the Court has found that Plaintiff has not stated a claim against the Outside Director Defendants under § 10(b), Plaintiff must satisfy *three* elements to state a claim under § 20(a): 1) an underlying violation by Advanta; 2) circumstances indicating control over the company's actions; and 3) culpable participation in the wrongful actions.[98]  As discussed in detail above, the Court finds that Plaintiff has not pled with particularity that the Outside Director Defendants culpably participated in the alleged fraud.  Accordingly, this count against the Outside Director Defendants will also be dismissed.

### (3) *Christopher J. Carroll*

Plaintiff does not allege that Carroll committed fraud in violation of § 10(b), but alleges that he was in a position to control Advanta during the Class Period, and so brings a § 20(a) claim against him.  Carroll challenges the adequacy of the § 20(a) claim, arguing that the Complaint does not adequately plead the elements of control.  Carroll also argues that because Plaintiff does not allege that Carroll himself engaged in fraud under § 10(b), Plaintiff must allege that Carroll was a culpable participant in the 10(b) violation allegedly committed by Advanta in

---

[97] Section III B(1).

[98]  The Third Circuit has held that Congress intended liability under § 20(a) to be premised on something other than control, and has clearly established that culpable participation is an element of a § 20(a) claim.  In re Suprema, 438 F.3d at 284 n. 16(secondary liability cannot be shown under § 20(a) unless it can be shown that defendant was a culpable participant in the fraud) (citing Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 890 (3d Cir. 1975)).

order to state a claim under § 20(a).[99]

Carroll argues that Plaintiff has failed to plead facts demonstrating that he controlled Advanta's conduct insofar as it relates to the three fraudulent schemes alleged. Plaintiff did not allege that Carroll made any of the misstatements or signed any SEC filings.  Although Plaintiff pleads that Carroll knew or should have known of the practices that were allegedly fraudulently misrepresented to the public, pleading *knowledge* of the facts underlying the fraud, or even knowledge of the fraud itself, is simply not enough to establish culpable *participation* in the securities violation by an allegedly controlling person.[100]

Plaintiff alleges that Carroll instigated two internal audits related to delinquency practices, and eventually unilaterally reported Advanta to the FDIC when the company did not make the recommended changes in its practices.  From the fact that he took the drastic step of reporting his employer to the FDIC, the Court finds it more probable to infer that Carroll was frustrated with his *inability* to exert control over the practices of the company than to infer that Carroll was controlling the company as it engaged in fraudulent behavior.  Plaintiff simply does not point to any other facts from which the Court can infer that Carroll controlled or could have controlled any of the allegedly fraudulent statements issued by the company.

Plaintiff asks the Court to consider allegations that Carroll's stock sales were suspicious in amount or timing in determining whether Plaintiff has sufficiently culpable participation in Advanta's fraudulent behavior, as that may indicate motive (personal financial gain).[101]  Here, the

---

[99] In re Suprema, 438 F.3d at 284 n. 16

[100] In re Digital Island Sec. Litig., 223 F. Supp. 2d 546, 563 (D.Del. 2002).

[101] In re Suprema, 438 F.3d at 277.

Court does find that Carroll's stock sales were suspicious in both amount and timing.[102]
However, this is not sufficient to show culpable participation in the securities violation here,
where Plaintiff has also alleged that Carroll initiated two internal audits and later an FDIC
investigation of the company's delinquency reporting.  Looking at the Complaint as a whole, the
Court finds that the inference that Carroll *did not intend* to participate in Advanta's alleged
fraudulent activities is more compelling than an inference that he acted with scienter.

    (4)  *John F. Moore*

Moore is the former president of Bank Corp., and was not an officer or director of
Advanta.  His position in the subsidiary is not, without more, sufficient to establish that he was in
a position to control the parent company.[103]  Plaintiff does not allege that Moore or his employer,
Bank Corp., violated § 10(b).  Plaintiff raises the §20(a) claim without asserting any facts from
which the Court can infer that Moore could potentially influence or control Advanta, the parent
company of his employer.  Plaintiff does not specifically allege that Moore was in a position to
make or did make any false statements, direct others to make any false statements, or sign SEC
filings on behalf of Advanta.  These significant gaps in the pleadings are grounds for dismissal of
Plaintiff's § 20(a) claim against Moore, even at the pleading stage of litigation.[104]

    D.    Claims under § 20A of the Exchange Act

---

[102] Carroll points out that he sold even more shares at a higher price in 2005, but while this is outside of the Class Period, Plaintiff has alleged that Carroll knew of problems with the company's delinquency records in 2005 as well, initiating an audit then.  Therefore, this is not an informative comparator for the Court.

[103] Copeland v. Grumet, 88 F. Supp. 2d 326 (D.N.J. 1999) (alleging than an individual is an officer of a subsidiary is not sufficient for the court to infer that the individual is a person who controls a parent corporation under Securities Exchange Act).

[104] Antinoph v. Laverall Reynolds Sec., Inc. No. 88-3664, 1989 U.S. Dist. LEXIS 10541 (E.D. Pa. Sept. 5, 1989) (dismissing a § 20(a) claim against defendant who was not an employee of and was not a manager or director of the entity accused of violating § 10(b)).

Count III alleges that certain Defendants engaged in insider trading, selling their own Advanta stocks while in possession of material, non-public information about the company, in violation of Exchange Act § 20A.  To state a claim under § 20A, Plaintiff must allege: (1) Defendant sold stock; (2) contemporaneously with Plaintiff's purchase of stock; (3) while in possession of material, undisclosed information; (4) while committing a separate violation of the Securities Act (predicate act requirement).[105]   Section 20A does not define the term "contemporaneous," and the Third Circuit has not spoken on this issue.  However, some district courts within the Third Circuit have required plaintiffs to plead that they purchased stock on the same dates on which the defendant's sales took place.[106]   This Court will do likewise.

(1)  *Management Defendants*

Plaintiff alleges that Management Defendants Rosoff, Browne and Weinstock have violated Section 20A.  Management Defendants move to dismiss this claim, arguing that Plaintiff has not demonstrated that Plaintiff's purchase of stock was contemporaneous with Defendants' sale of Advanta stock.

Plaintiff alleges that it purchased Advanta stock on April 19, 2007 (10,650 shares), May 3, 2007 (600 shares) and July 20, 2007 (150 shares).[107]   Rosoff sold stock only on April 26, 2007 (375,000 shares).[108]   Browne sold stock on many dates, including one day prior to each of Plaintiff's purchases (April 18, 2007 (3000 shares), May 2, 2007 (3000 shares) and  July 18-19,

---

[105] In re Advanta Corp. Sec. Litig., 180 F.3d at 541.

[106] Copland, 88 F. Supp. 2d at 338; In re Able Laboratories Securities Litig., No. 05-2681, 2008 WL 1967509, at *26 (D.N.J. Mar. 24, 2008).

[107] Am. Compl. ¶ 212

[108] Am Compl. ¶ 158.

2007 (3000 shares)).[109]  Weinstock sold some of his shares on April 16, 2007 (1125 shares), May

1, 2007 (1125 shares) and July 16, 2007 (1125 shares)[110]– two to four days prior to each of

Plaintiff's purchases.  Although some of these sales were very close in time to Plaintiff's

purchase, they did not occur on the same day.  Thus, the Court finds that Plaintiff has failed to

state a claim under § 20A against the Management Defendants.

Plaintiff argues that it is premature to dismiss this claim, as other (as yet unidentified)

members of the putative class may have purchased stock contemporaneously with Defendants.

However, the Court finds it must dismiss the claim based upon the allegations before it at this

time.

(2)  *Outside Directors*

Plaintiff alleges that Outside Director Defendants Blank, Botel, Dunn, Lubner and

Olaffson engaged in insider trading in violation of § 20A. The Outside Director Defendants argue

that Plaintiff failed to meet the predicate act requirement, as Plaintiff has not adequately pled that

these Defendants violated §§ 10(b) or 20(a), and that Plaintiff has not pled that it purchased stock

contemporaneously with Defendants' sales.

The Court has found that Plaintiff's §§ 10(b) and 20(a) claims against Outside Director

Defendants must be dismissed for failure to state a claim.  Hence, the claims under § 20A must

be dismissed as a matter of law.  Additionally, the Court notes that Plaintiff did not purchase

Advanta stock contemporaneously with the Outside Directors' sale of stock, and so has not

satisfied the contemporaneous trading requirement.

---

[109] Id.

[110] Id.

29

(3)  *Christopher J. Carroll*

Carroll argues that Plaintiff failed to plead that he committed a predicate act, and so Plaintiff cannot sustain a § 20A against him.  Indeed, Plaintiff did not bring a § 10(b) claim against Carroll, and as noted above, Plaintiff has not adequately pled a § 20(a) claim against him. For this reason alone, the Court must dismiss the § 20A claim.

In addition, the Court finds that Plaintiff does not have standing to bring this claim, as they have not alleged that they purchased Advanta stock contemporaneously with Carroll's sale of the stock, and therefore could not have been injured by Carroll's sale.  Named Plaintiff's first documented purchase of Advanta stock occurred nearly five months after Carroll's last sale of stock.[111]  Carroll's stock sales and Plaintiff's stock purchases were not contemporaneous, the Court finds an additional basis on which to dismiss this claim against Carrroll.

(4)  *John F. Moore*

Plaintiff also asserts a §20A claim against Moore.[112]  However, this claim will also be dismissed, as Plaintiff has again failed to meet the predicate act requirement.  Plaintiff did not allege that Moore violated § 10(b), and the Court is dismissing the claim that Moore violated § 20(a) for failure to state a claim.  In addition, Moore's stock sales and Plaintiff's stock purchases were not contemporaneous, as the sales preceded the purchases by a minimum of seventeen days.

**IV.  <u>CONCLUSION</u>**

For the reasons set forth above, the Court will dismiss the Count I claims against the

---

[111] Carroll sold 82,000 shares in August and September 2005, and 39,000 shares in October and November 2006.  Named Plaintiff alleges that it began purchasing Advanta stock in April 2007.

[112] Moore sold nearly 43% of his Advanta stock between January 3, 2007 and April 2, 2007, for proceeds in excess of $1 million.

Outside Director Defendants, the Count II claims against the Outside Director Defendants,

Carroll, and Moore, and the Count III claims against all Defendants.